**FOR THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **JOHN DOE P.M.** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 16-cv-2315** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **MARK E. WISNER** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>PLAINTIFF'S PROPOSED FINDINGS OF FACT & MEMORANDUM OF LAW</u>**

Plaintiff John Doe P.M. by and through counsel, submits proposed Findings of Fact and Memorandum of Law, pursuant to F.R.C.P. Rule 52.01, as follows:

## TABLE OF CONTENTS

FINDINGS OF FACT .................................................................................................. 4

*Dr. Kelley's Qualifications & Clinical Experience* .................................................. 4

*Role of Physician Extenders in Primary Care Medicine* ......................................... 6

*Scope of Wisner's Practice & Job Duties* ................................................................ 7

*Foundation for the Standard of Care* ..................................................................... 15

*Freedom Allowed by VA* ......................................................................................... 17

*Wisner's Conduct Arose in the Course of Providing Medical Care* ....................... 27

*Wisner's Medical Treatment Provided to Plaintiff* ................................................ 29

*Deviations from the Standard of Care* ................................................................... 34

*Defendant's Theory of the Standard of Care* ......................................................... 40

*Wisner's Intent* ....................................................................................................... 42

*Wisner's Prescription Practices* ............................................................................ 44

*Wisner was an Impaired Practitioner* .................................................................... 51

*VHA Policies Recognize Potential for Patient Abuse* ............................................ 55

*Foreseeability of Wisner's Conduct* ....................................................................... 59

*Plaintiff's Military Service* ..................................................................................... 78

*Post-Wisner VA Medical Care* ............................................................................... 89

*Dr. Peterson's Forensic Psychiatric Evaluation* .................................................... 91

*Defendant's Psychiatric Opinions* ....................................................................... 115

*Harm to Wisner's Patients* ................................................................................................... 117

*Harm to Plaintiff* ................................................................................................................... 118

*Harm to Plaintiff Witnessed by His Mother* ........................................................................ 123

*The VA Cannot and Will Not Provide Care to Plaintiff for PTSD related to Wisner* ............. 129

*Plaintiff is Committed to Recovery* ...................................................................................... 130

*Dr. Ward's Calculation of Economic Damages* ................................................................... 131

*Accountability of the VA* ....................................................................................................... 135

**MEMORANDUM OF LAW** .................................................................................................... **137**

    A.  INTRODUCTION ..................................................................................................... 137

    B.  NONECONOMIC DAMAGES .................................................................................. 137

    C.  SCOPE OF EMPLOYMENT ................................................................................... 140

    D.  IMMUNITY ............................................................................................................... 144

    E.  CONCLUSION ......................................................................................................... 146

**FINDINGS OF FACT**

1.      Plaintiff is 37 years old. (9/3/20 Tr., 49:5-6).

2.      Plaintiff received medical care at the Leavenworth VA Medical Center ("VAMC")
in Leavenworth, Kansas.  (Exh. 286, p. 5-6).

3.      The Leavenworth VA Medical Center is operated by the Department of Veterans
Affairs. (Exh. 286, p. 5).

### *Dr. Kelley's Qualifications & Clinical Experience*

4.      Dr. Kelley is a physician with a medical degree practicing in the area of family
medicine.  (8/31/20 Tr., 2-7).

5.      Dr. Kelley is board certified by the American Board of Family Medicine since 1998
until 2024.  (8/31/20 Tr., 43:10-17).

6.      Family medicine is primary care medicine.  (8/31/20 Tr., 43:8-9).

7.      Dr. Kelley has been certified by the national board of medical examiners for 24
years.  (8/31/20 Tr., 43:18-23).

8.      Dr. Kelley has been licensed to practice medicine in Missouri for 24 years.  (8/31/20
Tr., 43:24 – 44:1).

9.      Dr. Kelley maintains a full-time clinical practice.  (8/31/20 Tr., 44:2-3).

10.     Dr. Kelley holds a bachelor of arts in psychology from University of Omaha,
Nebraska; a master's of science in counseling from Creighton University; and a medical degree
from the University of Kansas School of Medicine completed in 1995.  (8/31/20 Tr., 44:14-20).

11.     Dr. Kelley completed his family medicine residency at Trinity Lutheran Hospital
in Kansas City from July 1995 until June 1998.  (8/31/20 Tr., 44:21 – 45:2).

12.     Dr. Kelley has served as a clinical instructor for the University of Kansas School of Medicine from 1999 to the present.  (8/31/20 Tr., 45:3-12).

13.     As a clinical instructor, Dr. Kelley supervises and teaches medical students rotating through his family primary care practice on the proper ways to perform physical exams and genital exams.  (8/31/20 Tr., 45:14-25).

14.     Dr. Kelley has also served as a clinical instructor in the Baptist Lutheran family medicine program and at the University of Missouri.  (8/31/20 Tr., 46:2-16).

15.     Dr. Kelley has been affiliated with Liberty Hospital since 1998 where he served as the chairman of the department of family medicine.  (8/31/20 Tr., 46:17-22).

16.     Dr. Kelley has been a member of the Missouri Academy of Family Physicians and the American Academy of Family Physicians from 1995 to the present.  (8/31/20 Tr., 46:23 – 47:1)

17.     Dr. Kelley has been a fellow with the American Academy of Family Physicians since 2008.  (8/31/20 Tr., 47:2-12).

18.     Dr. Kelley held the offices of president and chairman of the board with the Missouri Academy of family physicians.  (8/31/20 Tr., 47:13-18).

19.     Dr. Kelley has made numerous presentations and lectures in the area of family care medicine and primary care medicine.  (8/31/20 Tr., 47:19-23).

20.     Dr. Kelley has had an active clinical practice for about 22 years consistently seeing between 25 to 35 patients in a day in his clinic. (8/31/20 Tr., 48:2-14).

21.     Dr. Kelley routinely performs physical exams and genital exams almost daily in his clinical practice.  (8/31/20 Tr., 48:15-22).

22.     Dr. Kelley currently has three physician extenders working in his medical practice. (8/31/20 Tr., 48:2-8).

23.     Dr. Kelley regularly utilizes physician extenders in his practice ever since he started practicing 22 years ago.  (8/31/20 Tr., 49:5-9).

24.     Dr. Kelley expends about 5 percent of his time consulting in litigation versus working in his clinical practice.  (8/31/20 Tr., 52:21 – 53:5).

### *Role of Physician Extenders in Primary Care Medicine*

25.     Physician extenders are physician assistants and nurse practitioners.  (8/31/20 Tr., 48:23 – 49:4).

26.     The principles of supervising physician extenders are the same for nurse practitioners and PAs.  (8/31/20 Tr., 49:17 – 50:1).

27.     A written collaborative agreement is very important in the employment of physician extenders because it delineates the scope of practice and allows the physician to provide counseling, audit charts, and engage in disciplinary action if necessary.  (8/31/20 Tr., 50:2-18).

28.     In the field of primary care medicine, collaborative agreements and auditing records are fundamental principles that are recognized when a physician extender is utilized by physicians.  (8/31/20 Tr., 50:19-23).

29.     In the field of primary care medicine, there is an obligation to counsel the physician extender and remove the extender from patient care if and when it is necessary.  (8/31/20 Tr., 50:24 – 51:11).

30.     The field of primary care medicine universally recognizes that the core, fundamental job of physician extenders and physician assistants is to obtain patient histories and perform physical exams.  (8/31/20 Tr., 51:22 – 52:3).

31.     It is universally recognized in the field of primary care that a PA's job is to perform genitourinary exams when clinically indicated.  (8/31/20 Tr., 52:17-20).

32.     The male genitourinary exam involves inspection and palpation of the penis scrotum, groin, inguinal canal, and lymph nodes.  (8/31/20 Tr., 52:4-9).

33.     Visual inspection and physical touching are components of a male genitourinary exam.  (8/31/20 Tr., 52:10-16).

### Scope of Wisner's Practice & Job Duties

34.     Defendant Mark E. Wisner ("Wisner") was employed as a Physician Assistant with the Department of Veterans Affairs from September 28, 2008 until June 28, 2014.  (Exh. 286, p. 3).

35.     Wisner was assigned to lead the OIF-OEF clinic.  (Exh. 238, 8:22 – 9:5).

36.     No other physicians or physician assistants assisted Wisner in leading the OIF-OEF clinic.  (Exh. 238, 9:6-8).

37.     Wisner's patient load at the OEF-OIF clinic exceeded the 750-patient limit most of the time and often reached 1,000 patients.  (Exh. 238, 10:3-17; Exh. 1, 67:14-18, 106:6 – 107:1, 142:24 – 125:5).

38.     The VA employed Wisner to, in part, conduct physical exams of patients which may have involved sensitive or intimate matters.  (8/31/20 Tr., 79:11-14; Exh. 286, p. 4).

39.     The VA employed Wisner to, in part, conduct physical examinations of patients which may have involved sensitive or "uncomfortable" matters.  (8/31/20 Tr., 79:23 – 80:2; Exh. 286, p. 4).

40.     It is beyond dispute that Wisner's job at the VA was to conduct intimate and sensitive examinations.  (8/31/20 Tr., 80:3-6).

41.     Performing initial histories and physical examinations are considered routine duties performed on a regular, repetitive basis for physician assistants practicing in the Veterans Health Administration.  (8/31/20 Tr., 59:20 – 61:11; Exh. 58).

42.     It was a core function of Wisner's job to perform physical examinations, and genital exams when indicated.  (8/31/20 Tr., 61:12-24).

43.     VHA Directive 1063, Appendix A, states the core elements for a PA scope of practice ay include but are not limited to obtaining medical histories and performing physical examinations.  (8/31/20 Tr., 68:19 – 69:16; Exh. 60).

44.     Physical examinations are a core element of Wisner's practice.  (8/31/20 Tr., 69:17-19).

45.     As part of physical examinations, genital examinations are a core element of Wisner's practice when clinically indicated.  (8/31/20 Tr., 69:20-23).

46.     Wisner's scope of practice and approved privileges at the VA EKHCS authorized him to prescribe morphine, oxycodone, codeine, meperidine, fentanyl, and methadone, which are classified as Schedule 2 medications.  (8/31/20 Tr., 72:18 – 73:16; Exh. 75, p. 7).

47.     Wisner's scope of practice and approved privileges at the VA EKHCS authorized him to prescribe benzodiazepines, including Alprazolam, diazepam, and Temazepam.  (8/31/20 Tr., 76:13 – 77:2; Exh. 75, p. 7).

48.     Wisner's scope of practice and approved privileges at the VA EKHCS authorized him to prescribe hydrocodone, Tylenol No. 3 (which is codeine), propoxyphene, and zolpidem. (8/31/20 Tr., 76:16 – 77:2; Exh. 75, p. 7).

49.     Wisner was authorized to make clinical practice decisions autonomously within his scope of practice and prescriptive authority granted, with supervision, collaboration, and consultation of the supervising physician.  (8/31/20 Tr., 77:3-18; Exh. 75, p. 6).

50.     Wisner's routine responsibilities at the VA EKHCS included conducting and documenting findings on initial, periodic, episodic and/or annual health histories and physical examinations on patients seen in the clinical setting.  (8/31/20 Tr., 77:19-24; Exh. 75, p. 6).

51.     Performing physical exams which included genital exams when indicated was a core, routine responsibility for Wisner.  (8/31/20 Tr., 77:25 – 78:3).

52.     Wisner's supervising physician was required to review, counter sign, concur, and counter sign as required to VA EKHCS by-laws or policy, providing an addendum if indicated. (8/31/20 Tr., 78:4-7; Exh. 75, p. 6).

53.     Dr. Kelley did not see any indication whatsoever that Dr. Cline was counter signing Wisner's office notes.  (8/31/20 Tr., 78:8-12).

54.     Kerry Baker is a special agent for the VA's Office of Inspector General based out of Kansas City, Missouri. (Exh. 1, 9:22 – 10:20, 15:2-16).

55.     Dr. Daniel Cline told Special Agent Kerry Baker that "There were really no providers at VAMC Leavenworth with whom to compare Wisner, as he was the only primary care provider for the OIF/OEF Clinic." (Exh. 1, 101:2 – 102:5; Exh. 21).

56.     Wisner's Scope of Practice included the routine responsibility to conduct and document findings on initial, periodic, episodic, and/or annual health histories and physical examinations on patients seen in the clinical setting.  (Exh. 75, p. 6).

57.    Throughout Wisner's employment as a physician assistant at the VA, his job in performing physical exams included genital, rectal and prostate exams as well as prescribing medication.  (Exh. 238, 24:6-11).

58.    Performing initial histories and physical examinations are considered routine duties performed on a regular, repetitive basis within the Scope of Practice ("SOP") for Physician Assistants ("PA") employed at the VA.  (Exh. 58, p. A-1).

59.    Obtaining medical histories and performing physical examinations are considered a core element of the Scope of Practice for PA's employed at the VA.  (Exh. 60, p. A-1).

60.    The VA employed Wisner to, in part, conduct physical exams of patients which may involve sensitive or "intimate" matters.  (Exh. 286, p. 4).

61.    The VA employed Wisner to, in part, conduct physical examinations of patients which may involve sensitive or "uncomfortable" matters.  (Exh. 286, p. 4).

62.    Denni Woodmansee was produced by the United States pursuant to a Rule 30(b)(6) deposition notice to provide testimony on, *inter alia*, "any and all" policies the United States had for "providing male genitalia exams in effect at the Leavenworth VAMC at the time Wisner was employer there." (Exh. 14, 32:23 – 33:11).

63.    At the time of his deposition, Denni Woodmansee was the director of physician assistant services for the entire VA. (Exh. 14, 18:12 – 19:10).

64.    At the time of his deposition, Denni Woodmansee was the highest-ranking physician assistant in the entire VA health system. (Exh. 14, 129:24 – 131:18).

65.    As the director of physician assistant services for the VA, Denni Woodmansee's duties included overseeing policy development, education, credentialing, and scope of practice for

physicians assistants practicing within the VA health system. (Exh. 14, 1812 – 19:10, 94:23 – 97:9, 99:1 – 100:13).

66.     Denni Woodmansee testified that the VA's national policies governing medical practice apply to genitalia exams at any VA Medical Center. (Exh. 14, 32:23 – 33:11).

67.     Denni Woodmansee testified that performing genital exams is within the scope of practice for a physician assistant. (Exh. 14, 117:7-11).

68.     Denni Woodmansee testified that performing rectal exams is within the scope of practice for a physician assistant. (Exh. 14, 117:12-15, 219:3-12).

69.     Denni Woodmansee testified that there are different kinds of genital examinations – general "screening-type" genital exams, and exams for specific complaints. (Exh. 14, 25:3-18).

70.     Denni Woodmansee testified that the genital exam could even include helping the veteran "achieve an erection" if there are complaints of erectile dysfunction. (Exh. 14, 25:19 – 26:1).

71.     Denni Woodmansee testified that genital exams could include "expression of sematic fluid." (Exh. 14, 27:9 – 21).

72.     Denni Woodmansee testified that palpating the testicles is standard procedure for VA genital exams. (Exh. 14, 29:19 – 30:4).

73.     Denni Woodmansee testified that retracting the foreskin is standard procedure for VA genital exams. (Exh. 14, 30:5-9).

74.     Denni Woodmansee testified that checking for hernias is standard procedure for VA genital exams. (Exh. 14, 30:10-11).

75.     Denni Woodmansee testified that compressing the glands with fingers is standard procedure for VA genital exams. (Exh. 14, 30:18-19).

76.      Denni Woodmansee testified that milking the shaft of the penis from the base to the glands is standard procedure under certain circumstances for VA genital exams. (Exh. 14, 30:23 – 31:2).

77.      Denni Woodmansee testified that palpating the shaft of the penis is standard procedure for VA genital exams. (Exh. 14, 31:3-6).

78.      Denni Woodmansee testified that using fingers to palpate each testi, the epididymis, the spermatic cord, and the external ring is standard procedure for VA genital exams. (Exh. 14, 31:8-14).

79.      Denni Woodmansee testified that visual inspection of the scrotum, penis, and pubic hair is standard procedure for VA genital exams. (Exh. 14, 31:15-19).

80.      Denni Woodmansee testified that questioning a patient's sexual practices, and/or asking about the number of partners a patient has is standard procedure for VA genital exams. (Exh. 14, 32:4-15, 217:1-6).

81.      Denni Woodmansee testified that there is no standard as it relates to the frequency of genital exams. (Exh. 14, 28:25 – 29:18).

82.      All of the exams Wisner conducted at the OIF-OEF clinic occurred in an examination room during his working hours at the VA Medical Center.  (Exh. 238, 28:2-12).

83.      The first intake for a new patient at the clinic, including history and head-to-toe physical, were scheduled for one hour.  (Exh. 238, 12:1-8).

84.      The amount of time Wisner spent performing a genital exam as part of a physical exam would only be a small fraction of the overall time he spent with a patient during a medical appointment.  (Exh. 238, 28:14-20).

85.     The United States did not require a supervisor to be present during Wisner's examinations of his patients.  (Exh. 286, p. 4; Exh. 1, 65:17 - 18).

86.     The United States did not require a chaperone to be present during Wisner's examinations of his male patients.  (Exh. 286, p. 4).

87.     The VA considered it an extra burden to offer chaperones for same-sex genital exams.  (Exh. 6, 97:10-25).

88.     The VA never told Wisner that he needed to have a chaperone when conducting physical examinations.  (Exh. 238, 32:4-8).

89.     Part of Wisner's job as a primary care provider when taking a history would be to ask personal and private questions, which could include questions about sexual anatomy, piercings, tattoos, grooming habits, and patient sexuality and sexual practices.  (Exh. 238, 28:24 – 29:25).

90.     VA policy required any new patient assigned to the OEF-OIF clinic to receive a complete head-to-toe physical and history on their first visit.  (Exh. 238, 10:22 – 11:7).

91.     VA policy required all veterans receive a complete head-to-toe physical at least once a year.  (Exh. 238, 13:5-12).

92.     Dr. Cline, the chief of primary care, told Wisner to do a complete physical.  (Exh. 238, 12:9-18).

93.     Wisner was trained at the VA on how to do a comp and pen or physical consistent with VA expectations when he was hired in 2008.  (Exh. 238, 23:8-13).

94.     Wisner received training from the VA on palpitating scrotal tissue.  (Exh. 238, 19:5-20).

95. If the patient had a compensation claim, the regional office required a generalized complete physical, so the patient could end up having two physicals per year. (Exh. 238, 13:13-22).

96. If the patient had a comp and pen claim, policy required a full physical even if the patient had just had a full physical the week before. (Exh. 238, 14:6-12).

97. Wisner contended it was unnecessary to do additional physical exams just for the purpose of comp and pen claims. (Exh. 238, 22:3-10).

98. Wisner was told that federal law requires a complete physical for comp and pen exams. (Exh. 238, 22:22 – 23:6).

99. A federal regulation or law codifies the thoroughness of Wisner's exams. (Exh. 238, 23:19-21).

100. Wisner was told it could be a form of negligence and inappropriate medical care if he failed to perform additional physical exams for comp and pen exams. (Exh. 238, 22:12-20).

101. In 2014, VA policy required Wisner to perform a rectal examination and a prostatic surface antigen laboratory exam. (Exh. 238, 16:6 – 17:1).

102. There were times when the VA had Wisner doing testicular exams more than was necessary. (Exh. 238, 17:21-24).

103. There were times when the VA had Wisner doing rectal exams more than were medically necessary. (Exh. 238, 18:3-9).

104. The VA wanted Wisner to screen for cancer by doing a testicular exam of the scrotum to determine that the VA was meeting some standard set out by "National," which they agreed to do in Wisner's clinic. (Exh. 238, 20:4-21).

105.   Wisner believed for his patient population from ages 20s to 40s, the greatest likelihood of cancer screening would be testicular up until age 35, and Dr. Cline agreed.  (Exh. 238, 18:11-25).

106.   Wisner believes all the care he provided to these plaintiffs was within the course and scope of his job and duties as a physician assistant at the VA in Leavenworth.  (Exh. 238, 32:25 – 33:6).

107.   Wisner asked the VA and the Department of Justice to provide him counsel in these civil cases.  (Exh. 238, 32:21-24).

108.   The VA has refused to provide Wisner with counsel.  (Exh. 238, 33:8-10).

### *Foundation for the Standard of Care*

109.   In medical malpractice cases, Dr. Kelly determines whether particular conduct deviates from the standard of care recognized in the field of primary care medicine, which requires him to consider the scope of medical practice involved.  (8/31/20 Tr., 53:10-18).

110.   The standard of care is the level and type of care that a reasonably competent and skilled healthcare professional with a similar scope of practice would provide under the same and similar circumstances.  (8/31/20 Tr., 53:20 – 54:1).

111.   The standard of care represents a collective body of healthcare professionals, and what a reasonable healthcare provider would do under the same and similar circumstances. (8/31/20 Tr., 54:2-9).

112.   In considering what is reasonable under the circumstances, one considers what the consensus is in the medical community, in this case, in the field of primary care medicine.  (8/31/20 Tr., 54:10-14).

113.    Dr. Kelley considered the scope of Wisner's practice, as a physician assistant performing physical exams and genital exams, in applying the appropriate standard of care. (8/31/20 Tr., 54:15 – 55:7).

114.    There is a very clear and strong consensus in the medical community when a genital exam is clinically indicated for a physician assistant performing physical exams like Wisner. (8/31/20 Tr., 55:13-17).

115.    The standard of care applies first to the determination of when the genital exam is clinically indicated.  (8/31/20 Tr., 55:18-23).

116.    The standard of care applies to the proper manner and method of performing the genital exam.  (8/31/20 Tr., 55:24 – 56:1)

117.    Even if a physician assistant performs a genital exam when it's not clinically indicated, the standard of care still applies to the manner and method in which the physician assistant performs the exam.  (8/31/20 Tr., 56:2-11).

118.    Regardless of the intent of the provider, the standard of care of the method and manner always applies.  (8/31/20 Tr., 56:2-11).

119.    The standard of care does not just magically disappear when the intent of the provider is different. (8/31/20 Tr., 56:2-11)

120.    If Wisner performed a genital exam on Plaintiff when there is no clinical indication to do so, Wisner still has an obligation to perform the exam in a manner and a method that complies with the standard of care.  (8/31/20 Tr., 56:12-16).

121.    The intent of the practitioner does not control the application of the standard of care.  (8/31/20 Tr., 56:17-19).

122.    The standard of care applies regardless of the practitioner's intent in performing the exam.  (8/31/20 Tr., 56:20-22).

123.    The standard of care does not magically disappear.  (8/31/20 Tr., 56:23-24).

124.    A PA like Wisner is held to the same standard of care when performing the same primary medical care as a physician for that scope of practice, including the act of performing physical exams, genital exams, and prescription practices.  (8/31/20 Tr., 58:14-23).

### *Freedom Allowed by VA*

125.    Dr. Kelley examined Wisner's conduct in the course of providing medical care to Plaintiff.  (8/31/20 Tr., 41:18-21).

126.    Wisner's conduct at issue arose in the course of scheduled medical appointments at the VA clinic in Leavenworth.  (8/31/20 Tr., 41:22 – 42:1).

127.    Wisner's conduct at issue arose in the course of performing physical exams and genital exams.  (8/31/20 Tr., 42:2-7).

128.    Dr. Kelley noted similarities and consistencies between Wisner's conduct with respect to Plaintiff A.L. and Plaintiff P.M.  (8/31/20 Tr., 42:8-10).

129.    Dr. Kelley considered all of the evidence presented to the court in the AL case in forming his opinions in this case.  (8/31/20 Tr., 42:18-21).

130.    Dr. Kelley holds all of his opinions expressed in this case to a reasonable degree of medical certainty.   (8/31/20 Tr., 42:24 – 43:1).

131.    Wisner was practicing primary care medicine as a PA at the OEF-OIF clinic in Leavenworth, Kansas.  (8/31/20 Tr., 56:25 – 57:3).

132.   Dr. Kelley reviewed medical records for and spoke directly to 20 patients of Wisner, including the Plaintiff.  (8/31/20 Tr., 57:4-20).

133.   Dr. Kelley found remarkable consistency among the information provided by these 20 veterans.  (8/31/20 Tr., 57:21-23).

134.   In each and every case, Dr. Kelley found that Wisner was routinely performing physical exams and genital exams in the course of clinic appointments at the outpatient clinic.  (8/31/20 Tr., 57:24 – 58:6).

135.   Dr. Kelley found that Wisner was routinely prescribing multiple opioid narcotics, anxiolytics, benzodiazepines, and a lot of habit forming medication.  (8/31/20 Tr., 58:7-13).

136.   All of Wisner's conduct arose in the course of providing medical care to these veterans.  (8/31/20 Tr., 57:8-11).

137.

138.   Daniel Cline, M.D. was Wisner's first-line supervisor.  (Exh. 4, 12:5-18).

139.   Dr. Cline became Wisner's supervising physician in 2010.  (Exh. 4, 38:9-11).

140.   Wisner's patients were Dr. Cline's responsibility.  (Exh. 4, 20:4-8).

141.   The collaborating physician is responsible for monitoring the PA's clinical activities to ensure they are within the authorized Scope of Practice and are medically appropriate.  (Exh. 59, p. 4).

142.   Dr. Cline was not fulfilling his supervisory duties.  (Exh. 6, 134:15-18).

143.   Dr. Cline neglected his duties to Winser's patients.  (Exh. 4, 24:19-25).

144.   VHA Directive 2004-029 required that the "chief of the clinical service, to which the PA is assigned, should ensure that clinical activities of PAs are monitored and evaluated." (Exh. 14, 54:16-24, 100:25 – 101:13, 101:17 – 102:2, 102:20 – 103:4, 185:16 – 188:7. *See also*,

Exh. 58; Exh. 59).

145.    VHA Directive 2004-029 states that the "chief of staff is responsible for seeing that such reviews are conducted and for assuring that clinical service chiefs take appropriate action to correct discovered deficiencies." (Exh. 14, 55:8-14, 100:25 – 101:13, 101:17 – 102:2, 102:20 – 103:4. *See also*, Exh. 58; Exh. 59).

146.    VHA Directive 2004-029 states that the "COS, or the chief of the clinical service, must appoint a member of the regular physician staff to be the official supervisor, hereafter designated as the supervising physician, of each PA." (Exh. 14, 55:20 – 56-2, 56:12-19. *See also*, Exh. 58).

147.    Dr. Leeson was produced by the United States pursuant to a Rule 30(b)(6) deposition notice to provide testimony on, *inter alia*, the VA's evaluation of Dr. Cline's job performance as it relates to his supervision of physician assistants. (Exh. 10, 97:25 – 98:11).

148.    At the time of his deposition, Dr. Michael Leeson was the interim chief of staff at V.A. Eastern Kansas Healthcare System. (Exh. 10, 23:4-8, 68:23 – 69:2).

149.    Prior to that, Dr. Leeson, a licensed psychiatrist, was the service line manager for behavioral health services for the VA in Leavenworth and Topeka. (Exh. 10, 23:-13-18, 35:14, 64:19 - 66:25, 67:24 – 68:20, 70:1-9).

150.    Dr. Leeson testified that there was no review of Dr. Cline and how he was managing Wisner. (Exh. 10, 104:15 – 105:2).

151.    Dr. Leeson testified that Dr. Cline was not properly supervised in his role as a supervising or collaborating physician. (Exh. 10, 106:16 – 107:10, 118:4-7).

152.    Rudy Klopfer was the Director, CEO of VA Eastern Kansas Healthcare System at all relevant times in this lawsuit. (Exh. 8, 10:13-18).

153.    Prior to 2013, the VA Director, Rudy Klopfer, was responsible for ensuring that the Physician Assistant supervising policies were being implemented. (Exh. 10, 169:13-21).

154.    After 2013, the responsibility for ensuring the Physician Assistant supervising policies were being implemented was divvied up between the Director, Rudy Klopfer, the Chief of Staff, Dr. Trehan, the Chief of Service, Dr. Anil Desai, and the collaborating physician. (Exh. 10, 169:22 – 170:2, 170:19 – 172; Exh. 59).

155.    Dr. Leeson testified that he could not find any documentation that any of these people were compliant with this directive. (Exh. 10, 172:9-14).

156.    Dr. Cline was given no training from the VA on how to supervise Wisner.  (Exh. 4, 41:20-42:1).

157.    There is nothing in Dr. Cline's HR file that shows Dr. Cline was trained on how to supervise Wisner.  (Exh. 12,80:17-22).

158.    The VA failed to tell Dr. Cline about any rules that applied to him as a supervising doctor.  (Exh. 4, 155:24-156:4).

159.    Nobody at the VA talked to Dr. Cline to ensure he was monitoring Wisner's clinical activities.  (Exh. 4, 161:7-12).

160.    Dr. Desai did not explain to Dr. Cline the things Cline needed to do to supervise Wisner.  (Exh. 6, 37:3-9).

161.    Dr. Desai did not provide Dr. Cline any VHA directives on how a physician's assistant should be supervised at the VA, even though Dr. Desai knew such directives existed. (Exh. 6, 37:10-17).

162.    No one from the VA told Dr. Desai how to comply with policies.  (Exh. 6, 121:17-24).

163.    Dr. Cline was not aware he was to periodically monitor Wisner's clinical activities. (Exh. 4, 181:7-18).

164.    Dr. Cline has never been in an exam room with Wisner and a patient.  (Exh. 4, 74:4-6).

165.    Dr. Cline never watched Wisner provide care or examine a patient.  (Exh. 4, 74:7-9).

166.    Neither Dr. Cline nor anybody else ever supervised Wisner while he was performing physical examinations.  (Exh. 238, 32:10-13).

167.    Dr. Cline did not review Wisner's charts.  (Exh. 4, 74:17-20).

168.    Dr. Cline was not aware he was required to review Wisner's charts.  (Exh. 4, 74:21-75:2).

169.    Dr. Cline never pulled one of Wisner's charts to ensure competency and medical appropriateness.  (Exh. 4, 181:19-24).

170.    Neither Dr. Cline nor anybody else at the VA ever asked Wisner to provide more detailed notes regarding his prostate or genital examinations.  (Exh. 238, 32:14-17).

171.    The only time Wisner submitted records for Dr. Cline's counter-signature would be if it was one of Dr. Cline's patients.  (Exh. 238, 15:4-7).

172.    Dr. Cline and the VA learned that Wisner was overprescribing narcotics and testosterone from the physicians who took over care from Wisner.  (Exh. 4, 84:24-85:2).

173.    As the supervising physician, Dr. Cline should have known that Wisner was improperly prescribing opiates and testosterone.  (Exh. 4, 94:20-95:1).

174.    An audit was not done of Wisner's medical records or prescriptions until after he retired.  (Exh. 4, 114:4-7).

175.    Wisner wrote prescriptions beyond his prescriptive authority.  (Exh. 4, 147:10-21).

176.    Dr. Cline did not discipline Wisner for exceeding his prescriptive authority.  (Exh. 4, 148:11-13).

177.    Dr. Cline determined Wisner's competency based on what Wisner said he did. (Exh. 4, 1114:14-22).

178.    Dr. Cline did not investigate complaints regarding Wisner, even though he should have.  (Exh. 4, 61:7-62:4).

179.    Dr. Cline did not know he was supposed to report any deficiencies in relationship to Wisner's established scope of practice.  (Exh. 4, 175:15-23).

180.    With the exception of one incident, Dr. Desai did not receive any notice of other complaints from Dr. Cline as required.  (Exh. 6, 112:16-23).

181.    Dr. Desai did not pass on any complaint regarding Wisner to facility leadership. (Exh. 6, 113:4-9).

182.    Dr. Cline does not know if a centralized system for reporting and tracking sexual assault existed at Leavenworth VA.  (Exh. 4, 214:7-17).

183.    The complaints received about Wisner should have been reported up the chain of command pursuant to VA policy.  (Exh. 27; Exh. 6, 116:22-117:4).

184.    Dr. Cline agrees that Wisner's patients have been traumatized by Wisner's conduct. (Exh. 4, 186:11-20).

185.    Dr. Leeson testified that Dr. Cline deviated from the standard of care in his failure to supervise Wisner. (Exh. 10, 92:16 – 93:20, 96:24 – 97:24, 105:3:20, 106:11-15, 117:23 – 118:3, 145:11-19).

186.    Dr. Leeson testified that Dr. Cline violated VA policies in failing to supervise

Wisner. (Exh. 10, 118:12-23).

187.    Dr. Leeson also testified that Wisner's prior supervising physicians, Dr. Wells and Dr. Hallock, also deviated in the standard of care in their failure to supervise Wisner. (Exh. 10, 93:11 – 94:2, 95:19 – 96:13).

188.    Dr. Leeson was produced by the United States pursuant to a Rule 30(b)(6) deposition notice to provide testimony on, *inter alia*, the VA's policy regarding random audits of Wisner's files and whether Dr. Cline did it. (Exh. 10, 132:14 – 133:10).

189.    Dr. Leeson testified that he could find no record that Dr. Cline audited Wisner's medical records and that his failure to do so was a violation of VA policy. (Exh. 10, 132:14 – 133:10).

190.    Denni Woodmansee likewise testified that Dr. Cline was required to review Dr. Wisner's patient records. (Exh. 14, 188:25 – 189:25, 191:13-21).

191.    Denni Woodmansee testified that the failures to evaluate or monitor Wisner's medical records was a violation of VHA Directive 2004-029. (Exh. 14, 191:24 – 192:4. *See also*, Exh. 58).

192.    Denni Woodmansee was produced by the United States pursuant to a Rule 30(b)(6) deposition notice to provide testimony on, *inter alia*, the "Standard operating procedures, policy or procedure manuals, protocols, rules, or guidelines for Mark Wisner's supervisors as they relate to Wisner's patient care and treatment in effect" during the time Wisner was employed by the VA Leavenworth. (Exh. 14, 49:25 – 50:1).

193.    There were two VHA Directives governing supervision of physician assistants at the time Wisner was employed by the VA Leavenworth. (Exh. 14, 50:10-24).

194.    The first such policy was VHA Directive 2004-029, Utilization of Physician

Assistants, which was in effect from 2004 until 2014. (Exh. 14, 50:10-24, 52:3-8. *See also*, Exh. 58).

195.     Its successor was VHA Directive 1063, same title, which took effect on December 31, 2013. (Exh. 14, 50:10-24, 88:10 – 89:10. *See also*, Exh. 59).

196.     VHA Directive 2004-029 required that all VA physician assistants have a scope of practice set out in writing. (Exh. 14, 53:3-24).

197.     Denni Woodmansee testified that a "scope of practice for a physician ·assistant is a written document similar to a delineation of clinical privileges that physicians have which authorize them to perform certain medical acts and medical practice.· And the scope of practice specifies what those actions or acts are ." (Exh. 14, 53:3-24. *See also*, Exh. 58).

198.     Under VHA Directive 2004-029, a physician assistant is not allowed to interact with patient unless a specifically designated supervising physician is assigned. (Exh. 14, 60:21 – 61:7. *See also*, Exh. 58).

199.     VHA Directive 2004-029 states that the "effectiveness of the supervising physician in overseeing the work of assigned PAs must be reflected in their proficiency reports." (Exh. 14, 58:8 – 59:2 *See also*, Exh. 58).

200.     Failure to evaluate a supervising physician in his supervisory capacity is a violation of VHA Policy 2004-029. (Exh. 14, 59:1-5).

201.     Denni Woodmansee testified that Dr. Daniel Cline, Wisner's supervising physician, was responsible to monitor Wisner and ensure that his conduct remained within the scope of practice. (Exh. 14, 79:15-18, 79:24-14).

202.     Under VHA Directive 2004-029, the supervising physician, Dr. Daniel Cline, has legal liability for the actions of the PA that is assigned – Wisner. (Exh. 14, 59:23 – 60:12, *See also*,

Exh. 58).

203.    Under VHA Directive 2004-029, Dr. Daniel Cline is legally responsible for every inappropriate genital exam performed by Wisner from 2004 through 2014. (Exh. 14, 60:13:20, 50:10-24, 52:3-8. *See also*, Exh. 58).

204.    Denni Woodmansee was produced by the United States pursuant to a Rule 30(b)(6) deposition notice to provide testimony regarding, *inter alia*, the "United States' policies for the evaluation of supervision of physician assistants in effect at the Leavenworth VAMC between 2008 and 2014 and how/whether those policies were followed with respect to Mr. Wisner." (Exh. 14, 64:18-65:9).

205.    Under VHA Directive 2004-029, a "structured review of the PA's performance by the supervising physician must be conducted." (Exh. 14, 67:25 – 68:13).

206.    Dr. Daniel Cline's reviews of Mark Wisner did not include required reviews of Wisner's scope of practice, service monitoring and evaluation, drug utilization review, blood use evaluation, or medical record review. (Exh. 14, 68:19-25, 29:11-15, 71:6 – 72:3, 74:18-24, 225:2-18. *See also*, Exh. 58; Exh. 130).

207.    Denni Woodmansee testified that Dr. Daniel Cline's structured reviews of Mark Wisner did not comply with VHA Directive 2004-029. (Exh. 14, 68:19-25, 29:11-15, 71:6 – 72:3, 74:18-24, 75:5-22, 76:2-18, 77:19-21. *See also*, Exh. 58; Exh. 130; Exh. 35; Exh. 38).

208.    Under VHA Directive 1063, which took effect December 31, 2013, Dr. Daniel Cline is still "professionally responsible" for the patient care provided by Wisner. (Exh. 14, 90:12-18. *See also*, Exh. 59).

209.    Under VHA Directive 1063, Dr. Daniel Cline was required to provide "appropriate clinical oversight, consultation, and patient care management assistance" to Wisner. (Exh. 14,

103:18-23. *See also*, Exh. 59).

210.    Under VHA Directive 1063, Dr. Daniel Cline was required to "monitor [Wisner's] ·activities to ensure they are within their authorized scope of practice and are medically appropriate, and that the collaborating physician must provide timely notification to the chief of service of any deficiencies that that person discovers.  (*See* Exh. 59).

211.    By his own admission, Dr. Daniel Cline did none of these things. (Exh. 4, 20:4-8, 24:19-25, 181:7-18, 74:4-6, 74:7-9, 74:17-20, 74:21-75:2, 181:19-24, 94:20-95:1, 114:4-7, 148:11-13, 1114:14-22, 61:7-62:4, 175:15-23). (*See also*, 7/7/2020 Tr., 25:5-24, 26:1-17).

212.    Under VHA Directive 1063, Dr. Daniel Cline was required to ""include periodic monitoring of [Wisner's] clinical activities through a retrospective review of at least five randomly selected patient encounter notes each quarter to ensure the presence of ongoing competency and medical appropriateness." (Exh. 14, 108:12 – 110:9, 152:21-25. *See also*, Exh. 59).

213.    Denni Woodmansee helped draft this language in VHA Directive 1063 and he testified that it was designed as a "quality control measure to ensure that the PA is making appropriate medical decisions and providing appropriate care. It could even be they're prescribing the right medication for the right treatment." (Exh. 14, 152:21-25, 171:5-12, 172:16 – 174:4).

214.    Dr. Cline told Dr. Leeson that he did not receive any direction regarding how to supervise Wisner. (Exh. 10, 25:24 – 26:8).

215.    Denni Woodmansee testified that Dr. Cline is required to know what his requirements are as a supervising physician. (Exh. 14, 111:1-4).

216.    By his own admission, Dr. Daniel Cline never audited any of Wisner's files. (Exh. 4, 20:4-8, 24:19-25, 181:7-18, 74:4-6, 74:7-9, 74:17-20, 74:21-75:2, 181:19-24, 94:20-95:1, 114:4-7, 148:11-13, 114:14-22, 61:7-62:4, 175:15-23).

217.    Denni Woodmansee testified that this was a violation of VHA Directive 1063. (Exh. 14, 111:16 – 112:1).

218.    As the director of physician assistant services for the VA, Denni Woodmansee advocated for physician assistant positive policies that granted the 2,000 physician assistants working within the VA health system more autonomy and a greater role in medical decision-making. (Exh. 14, 19:5 – 21:25, 94:23 – 97:9, 147:4-9, 148:7-23, 150:6-12).

219.    Under VHA Directive 1063, physician assistants are given varying levels of autonomy based on their experience – "full," "limited," and "supervised." (Exh. 14, 105:18 – 108:6).

220.    Mark Wisner operated with full autonomy, which means he had "full leeway to do his job, make independent medical decisions, and decide what tests to order, and perform diagnoses."(Exh. 14, 107:12-25).

221.    This autonomy gave him full authority to decide when and where to do genital exams and prostate exams.  (Exh. 14, 108:1-6).

### _Wisner's Conduct Arose in the Course of Providing Medical Care_

222.    Plaintiff attended appointments documented in the medical records with Wisner at the VAMC on March 11, 2011; June 1, 2011; October 13, 2011; February 24, 2011; March 20, 2012; April 24, 2012; November 26, 2012; May 16, 2013; March 20, 2014; and April 19, 2014. (Exh. 286, p. 6-7).

223.    Plaintiff was seeking medical care at medical appointments documented in the medical records.  (Exh. 286, p. 4).

224.    Plaintiff though Wisner was a doctor.  (9/3/20 Tr., 131:22-23).

225.    Plaintiff refers to Wisner as "Doc" because that is how Wisner introduced himself to Plaintiff.  (9/3/20 Tr., 110:23-111:2).

226.    Wisner's medically documented examinations of Plaintiff occurred at the Leavenworth VA facility while the facility was open and operating.  (Exh. 286, p. 4).

227.    Wisner's medically documented examination of Plaintiff occurred in an exam room at the Leavenworth VA facility.  (Exh. 286, p. 4).

228.    Wisner's medically documented genital exams were part of his overall physical examinations.  (Exh. 286, p. 5).

229.    Dr. Kelley examined Wisner's conduct in the course of providing medical care to Plaintiff.  (8/31/20 Tr., 41:18-21).

230.    Wisner's conduct at issue arose in the course of scheduled medical appointments at the VA clinic in Leavenworth.  (8/31/20 Tr., 41:22 – 42:1).

231.    Wisner's conduct at issue arose in the course of performing physical exams and genital exams.  (8/31/20 Tr., 42:2-7).

232.    Dr. Kelley noted similarities and consistencies between Wisner's conduct with respect to Plaintiff A.L. and Plaintiff P.M.  (8/31/20 Tr., 42:8-10).

233.    Dr. Kelley considered all of the evidence presented to the court in the AL case in forming his opinions in this case.  (8/31/20 Tr., 42:18-21).

234.    Dr. Kelley holds all of his opinions expressed in this case to a reasonable degree of medical certainty.   (8/31/20 Tr., 42:24 – 43:1).

235.    Wisner was practicing primary care medicine as a PA at the OEF-OIF clinic in Leavenworth, Kansas.  (8/31/20 Tr., 56:25 – 57:3).

236.    Dr. Kelley reviewed medical records for and spoke directly to 20 patients of Wisner, including the Plaintiff.  (8/31/20 Tr., 57:4-20).

237.    Dr. Kelley found remarkable consistency among the information provided by these 20 veterans.  (8/31/20 Tr., 57:21-23).

238.    In each and every case, Dr. Kelley found that Wisner was routinely performing physical exams and genital exams in the course of clinic appointments at the outpatient clinic. (8/31/20 Tr., 57:24 – 58:6).

239.    Dr. Kelley found that Wisner was routinely prescribing multiple opioid narcotics, anxiolytics, benzodiazepines, and a lot of habit forming medication.  (8/31/20 Tr., 58:7-13).

240.    All of Wisner's conduct arose in the course of providing medical care to these veterans.  (8/31/20 Tr., 57:8-11).


### *Wisner's Medical Treatment Provided to Plaintiff*

241.    Wisner's medically documented examinations of Plaintiff occurred in an exam room at the Leavenworth VA facility.  (8/31/20 Tr., 81:10-13; Exh. 286, p. 4).

242.    The exams were occurring within the VA owned medical site, in exam rooms, as part of a physical exam, and were not occurring in a back alley, bar, private residence, or park. (8/31/20 Tr., 81:14-24).

243.    The exams were occurring while the facility was open and operating.  (8/31/20 Tr., 81:25 – 82:2; Exh. 286, p. 4).

244.    In providing these exams, Wisner was furthering the business of the VA in carrying for veterans.  (8/31/20 Tr., 82:3-6).

245.    Wisner's medically documented genital exams were part of his overall physical examinations.  (8/31/20 Tr., 82:7-10; Exh. 286, p. 5).

246.    At least some portions of the medical care Wisner provided Plaintiff was for a valid medical purpose in order to provide diagnostic care.  (8/31/20 Tr., 82:11-15; Exh. 286, p. 5).

247.    The care Wisner was providing in many respects was for a valid medical purpose.  (8/31/20 Tr., 82:25 – 83:14).

248.    Much of the care Wisner was providing was for a valid medical purpose.  (8/31/20 Tr., 83:15-20).

249.    The pretrial order stipulates Plaintiff's medical records identify 10 visits with Wisner at the VAMC, which are documented in the medical record:  March 1, 2011; June 1, 2011; October 13, 2011; February 24, 2012; March 20, 2012; April 24, 2012; November 26, 2012; May 16, 2013; March 20, 2014; and April 19, 2014.  (8/31/20 Tr., 85:10-20; Exh. 286, pp. 6-7).

250.    The medical record for Plaintiff identifies and documents an additional visit with Wisner on September 19, 2013.  (Exh. 133).

251.    The pretrial order stipulates that Wisner conducted a genital exam at each of Plaintiff's visits.  (8/31/20 Tr., 85:25 – 86:3; Exh. 286, p. 7).

252.    Plaintiff indicated to Dr. Kelley that Plaintiff declined the genital exam on the last visit on April 19, 2014.  (8/31/20 Tr., 86:4-11).

253.    Wisner performed a genital exam on Plaintiff at each and every visit with the exception of the last visit on April 19, 2014.  (8/31/20 Tr., 86:15-19).

254.    The pretrial order stipulates that Wisner did not wear gloves during the March 1, 2011, genital exam.  (8/31/20 Tr., 86:20-23; Exh. 286, p. 7).

255.    Wisner did not wear gloves during any of the genital exams conducted on Plaintiff. (8/31/20 Tr., 87:2-9).

256.    Plaintiff saw Wisner from approximately March 2011 through April 2014.  (9/3/20 Tr., 110:19-22).

257.    Plaintiff refers to Wisner as "Doc" because that is how Wisner introduced himself to Plaintiff.  (9/3/20 Tr., 110:23-111:2).

258.    Plaintiff believes there were 13 visits with Wisner.  (9/3/20 Tr., 111:4-11).

259.    Plaintiff's exams with Wisner took place on the 4th floor of the Dwight D. Eisenhower VA Facility in Leavenworth.  (9/3/20 Tr., 111:12-16).

260.    Plaintiff's exams with Wisner took place with the door closed.  (9/3/20 Tr., 111:17-18).

261.    No one else was in the exam room with Plaintiff and Wisner.  (9/3/20 Tr., 111:19-20).

262.    The exams typically took place at 1:00 in the afternoon.  (9/3/20 Tr., 111:21-23).

263.    The exams took place during regular clinic hours.  (9/3/20 Tr., 111:24-25).

264.    Plaintiff did not see Wisner at night or on weekends.  (9/3/20 Tr., 112:1-2).

265.    Plaintiff's appointments with Wisner were scheduled appointments.  (9/3/20 Tr., 112:3-4).

266.    Plaintiff went to the VA for his PTSD and degenerative arthritis of the lumbosacral spine.  (9/3/20 Tr., 112:5-8).

267.    The degenerative arthritis would become the genesis of Plaintiff's addiction issue.  (9/3/20 Tr., 112:5-16).

268.    Wisner helped Plaintiff with a trapped nerve.  (9/3/20 Tr., 112:11-18).

269.    Genital exams were performed at every exam but the last one.  (9/3/20 Tr., 113:5-8).

270.    Plaintiff did not know at the time that the genital exams were improper.   (9/3/20 Tr., 131:19-21).

271.    Plaintiff thought Wisner was a doctor.   (9/3/20 Tr., 131:22-23).

272.    Wisner outranked Plaintiff in the military structure.   (9/3/20 Tr., 131:24-25).

273.    As an enlisted man, Plaintiff does not question officers.   (9/3/20 Tr., 132:1-2).

274.    Military doctors are officers.   (9/3/20 Tr., 132:3-5).

275.    Plaintiff does not question doctors in the military.   (9/3/20 Tr., 132:6-7).

276.    Wisner told Plaintiff the genital exams were medically necessary.   (9/3/20 Tr., 132:8-10).

277.    Plaintiff was touched inappropriately during the genital exams.  (9/3/20 Tr., 113:9-19).

278.    Wisner would cup Plaintiff's testicles and jiggle them.  (9/3/20 Tr., 113:9-19).

279.    Wisner would press his thumb against Plaintiff's penis.  (9/3/20 Tr., 113:9-19).

280.    The genital exams would take one to two minutes.  (9/3/20 Tr., 113:9-19).

281.    Plaintiff was required to remove his pants on one visit while Wiser was checking Plaintiff's knee reflexes.  (9/3/20 Tr., 113:23-114:5).

282.    During that visit, Plaintiff had to sit on the table with his pants off for approximately twenty minutes.  (9/3/20 Tr., 114:6-9).

283.    Plaintiff had to remove his underwear for a portion of that time.  (9/3/20 Tr., 114:10-12).

284.    Wisner said inappropriate things to Plaintiff.  (9/3/20 Tr., 114:13-15).

285.    Wisner said sexualized things to Plaintiff.  (9/3/20 Tr., 114:13-15).

286.    Wisner told Plaintiff that Plaintiff had a nice cock.  (9/3/20 Tr., 114:16-115:5).

287.    Wisner told Plaintiff he bet the ladies really loved Plaintiff's nice cock, or his big cock.  (9/3/20 Tr., 114:16-115:5).

288.    Wisner told Plaintiff he bet the ladies kept coming back for more.  (9/3/20 Tr., 114:16-115:5).

289.    Wisner told Plaintiff that he bet Plaintiff made the ladies walk funny.  (9/3/20 Tr., 114:16-115:5).

290.    Wisner called Plaintiff a stallion.  (9/3/20 Tr., 115:7-8).

291.    Wisner called Plaintiff a stud.  (9/3/20 Tr., 115:7-8).

292.    Plaintiff does not recall Wisner wearing gloves during an exam.  (9/3/20 Tr., 115:9-14).

293.    Plaintiff recalls that Wisner would frequently not wash his hands before or after exams.  (9/3/20 Tr., 115:9-14).

294.    Plaintiff felt the exams were uncomfortable, but did not know at the time that they were inappropriate.  (9/3/20 Tr., 115:15-116:2).

295.    Plaintiff felt like Wisner was trying to be his buddy.  (9/3/20 Tr., 115:15-116:2).

296.    Plaintiff found a mental benefit in talking to Wisner.  (9/3/20 Tr., 116:3-117:1).

297.    Plaintiff felt like Wisner really listened to Plaintiff's issues.  (9/3/20 Tr., 116:3-117:1).

298.    The April 14, 2014 visit is Plaintiff's last visit with Wisner.  (Exh. 206, 9/3/20 Tr., 127:1-3).

299.    By April 14, 2014, Plaintiff's mother had been appointed his guardian and attended Plaintiff's medical appointments.  (9/3/20 Tr., 127:6-9).

300.    Wisner knew Plaintiff's mother was his guardian.  (9/3/20 Tr., 127:10-11).

301.    Plaintiff did not receive a genital exam at the April 14, 2014 appointment.  (9/3/20 Tr., 127:12-21).

302.    Plaintiff refused the exam because he was in a rush that day and wanted to get his refills and get out.  (9/3/20 Tr., 127:22-25).

303.    Plaintiff did not know it would be his last visit with Wisner.  (9/3/20 Tr., 128:1-3).

304.    Plaintiff did not know Wisner had been under investigation for two months by this time.  (9/3/20 Tr., 128:4-6).

305.    At the April 14, 2014 appointment, Plaintiff was given a 15-day supply of medications instead of the 30-day supply.  (Exh. 206, 9/3/20 Tr., 128:21-129:3).

306.    When Plaintiff tried to make his next appointment, he was told Wisner retired.  (9/3/20 Tr., 129:4-10).

307.    Wisner provided Plaintiff with real and meaningful medical care.  (9/3/20 Tr., 136:16-18).


### *Deviations from the Standard of Care*

308.    The standard of care requires the donning of gloves by a medical practitioner during genital exams to protect the practitioner and the patient from communicable diseases.  (8/31/20 Tr., 88:2-11).

309.    It is clearly a violation of the standard of care to not wear gloves during a genital exam.  (8/31/20 Tr., 88:12-14).

34

310.    On each and every occasion of at least nine documented visits, Wisner deviated from the standard of care in failing to wear gloves while conducting genital exams on Plaintiff. (8/31/20 Tr., 88:15-19).

311.    Wisner's deviations from the standard of care in failing to wear gloves during genital exams conducted on Plaintiff arise from the scope of Wisner's job duties at the VA. (8/31/20 Tr., 88:15-24).

312.    Wisner's conduct in failing to wear gloves is incidental to the genital exam itself. (8/31/20 Tr., 88:25 – 89:2).

313.    Wisner's clinic notes documenting medical care provided to Plaintiff contain categories for standard information expected in a primary care clinic note, including: author, vital signs, medication list, active problems, past surgeries, vaccinations, present history of illness, chief complaint, review of systems, physical exam (mental assessment, lungs, heart, gastrointestinal (GI), genitourinary (GI), extremities, neurologic, pulses, skin).  (8/31/20 Tr., 90:7 – 92:2; 95:16 – 96:18).

314.    On March 1, 2011, Wisner saw Plaintiff in the clinic while Plaintiff was complaining of left hand numbness and tingling.  (8/31/20 Tr., 92:9-16; Exh. 197).

315.    Wisner provided some medical care to Plaintiff during the March 11, 2011, clinic visit that was for a valid medical purpose, including ordering a nerve conduction study properly responding to the symptoms Plaintiff was experiencing at that time.  (8/31/20 Tr., 92:3-8; 94:12 – 95:15).

316.    Wisner charted in the March 1, 2011 clinic note that he performed a genitourinary exam on Plaintiff.  (8/31/20 Tr., 92:17-22; Exh. 197).

317.     Given Plaintiff was seeing Wisner in the clinic for left hand numbness and tingling, a genitourinary exam was not clinically indicated on March 11, 2011.  (8/31/20 Tr., 92:23 – 93:8).

318.     Wisner deviated from the standard of care when he performed a genitourinary exam during the clinic visit on March 11, 2011.  (8/31/20 Tr., 93:9-15).

319.     The information contained in the March 11, 2011 office note alone generated a responsibility on the part of the VA to inquire of Wisner why he was performing a genital exam under those circumstances and indicates Wisner was violating the standard of care.  (8/31/20 Tr., 93:25 – 94:11).

320.     The clinic note dated June 1, 2011, states Plaintiff was experiencing hematuria which provides clinical indication for the genital exam Wisner performed on Plaintiff during that particular clinic visit.  (8/31/20 Tr., 96:19 – 97:17; Exh. 197).

321.     Wisner's plan at the June 1, 2011 visit to order an ultrasound of Plaintiff's bladder on repeat evaluation was medically appropriate for a valid medical purpose. (8/31/20 Tr., 98:8-14).

322.     On June 1, 2011, Wisner deviated from the standard of care by performing the genital exam without gloves.   (8/31/20 Tr., 98:15-25).

323.     On June 1, 2011, Wisner deviated from the standard of care in the duration of the exam by taking two minutes to do the genital exam.   (8/31/20 Tr., 98:20 – 100:1).

324.     The duration of every genital exam Wisner performed on Plaintiff was two minutes. (8/31/20 Tr., 100:2-7).

325.     A genitourinary exam in a male should only take 30 seconds to 1 minute.  (8/31/20 Tr., 99:1-5).

326.     On October 13, 2011, Wisner deviated from the standard of care by performing a genital exam on Plaintiff because there was no clinical indication for the genital exam.  (8/31/20 Tr., 100:11 – 101:3).

327.     On October 13, 2011, Wisner deviated from the standard of care concerning the means and method by which he performed the genital exam by not wearing gloves, by taking two minutes to do the genital exam, and by inappropriate disrobing practices.  (8/31/20 Tr., 101:4-11).

328.     On February 24, 2012, Wisner deviated from the standard of care by performing a genital exam on Plaintiff because there was no clinical indication for the genital exam.  (8/31/20 Tr., 101:15 – 102:3).

329.     On February 24, 2012, Wisner deviated from the standard of care in the method and manner by not wearing gloves and by taking two minutes to perform the genital exam on Plaintiff.  (8/31/20 Tr., 102:4-7).

330.     On March 20, 2012, Wisner deviated from the standard of care by performing a genital exam on Plaintiff because there was no clinical indication for the genital exam.  (8/31/20 Tr., 102:11 – 103:13).

331.     On March 20, 2011, Wisner deviated from the standard of care by not wearing gloves and taking an excessive amount of timer performing the genital exam on Plaintiff.  (8/31/20 Tr., 103:14-17).

332.     On April 24, 2012, Wisner deviated from the standard of care by performing a genital exam on Plaintiff because there was no clinical indication for the genital exam.  (8/31/20 Tr., 103:18 – 104:9).

333.    On April 24, 2012, Wisner deviated from the standard of care by not wearing gloves and by taking an excessive amount of time to perform the exam on Plaintiff.  (8/31/20 Tr., 104:10-13).

334.    On November 26, 2012, it was discretionary whether a genital exam was clinically indicated because the clinic note states Plaintiff presented with claims of discolored urine. (8/31/20 Tr., 104:17 105:19).

335.    On November 26, 2012, Wisner deviated from the standard of care by performing the exam ungloved and by spending excessive amount of time performing the genital exam. (8/31/20 Tr., 106:5-11).

336.    On May 16, 2013, a genital exam was clinically indicated based on the clinic note stating Plaintiff had genitourinary concerns.  (8/31/20 Tr., 106:12 – 107:4).

337.    On May 16, 2013, Wisner deviated from the standard of care because he did not wear gloves and he took at least two minutes to do the genital exam.  (8/31/20 Tr., 107:5-17).

338.    On March 20, 2014, a genital exam was clinically indicated and served a valid medical purpose based on the information contained in the clinic note stating Plaintiff was experiencing testicular tenderness with erectile dysfunction. (8/31/20 Tr., 108:3 – 109:10).

339.    On March 20, 2014, Wisner deviated from the standard of care by performing the genital exam ungloved and by taking two minutes to perform the genital exam.  (8/31/20 Tr., 109:11-22).

340.    The standard of care requires certain disrobing practices because of the sensitive nature of physical exams and the vulnerability of the patient undergoing physical exams requiring the patient to undress.   (8/31/20 Tr., 111:3-24).

341.    Wisner deviated from the standard of care concerning disrobing practices as it relates to Plaintiff by not utilizing any draping practices, and by asking Plaintiff to take down his pants and stand while Wisner performed the exam during each of the visits where Wisner performed a genital exam.  (8/31/20 Tr., 111:25 – 112:21).

342.    As a primary care practitioner, it is necessary to discuss sensitive information and ask questions about sexual history, sexual practices, and sexual habits.  (8/31/20 Tr., 112:22 – 113:8).

343.    Wisner deviated from the standard of care by commenting on Plaintiff's genitalia and engaging in other inappropriate commentary.  (8/31/20 Tr., 113:9 – 114:5).

344.    The inappropriate commentary by Wisner arose in the midst of the genital exams and was incidental to the exams.  (8/31/20 Tr., 114:6-12).

345.    All of the deviations by Wisner arose from the scope of Wisner's job at the VA clinic.  (8/31/20 Tr., 114:13-16).

346.    All of the deviations by Wisner were incidental to his job at the VA clinic.  (8/31/20 Tr., 114:17-19).

347.    A very small amount of time was consumed by the unnecessary or excessive genital exams performed by Wisner.  (8/31/20 Tr., 114:20-25).

348.    The genital exams took approximately two minutes during clinic appointments that generally lasted up to 30 minutes.  (8/31/20 Tr., 115:1-5).

349.    Even if the genital exam is not clinically indicated or necessary, the exam can still serve a medical purpose.  (8/31/20 Tr., 115:6-15).

350. Even on those instances where Wisner was performing the genital exam without clinical indication based on the exam itself it could still serve a valid medical purpose. (8/31/20 Tr., 115:16-19).

### *Defendant's Theory of the Standard of Care*

351. Mr. Nicholson's theory that the standard of care disappears based on Wisner's intent has never been peer reviewed. (7/8/2020 Tr., 212:3-6).

352. Mr. Nicholson's theory that there cannot be criminal and medical malpractice has never been subject to peer review or any research. (7/8/2020 Tr., 238:23 – 239:8).

353. Mr. Nicholson's theory that the standard of care suddenly disappears has not been published. (7/8/2020 Tr., 214:10-12).

354. Mr. Nicholson has not published anything on the standard of care related to sexual misconduct against healthcare providers. (7/8/2020 Tr., 237:22 – 238:1).

355. Mr. Nicholson concedes his theory, that the standard of care disappears based on Wisner's intent, has not been argued or appreciated by the courts. (7/8/2020 Tr., 212:9-14).

356. Mr. Nicholson argues that just because his "framework" has not been argued or appreciated by the courts does not mean the current perception by the courts is the valid or correct one. (7/8/2020 Tr., 212:9-14).

357. Mr. Nicholson is not a lawyer. (7/8/2020 Tr., 121:15-20).

358. The notion that the standard of care suddenly disappears comes from Mr. Nicholson. (7/8/2020 Tr., 213:8-11).

359. Mr. Nicholson's contention that the standard of care suddenly disappears comes from no other source other than Mr. Nicholson. (7/8/2020 Tr., 213:15-19).

360.    Mr. Nicholson did not cite anything in his report or identify anything in his deposition that stands for the proposition or supports his contention that the standard of care suddenly disappears.  (7/8/2020 Tr., 214:1-9).

361.    Mr. Nicholson did not look at the progress notes in this case, but "skimmed" the medical records.  (7/8/2020 Tr., 216:13 – 217:10).

362.    Mr. Nicholson, as a PA, typically does not opine on the standard of care for physicians.  (7/8/2020 Tr., 218:9-12).

363.    Mr. Nicholson concedes that Dr. Kelley found that the standard of care applied and was violated.  (7/8/2020 Tr., 218:14-16).

364.    Mr. Nicholson agrees that physical exams are a routine, core part of Wisner's job. (7/8/2020 Tr., 240:19-21).

365.    Mr. Nicholson agrees Wisner was hired at the VA to perform physical exams. (7/8/2020 Tr., 240:22-24).

366.    Mr. Nicholson agrees genital exams are a routine or proper part of a physical exam when indicated.  (7/8/2020 Tr., 240:25 – 241:3)

367.    Mr. Nicholson agrees that conducting genital exams is a routine, core function of the PA in clinical practice.  (7/8/2020 Tr., 241:4-7).

368.    Mr. Nicholson agrees the standard of care applies throughout Plaintiff's clinic visit with Wisner if Wisner was: taking vital signs; taking a patient history; conducting a review of systems: performing a general assessment and mental status check; visually checking skin; checking ears, nose, and throat; checking gastrointestinal system; checking extremities; performing a neurological exam; and checking pulses.  (7/8/2020 Tr., 219:3 – 224:1).

369.    Mr. Nicholson agrees the standard of care applies if Wisner properly performs a genital exam that is clinically indicated.  (7/8/2020 Tr., 224:11-25).

370.    Mr. Nicholson agrees the standard of care applies for the first minute and a half of a genital exam properly conducted by Wisner.  (7/8/2020 Tr., 225:3-11).

371.    Mr. Nicholson contends the standard of care no longer applies the second Wisner develops sexual curiosity or derives sexual pleasure during a genital exam.  (7/8/2020 Tr., 225:23 – 227:2).

372.    Mr. Nicholson did not review Wisner's sworn testimony.  (7/8/2020 Tr., 228:22-24).


*__Wisner's Intent__*

373.    Wisner's goal or objective was thoroughness to fulfill the VA requirement and to document on an initial physical or a comp and pen the completeness of the patient's current medical status and physical stature and to address particular complaints.  (Exh. 238, 25:13-22).

374.    Even if Wisner's exam lasted too long as it relates to the genitals, Wisner's primary objective was still thoroughness.  (Exh. 238, 26:4-8).

375.    Even if Wisner's rectal or anal exams lasted too long, Wisner's primary objective was still thoroughness.  (Exh. 238, 26:10-14).

376.    Each and every physical Wisner performed on his patients, his primary intent was to conduct a thorough exam.  (Exh. 238, 26:16-20).

377.    In fact, Wisner told Special Agent Kerry Baker that "his method was simply thoroughness in looking for irregular- -- irregularities in their genitals . . . ." (Exh. 1, 86:3-9; Exh. 19).

378.    Wisner believes there could be a medical purpose for not wearing gloves in performing a genital exam because it may increase the ability to manually detect masses or other abnormalities.  (Exh. 238, 26:22 – 27:9).

379.    Wisner may have had to give genital, prostate or rectal exams that were not medically necessary, but his primary intent remained that he was trying to provide thorough medical care.  (Exh. 238, 11-18).

380.    Wisner believes that even if a genital, prostate or rectal exam was not medically necessary, those exams could still serve a medical purpose.  (Exh. 238, 27:20-25).

381.    Wisner has never been charged or convicted of anything related to John Doe, P.M. (Exh. 238, 43:6-11).

382.    Wisner had mixed motives where he was trained in the military method to be very thorough but also had sexual curiosity which began pervading into the exam room leading to deviations from the standard of care in choosing not to wear gloves, doing exams longer than necessary, or doing exams when they are not necessary.  (8/31/20 Tr., 139:8 – 140:6).

383.    There is a fine line where Wisner's sexual curiosity gets to the point where it is pervading the exam room.  (8/31/20 Tr., 139:8 – 140:6).

384.    Those genital exams performed by Wisner can still serve a medical purpose regardless of Wisner's intent.  (8/31/20 Tr., 140:7-9).

385.    Criminal action can coincide with a deviation from the standard of care, and can co-exist. (8/31/20 Tr., 140:13 – 141:24).

386.    Ultimately deemed criminal [conduct] does not dissolve or remove the fact that the standard of care applies to treatment.  (8/31/20 Tr., 141:25 – 142:3).

387.    When sexual assault occurs under the guise of a physical exam, that physical exam is still held to the standard of care for that physical exam.  (8/31/20 Tr., 200:12-16).

388.    If the conduct of a medical practitioner rises to the level of criminal but the conduct occurs in and as part of medical care like a physical exam, the conduct absolutely violates the standard of car.  (8/31/20 Tr., 209:5-11).

### *Wisner's Prescription Practices*

389.    Wisner's Scope of Practice authorized him to prescribe narcotic medications to his patients including Morphine, Oxycodone, Codeine, Meperidine, Fentanyl, Diazepam, and Hydrocodone, among others.  (Exh. 75, p. 7).

390.    Plaintiff believed that he had to have a genital exam in order to get his medications refilled.  (8/31/20 Tr., 115:20 – 116:2).

391.    When Plaintiff saw Wisner on March 1, 2011, Plaintiff was being prescribed Alprazolam.  (8/31/20 Tr., 121:3-6).

392.    Wisner's clinic note dated June 1, 2011, documents oxycodone was added to the prescribed medications for Plaintiff.  (8/31/20 Tr., 121:7-13).

393.    Wisner's clinic note dated February 24, 2012, documents a trial of lorazepam, a benzodiazepine, was started for Plaintiff.  (8/31/20 Tr., 121:14-23).

394.    On March 14, 2012, Jennifer Kreitzer documents that Plaintiff presented to the clinic requesting a refill of his oxycodone and Dr. Aron instructed that Plaintiff will need to come back and speak with his PCP, referring to Wisner.  (8/31/20 Tr., 122:4-21; Exh. 201).

395.    On March 14, 2012, Dr. Aron documented in an addendum that because Plaintiff had demonstrated typical drug seeking/substance abuse behavior, he did not feel comfortable writing him any narcotic prescription.  (8/31/20 Tr., 122:22 – 123:7; Exh. 201).

396.    On March 16, 2012, receipt of Dr. Aron's addendum note was acknowledged by Wisner before Wisner saw Plaintiff on March 20, 2012.  (8/31/20 Tr., 123:14 – 124:1).

397.    On March 20, 2012, Wisner continued Plaintiff's medications including oxycodone despite having received the addendum from Dr. Aron.  (8/31/20 Tr., 124:2 – 125:2).

398.    After the clinic visit on March 20, 2012, Wisner continued the oxycodone prescription in subsequent clinic visits.  (8/31/20 Tr., 125:3-6).

399.    Wisner added the prescription drug Tramadol, another opioid narcotic medication documented in the November 26, 2012 clinic note.  (8/31/20 Tr., 125:7-14; Exh. 203).

400.    Wisner continued the Tramadol prescription and added additional medication Tylenol No. 3 in Plaintiff's subsequent visit on May 16, 2013.  (8/31/20 Tr., 125:15-23; Exh. 204).

401.    On March 20, 2014, Wisner added morphine IR to Plaintiff's medication regimen.  (8/31/20 Tr., 125:24 -126:12; Exh. 205, p. 3).

402.    Morphine IR is an immediate release form of morphine that is a highly addictive narcotic pain medication.  (8/31/20 Tr., 126:13-16).

403.    On the last documented visit with Wisner on April 19, 2014, Wisner's clinic note for the first time documents Wisner resisting or discussing Plaintiff's use of narcotics being inappropriate or excessive.  (8/31/20 Tr., 126:17 – 127:13; Exh. 206).

404.    Wisner's clinic note discussing drug seeking behavior by Plaintiff for the first time is over two years after the addendum from Dr. Aron in March 2012.  (8/31/20 Tr., 127:14-17).

405.    Wisner's April 19, 2014 clinic note is the first instance in which Wisner discusses the need to wean Plaintiff off his medications.  (8/31/20 Tr., 128:6-9).

406.    The April 19, 2014 clinic visit is the only visit whereby Plaintiff declined to undergo a genital exam.  (8/31/20 Tr., 128:10-13).

407.    Dr. Ray is an anesthesiologist and the only pain management physician on staff at VAMC Leavenworth, and had been serving in that capacity for five and a half years.  (8/31/20 Tr., 129:2-8; Exh. 20, p. 1).

408.    On January 26, 2015, Dr. Ray stated she had many patients referred to her by Wisner, and she thought Wisner was "generous" in prescribing narcotics. (8/31/20 Tr., 129:17-23; Exh. 20, p. 2).

409.    Dr. Ray stated she found it particularly unusual for a physician assistant to prescribe such high doses of narcotic pain medications. (8/31/20 Tr., 130:1-4; Exh. 20, p. 2).

410.    For someone such as Dr. Ray, who is prescribing copious amounts of pain medication, to think Wisner was prescribing high doses of narcotic pain medications and generous in his prescribing habits is a huge red flag.  (8/31/20 Tr., 130:11-23).

411.    The first visit with Wisner, Plaintiff was noted to have alcohol dependence, alcohol induced mood disorder, sedative hypnotic, and narcotic abuse.  (Exh. 197, 9/3/20 Tr., 119:20-25).

412.    At the first visit, Wisner wrote Plaintiff a prescription for Xanax.  (Exh. 197, 9/3/20 Tr., 1120:1-5).

413.    At the second visit, Plaintiff was to continue on Xanax and add in oxycodone, an opiod.  (Exh. 197, 9/3/20 Tr., 120:6-16).

414.    At the February 24, 2012 visit, Wisner changed Plaintiff's oxycodone to lorazepam, and added quetiapine.  (Exh. 200, 9/3/20 Tr., 120:17-121:4).

415.    Plaintiff did not know Wisner was not authorized to prescribe quetiapine.  (9/3/20 Tr., 121:5-7).

416.    At the March 20, 2012 visit, Wisner continued Plaintiff on oxycodone, added a muscle relaxer, and prescribed quetiapine.  (Exh. 201, 9/3/20 Tr., 121:8-15).

417.    There is an addendum to the March 20, 2012 visit when Plaintiff asked for a pain medication refill, but it was denied by Dr. Aron who noted Plaintiff was exhibiting drug seeking behavior.  (Exh. 201, 9/3/20 Tr., 121:16-122:6).

418.    Wisner received Dr. Aron's note on March 16, 2012.  (Exh. 201, 9/3/20 Tr., 122:7-9).

419.    Wisner did not stop writing prescriptions for pain medication.  (9/3/20 Tr., 122:10-12).

420.    On April 24, 2012, Wisner kept Plaintiff on the lorazepam, quetiapine, and oxycodone.  (Exh. 202,  9/3/20 Tr., 122:13-18).

421.    On November 26, 2013, Wisner continued Plaintiff's oxycodone, lorazepam, quetiapine, and added Tramadol, an opiod pain reliever.  (Exh. 203, 9/3/20 Tr., 122:19-25).

422.    On May 16, 2013, Wisner continued the Tramadol, lorazepam, quetiapine, and added Tylenol Three, which is codeine and an opiate.  (Exh. 204, 9/3/20 Tr., 123:1-9).

423.    Due to the medications, Plaintiff was not very lucid.  (9/3/20 Tr., 123:14-19).

424.    Due to the medications, Plaintiff recalls listlessly going about his life in a very foggy or hazy way .  (9/3/20 Tr., 123:14-19).

425.    Plaintiff was impaired daily from the medications, for months at a time.  (9/3/20 Tr., 123:20-25).

426.   Plaintiff was impaired from taking the pills Wisner was giving to him.  (9/3/20 Tr., 124:1-2).

427.   At the July 25, 2013 visit, Plaintiff asked to taper off the hydrocodone because he was tired of being impaired all the time and having his mood affected.  (9/3/20 Tr., 124:3-20).

428.   Wisner did take Plaintiff off the hydrocodone but then replaced it with more powerful opiates.  (9/3/20 Tr., 125:5-7).

429.   Three months after the July 25, 2013 visit, Plaintiff was hospitalized with a massive drug addiction issue.  (9/3/20 Tr., 125:21-24).

430.   At the March 20, 2014 visit, Wisner starts Plaintiff on clonazepam, continues Tramadol, quetiapine, continues oxycodone and adds morphine, an extremely powerful opiate.  (Exh. 205, 9/3/20 Tr., 126:3-15).

431.   Wisner told Plaintiff he didn't have addiction issues, but had legitimate reasons to be prescribed opiates.  (9/3/20 Tr., 128:7-16).

432.   Plaintiff discussed with Wisner his concerns about being an addict.  (9/3/20 Tr., 129:15-19).

433.   Wisner told Plaintiff that he wasn't displaying drug seeking behavior, and if Plaintiff was demonstrating any sense of urgency, it was symptomatic of the amount of pain Plaintiff was in.  (9/3/20 Tr., 129:20-130:6).

434.   After Wisner, the doctor who took over Plaintiff's care took Plaintiff off the medications immediately.  (9/3/20 Tr., 130:18-20).

435.   Being taken off medications was frustrating for Plaintiff and he didn't understand.  (9/3/20 Tr., 130:21-131:3).

436.    Plaintiff believed he had legitimate physical pain and the diagnosis to support it.  (9/3/20 Tr., 130:21-131:3).

437.    When Plaintiff could not get medication from the VA, he became a street addict for years.  (9/3/20 Tr., 131:4-10).

438.    Plaintiff's addiction destroyed the progress he had made in the years 2010-2013.  (9/3/20 Tr., 131:11-13).

439.    Plaintiff has not been prescribed an opiate since April 2014.   (9/3/20 Tr., 131:14-18).

440.    To achieve sobriety, Plaintiff did a 10-day program at the Kansas City VA.  (9/3/20 Tr., 158:4-8).

441.    Plaintiff sought help for his drug abuse because he wanted a better life for himself.  (9/3/20 Tr., 194:12-17).

442.    Contrary to the VA's claims, Wisner was not terminated. Instead he was allowed to retire. (Exh. 1, 21:22 – 22:15, 22:23 – 23:23).

443.    In fact, Dr. Cline told Special Agent Kerry Baker that the reason the VA did not renew Wisner's contract was "because of concerns about overprescribing testosterone and inappropriate jokes about recal exams, et cetera." (Exh. 1, 103:3-12; Exh. 21).

444.    Dr. Daniel Cline told Special Agent Kerry Baker that Defendant "Wisner had a higher than average patient population on fairly high doses of opiate pain medication . . . ." (Exh. 1, 100:16-23; Exh. 21).

445.    One of the physicians who took over Wisner's patients after his retirement was identified as Dr. Hamidjaja. (Exh. 1, 73:22 – 76:4; Exh. 18).

446.   Dr. Hamidjaja told Special Agent Kerry Baker that she reviewed Wisner's pain medication prescription to a patient identified for the purposes of this record as John Doe D.M. (Exh. 1, 73:22 – 76:4; Exh. 18)

447.   Dr. Hamidjaja told Special Agent Kerry Baker that Wisner's prescriptions for opiates and narcotic pain medication to John Doe D.M. were extremely high, unnecessary, and disproportionate to the patient's symptoms. (Exh. 1, 73:22 – 76:4; Exh. 18).

448.   Dr. Hamidjaja reported Wisner's "liberal use of narcotic pain relief" to Dr. Daniel Cline. (Exh. 1, 73:22 – 76:4; Exh. 18).

449.   Dr. Hamidjaja also informed Dr. Daniel Cline that Wisner appeared to overprescribe testosterone to his mostly-young, male patients. (Exh. 1, 73:22 – 76:4; Exh. 18).

450.   Dr. Hamidjaja also informed Special Agent Kerry Baker that John Doe D.M.'s judgment would be impaired by the dosages of narcotics Wisner prescribed to him. (Exh. 1, 77:13 – 78:9; Exh. 18).

451.   After Wisner's retirement, Dr. Hamidjaja and a VA pharmacist named Cynthia Copeland conducted a review of Wisner's clinical pharmacy reports and discovered that many of Wisner's patients were on disproportionately high doses of narcotic pain medicine. (Exh. 1, 78:21 – 79:12; Exh. 18).

452.   In fact, Dr. Hamidjaja informed Special Agent Kerry Baker that her main concern with Wisner was his apparent overprescribing of controlled substances to his patients. (Exh. 1, 80:9-16; Exh. 18).

453.   One of Wisner's patients was so impaired by the opioids prescribed by Wisner that Special Agent Kerry Baker had to drive him to the sheriff's office for a statement. (Exh. 1, 201:6-23).

454.     Wisner admitted to Agent Baker that he knew long-term narcotic prescriptions could cause impairment and was also a way to keep patients happy and willing to come back. (Exh. 1, 87:17 – 88:4, 92:21 – 93:4; Exh. 19).

455.     Dr. Mahoua Ray, the only pain management physician on staff at VAMC Leavenworth, noted Wisner was "generous" in prescribing narcotics, and found it particularly unusual for a Physician Assistant to prescribe such high doses of narcotic pain medications.  Exh. 20, 1-2).

456.     Following Wisner's retirement, Dr. Ray's review revealed that Wisner was overprescribing opioids to patients. (Exh. 10, 177:15 – 178:5).

457.     The Kansas Board of Healing Arts found that Wisner "violated K.S.A. 65-28a05(a) as further defined by K.A.R. 100-28a-8(j) by prescribing controlled substances to [patients] in an excessive, improper, and inappropriate manner or quantity." (Exh. 129, ⁋32)

458.     There were times when Wisner prescribed medicine that was not on his approved medication list, but he was never disciplined.  (Exh. 238, 31:6-20).

### *Wisner was an Impaired Practitioner*

459.     In the field of primary care medicine, practitioner impairment is a recognized cause of standard of care violations or deviations.  (8/31/20 Tr., 130:24 – 131:3).

460.     The field of primary care medicine recognizes the need to anticipate, recognize, and address provider impairment when necessary.  (8/31/20 Tr., 131:4-7).

461.     The Kansas State Board of Healing Arts determined that Wisner was an impaired practitioner. (8/31/20 Tr., 135:18 – 136:10; Exh. 129).

462.     Wisner admitted to the Kansas Board of Healing Arts that he was an impaired practitioner.  (8/31/20 Tr., 136:11-15).

463.     Wisner stated to the Kansas Board of Healing Arts "I am an impaired practitioner and not capable of patient care and I voluntarily surrender my license."  (8/31/20 Tr., 136:25 - 137:8; Exh. 129, p. 5).

464.     The Kansas Board of Healing Arts found Wisner violated K.S.A. 65-28a05 by committing repeated acts of unprofessional conduct with patients at the Dwight D. Eisenhower VA Medical Center.  (8/31/20 Tr., 137:9-14; Exh. 129, p. 9).

465.     The Kansas Board of Healing Arts found Wisner violated K.S.A. 65-28a05 when he willfully and repeatedly violated the physician assistant licensure act, the pharmacy act of the state of Kansas, or the uniform control substances act, by repeatedly sexually assaulting his patients, having inappropriate sexual contact with his patients, making inappropriate sexual comments to his patients, overprescribing to his patients, and not meeting the appropriate standard of care.  (8/31/20 Tr., 137:15 – 138:4; Exh. 129, p. 9).

466.     Similar to Dr. Kelley's findings, the Kansas Board of Healing Arts determined and found that Wisner did not meet the appropriate standard of care.  (8/31/20 Tr., 138:8-11).

467.     The Kansas Board of Healing Arts found that Wisner violated K.S.A. 65-28a05 by repeated instances involving patients in which he failed to adhere to the applicable standard of care to a degree that constitutes ordinary negligence when he repeatedly performed unnecessary genital and testicular examinations, overmedicated patients, failed to wear gloves and did not refer patients as needed.  (8/31/20 Tr., 138:12-22; Exh. 129, p. 11).

468.     Consistent with Dr. Kelley, the Kansas Board of Healing Arts found Wisner's conduct in performing unnecessary genital exams and in failing to wear gloves constitutes ordinary negligence and fails to adhere to the applicable standard of care.  (8/31/20 Tr., 138:23 – 139:7).

469.     On January 28, 2015, Wisner admitted he was an impaired practitioner and voluntarily surrendered his license.  (Exh. 129. p. 5).

470.     In the field of primary care medicine, practitioner impairment is a recognized cause of standard of care violations or deviations.  (8/31/20 Tr., 130:24 – 131:3).

471.     The field of primary care medicine recognizes the need to anticipate, recognize, and address provider impairment when necessary.  (8/31/20 Tr., 131:4-7).

472.     The Kansas State Board of Healing Arts determined that Wisner was an impaired practitioner. (8/31/20 Tr., 135:18 – 136:10; Exh. 129).

473.     Wisner admitted to the Kansas Board of Healing Arts that he was an impaired practitioner.  (8/31/20 Tr., 136:11-15).

474.     Wisner stated to the Kansas Board of Healing Arts "I am an impaired practitioner and not capable of patient care and I voluntarily surrender my license."  (8/31/20 Tr., 136:25 - 137:8; Exh. 129, p. 5).

475.     The Kansas Board of Healing Arts found Wisner violated K.S.A. 65-28a05 by committing repeated acts of unprofessional conduct with patients at the Dwight D. Eisenhower VA Medical Center.  (8/31/20 Tr., 137:9-14; Exh. 129, p. 9).

476.     The Kansas Board of Healing Arts found Wisner violated K.S.A. 65-28a05 when he willfully and repeatedly violated the physician assistant licensure act, the pharmacy act of the state of Kansas, or the uniform control substances act, by repeatedly sexually assaulting his patients, having inappropriate sexual contact with his patients, making inappropriate sexual

comments to his patients, overprescribing to his patients, and not meeting the appropriate standard of care.  (8/31/20 Tr., 137:15 – 138:4; Exh. 129, p. 9).

477.    Similar to Dr. Kelley's findings, the Kansas Board of Healing Arts determined and found that Wisner did not meet the appropriate standard of care.  (8/31/20 Tr., 138:8-11).

478.    The Kansas Board of Healing Arts found that Wisner violated K.S.A. 65-28a05 by repeated instances involving patients in which he failed to adhere to the applicable standard of care to a degree that constitutes ordinary negligence when he repeatedly performed unnecessary genital and testicular examinations, overmedicated patients, failed to wear gloves and did not refer patients as needed.  (8/31/20 Tr., 138"12-22; Exh. 129, p. 11).

479.    Consistent with Dr. Kelley, the Kansas Board of Healing Arts found Wisner's conduct in performing unnecessary genital exams and in failing to wear gloves constitutes ordinary negligence and fails to adhere to the applicable standard of care.  (8/31/20 Tr., 138:23 – 139:7).

480.    On November 14, 2014, Dr. Rudy Klopfer, Director of the VA Eastern Kansas Health Care System, sent written notice to the Kansas State Board of Healing Arts, that allegations concerning Wisner suggest the provider may have failed to meet generally-accepted standards of clinical practice.  (Exh. 97, p.1).

481.    On February 10, 2015, the Kansas State Board of Healing Arts found, *inter alia*, Wisner violated K.S.A. 65-28a05(c) as defined by K.A.R. 100-28a7(b) by repeated instances in which he failed to adhere to the applicable standard of care to a degree that constitutes ordinary negligence when he repeatedly performed unnecessary genital and testicular examinations, overmedicated patients, failed to wear gloves and did not refer patients as needed.  (Exh. 129, p. 11).

### *VHA Policies Recognize Potential for Patient Abuse*

482.     In the field of primary care medicine, chaperones are commonly required for examinations where the practitioner and patient are of opposite sexes because there is a risk of abuse in these examinations.  (8/31/20 Tr., 142:8-18).

483.     Healthcare providers are mandated reporters to report abuse and [neglect].  (8/31/20 Tr., 142:19-23).

484.     The VA had an abuse and [neglect] reporting directive.  (8/31/20 Tr., 142:24 – 143:1).

485.     VHA Directive 2012-026 addresses sexual assault and other defined public safety incidents in VHA facilities.  (8/31/20 Tr., 143:2-7; Exh. 27).

486.     VHA Directive 2012-026 provides the facility director is responsible for ensuring a written and established policy consistent with this directive is implemented by December 31, 2012.  (8/31/20 Tr., 143:21-25; Exh. 27, p. 5).

487.     VHA Directive 2012-026 requires a centralized and comprehensive policy on the reporting and tracking of sexual assaults, sexual assault incidents, and other public safety incidents.  (8/31/20 Tr., 144:1-5; Exh. 27, p. 5).

488.     The Leavenworth VA did not comply with VHA Directive 2012-026 because there were obvious complaints of multiple instances of sexual abuse and it wasn't until the very end that the VA finally acted on it.  (8/31/20 Tr., 144:6-12).

489.     The VA Eastern Kansas Health Care System had a policy entitled Abuse, Neglect Or Exploitation Policy dated February 5, 2010.  (8/31/20 Tr., 144:13-18; Exh. 61).

490.     The stated purpose of the Abuse, Neglect Or Exploitation Policy was to maintain a policy, procedure and responsibility for the identification, protection and referral of abuse or

suspected abuse victims that are recognized in the VA Eastern Kansas Health Care System, VA EKHCS, and to ensure that the same level of care is applied throughout the system while protecting the patient's rights, dignity and well-being.  (8/31/20 Tr.,144:25 – 145:7; Exh. 61, p.1),

491.    The EKHCS Abuse, Neglect Or Exploitation Policy is significant because the VA recognized, as medicine does, that there is potential for sexual abuse in the medical care field in primary care.  (8/31/20 Tr., 145:8-20)

492.    The VA EKHCS had a policy entitled Patient And Visitor Abuse dated May 21, 2013.  (8/31/20 Tr., 145:21 – 146:12; Exh. 63).

493.    The EKHCS Patient And Visitor Abuse policy defines patient abuse to include actions against patients that involve physical, psychological, sexual or verbal abuse.  (8/31/20 Tr., 146:13-20; Exh. 63, p. 1).

494.    The EKHCS Patient And Visitor Abuse policy provides employee "intent" to abuse is not a requirement for patient abuse and the patient's perception of how he/she was treated is an essential component of the determination as to whether a patient was abused.  (8/31/20 Tr., 146:13-20; Exh. 63, p. 1).

495.    The patient complaints contain instances where a patient of Wisner is expressing the perception that they had been mistreated or abused.  (8/31/20 Tr., 146:21 – 147:11).

496.    The EKHCS Patient And Visitor Abuse policy defines patient abuse to include acts of unkindness, mistreatment, unwelcomed teasing, threatening behavior, speaking harshly, rudely or irritably to a patient, indifference, rude gestures, rough handling, physical assault, sexual acts or overtures.  (8/31/20 Tr., 147:16 – 148:1; Exh. 63, p.1).

497.    The  EKHCS  Patient  And  Visitor  Abuse  policy  requires  the  employee  who witnesses or who is the first to become aware of the incident will initiate and complete an electronic

incident report or report of contact and that any incident or allegation of a criminal nature will also be reported to EKHCS police.  (8/31/20 Tr., 148:6-13; Exh. 63, p. 1).

498.    The EKHCS Patient And Visitor Abuse policy was not adhered to with respect to patient complaints concerning Wisner.  (8/31/20 Tr., 148:22-24).

499.    The EKHCS Patient And Visitor Abuse policy requires the chief of quality management to review the incident, gather additional information and forward to the chief of staff and director for determination of investigation commencement.  (8/31/20 Tr., 148:25 – 149:4; Exh. 63, p. 1).

500.    The EKHCS Patient And Visitor Abuse policy requires the chief of staff to review the report, develop any additional medical facts as necessary, determine the need for additional investigation, and forward the report with documented comments and recommendation to the board director.  (8/31/20 Tr., 149:5-11; Exh. 63, p. 2).

501.    The EKHCS Patient And Visitor Abuse policy requires the director, associate director, chief of staff, associate director of patient care services, deputy chief of staff and assistant director to review the facts presented, document comments and recommendations.  (8/31/20 Tr., 149:23 – 150:5; Exh. 63, p. 2).

502.    There is no evidence that the EKHCS Patient And Visitor Abuse policy procedures were being followed with respect to patient complaints concerning Wisner.   (8/31/20 Tr., 150:6-9).

503.    Special Agent Kerry Baker testified that Wisner was in a position of power over his patients. (Exh. 1, 199:21 – 201:2).

504.    Several victims told Special Agent Kerry Baker that they thought Wisner was a licensed physician. (Exh. 1, 69:3-13).

505.   Richard Lawrenz worked as a patient advocate at the VA Leavenworth from 2008 through 2015. (Exh. 9, 13:22 – 15:9).

506.   When Patient Advocate Richard Lawrenz received complaints about a healthcare provider, he entered the information into a database called Patient Advocate Tracking System, or PATS. (Exh. 9, 26:2 – 27:20, 35:11-15).

507.   Patient Advocate Richard Lawrenz testified that other VA Leavenworth employees used a different "Report of Contact" form but those complaints were not entered into the PATS system. (Exh. 9, 129:8-20, 130:2-4, 130:14 – 131:6; See also, Exh. 76).

508.   The VA social workers did not have access to the VA PATS system. (Exh. 10, 161:19-24).

509.   VA Chief Quality Officer Michelle Boylan admitted that medical providers or social workers would not have access to the PATS system, or centralized system for tracking sexual assaults.  (Exh. 3, 152:20-24; 153:10-15).

510.   Even Richard Lawrenz's supervisor, Mary Weier, did not have access to the PATS system. (Exh. 9, 61:16-18 – 62:1-15).

511.   Even the VA police do not have access to the PATS system. (Exh. 9, 107:24 – 108:3).

512.   Patient Advocate Richard Lawrenz testified that he was angry to learn that other social workers and medical providers received similar complaints about Wisner but he was unaware of them. (Exh. 9, 259:23 – 260:2).

513.   Neither the VA Police or the OIG's office ever asked to examine Patient Advocate Richard Lawrenz's PATS system regarding Wisner. (Exh. 9, 39:20 – 40:11, 132:11 – 133:2).

514.     In fact, Patient Advocate Richard Lawrenz testified that no supervisor or manager ever asked him questions about Wisner, before or after charges were filed. (Exh. 9, 41:12 – 42:5).

515.     Rudy Klopfer testified that at least "some" of the complaints regarding Wisner constitute a "public safety incident" as defined by the VHA Directive 1063. (Exh. 8, 217:19 – 222:4, Exh. 27).

516.     Dr. Leeson testified that at least one of the Wisner complaints from 2012 were not reported to the service line manager. (Exh. 10, 55:22 – 56:6).

517.     Rudy Klopfer did not know that other VA employees were not aware that their co-employees had received complaints regarding Wisner. (Exh. 8, 81:7-13).

518.     On February 5, 2010, the VA Eastern Kansas Health Care System issued a Policy Memorandum to identify and address suspected sexual abuse among the patient population in the VA Eastern Kansas Health Care System.  (Exh. 61).

519.     On May 21, 2013, the VA Eastern Kansas Health Care System issued a Policy Memorandum to address incidents of patient abuse in the VA Eastern Kansas Health Care System. (Exh. 63).


### *Foreseeability of Wisner's Conduct*

520.     Prior to being hired by the VA Leavenworth, Wisner had been charged with indecent exposure in California. (Exh. 8, 94:24 – 95:4).

521.     Special Agent Kerry Baker ran Wisner's name through the NCIC (National Criminal Information Center) and saw that he had been arrested in 1987 and charged with lewd and lascivious conduct. (Exh. 1, 44:20 – 45:9).

522.     Federal and state agencies have access to the NCIC. (Exh. 1, 47:7-25)

523.     Wisner told Special Agent Kerry Baker that he had flashed his genitals and that it was a "glory hole" situation. (Exh. 1, 45:20 – 46:10).

524.     Background checks are supposed to be ran every 2-3 years, yet Rudy Klopfer is not aware of any background checks being ran on Wisner after he was hired in 2008. (Exh. 8, 102:14 – 103:1).

525.     VA Leavenworth failed to investigate why Wisner was previously rejected from employment by another VA hospital. (Exh. 10, 148:16 – 149:11).

526.     VA Social Worker Dawn Clouse received complaints about Wisner's physical exams.  (Exh. 5, 30:23-31:2).

527.     VA Social Workers have a duty to report suspected abuse of patients.  (Exh. 5, 36:19-25).

528.     Professionals at the VA, including social workers, were required to document alleged abuse.  (Exh. 61; Exh. 5, 52:3-16).

529.     VA Social Worker Dawn Clouse was not aware of any centralized tracking system for VA Leavenworth for reporting sexual assaults.  (Exh. 5, 67:23-68:9).

530.     VA Social Worker Dawn Clouse did not investigate any of the complaints she received.  (Exh. 5, 158:19-20).

531.     VA Social Worker Dawn Clouse told Special Agent Kerry Baker that at the time Wisner was at the VA Leavenworth, "she did not believe that there was a formal process in place" for reporting patient complaints. (Exh. 1, 139:16-21, 180:16-21; Exh. 23).

532.     VA Social Worker Dawn Clouse never brought this complaint to Rudy Klopfer's attention. (Exh. 8, 33:1-6).

533.    On February 17, 2012, Wisner's supervisors, Dr. Anil Desai and Dr. Daniel Cline, were aware that on at least 2 occasions, Wisner performed knee injections without having privileges to perform those procedures.  (Exh. 32, 1).

534.    At the time he was hired, Patient Advocate Richard Lawrenz did not receive any training. (Exh. 9, 16:19-23).

535.    Patient Advocate Richard Lawrenz claimed in his deposition that the only complaints he received about Wisner were patients who wanted to be reassigned to a difference primary care physician. (Exh. 9, 79:3-19).

536.    On February 21, 2012, VA Patient Advocate Richard Lawrenz received a report from a patient identified for this record as John Doe T.S. who was "uncomfortable" with comments made by Wisner during a medical visit and that Wisner used a scope to perform a rectal exam. (Exh. 29, 1).

537.    After receiving the report of contact from Patient John Doe T.S., Patient Advocate Richard Lawrenz issued a "heads up" to Dr. Daniel Cline and the chief of medicine service, Dr. Aniel Desai. (Exh. 9, 93:25 – 94:6, 94:24 – 96:9; *See also,* Exh. 29).

538.    Patient Advocate Richard Lawrenz coded John Doe T.S.'s complaint as an allegation of "negligence/malpractice." (Exh. 9, 97:4-7; *See also,* Exh. 29).

539.    Patient Advocate Richard Lawrenz testified that even though John Doe T.S. reported feeling "violated," he did not report John Doe T.S's complaints to the VA police because the patient was not "graphic" in his description of what occurred. (Exh. 9, 98:20 – 99:24, 100:6-12; *See also,* Exh. 29).

540.   John Doe T.S. even reported to Patient Advocate Richard Lawrenz that Wisner "used a scope to do a rectal exam for possible hemorrhoids." (Exh. 9, 100:24 – 101:2, 231:13 – 11, 231:21 – 233:17; *See also,* Exh. 29).

541.   Patient Advocate Richard Lawrenz testified that John Doe T.S.'s complaint was so serious, that in seven and a half years, it was the only time he coded a complaint in the PATS system as "Allegations of negligence/malpractice." (Exh. 9, 103:1-11).

542.   Instead of reporting this matter to the VA police as required, however, Patient Advocate Richard Lawrenz's recommendation was to change John Doe T.S.'s primary care provider. (Exh. 9, 52:2-5; 52:25 – 53:2, 101:3-15; Exh. 29).

543.   Patient Advocate Richard Lawrenz admitted that under the VA Patient and Visitor Abuse policy, the definition of abuse included "sexual acts" and "overtures," which would apply to the allegations he received regarding Wisner. (Exh. 9, 181:19 – 183:4; *See also*, Exh. 63).

544.   Patient Advocate Richard Lawrenz never received any training on the VA Patient and Visitor Abuse Policy. (Exh. 9, 184:2-10).

545.   Patient Advocate Richard Lawrenz never reported John Doe T.S.'s complaint to the VA Police though he should have under, *inter alia*, the VA Patient and Visitor Abuse Policy. (Exh. 9, 186:7 – 187:13, 138:14-22, 238:25 – 239:6; *See also,* Exh. 29; Exh. 63).

546.   Director Rudy Klopfer testified that Patient Advocate Richard Lawrenz never talked to him. (Exh. 8, 23:24 – 24:7).

547.   Director Rudy Klopfer testified that he did not learn of John Doe T.S.'s complaint until after Wisner retired. (Exh. 8, 22:25 – 23:14).

548.   In 2012, a patient identified for this record as John Doe N.A. made a complaint regarding Wisner to VA social worker Dawn Clouse. (Exh. 8, 29:7-14, 29:22 – 30:8, 30:19 – 32:1).

549.    According to the complaint, John Doe N.A. reported to VA Social Worker Dawn Clouse that he felt uncomfortable with Wisner's genital exams, that Wisner was inappropriate during his exams, and the patient demanded a new provider.  (Exh. 66 at 1, Exh. 8, 30:19 – 32:1).

550.    Rudy Klopfer claimed that he was never informed of John Doe N.A.'s complaint. (Exh. 8, 29:7-14, 29:22 – 30:8, 30:19 – 32:1).

551.    Rudy Klopfer testified that, at a minimum, Dawn Clouse should have reported this complaint to her supervisor. (Exh. 8, 258:16 – 259:6).

552.    On March 29, 2012, VA police and the VA Office of Inspector General were aware that a patient, identified for purposes of this record as John Doe J.D., alleged he had been sexually assaulted by Wisner at a medical appointment.  (Exh. 8, 20:5 – 20:11, 20:22 - 21:14, 161:13 – 164:18, 165:15 – 166:8; Exh. 85).

553.    On March 29, 2012, John Doe J.D. reported to the Department of Veterans Affairs, VA Police, that Wisner sexually assaulted him on March 28, 2012, in an exam room by putting his hand down his underwear to his groin area without telling the patient he was going to do that. (Exh. 40, at 1-2, (Exh. 8, 20:5 – 20:11, 20:22 - 21:14, 161:13 – 164:18, 165:15 – 166:8; Exh. 85; Exh. 8, 21:16 – 22:8).

554.    On March 29, 2012, John Doe J.D. was admitted to the VA acute psychiatry unit stating he was homicidal towards Wisner.  (Exh. 56, p. 1).

555.    The allegations concerning John Doe J.D. occurred approximately one month and one week before John Doe T.S.'s complaint. (Exh. 9, 106:11 – 108:3; *See also,* Exh. 29, Lawrenz Exh. 4).

556.    Patient Advocate Richard Lawrenz was not aware of John Doe J.D.'s allegations against Wisner at the time he took the complaint from John Doe T.S. (Exh. 9, 106:11 – 108:3).

557.    Patient Advocate Richard Lawrenz testified that if he had known about John Doe J.D.'s complaint at the time he took John Doe T.S.'s complaint, he would have immediately reported it to his supervisor and the VA police. (Exh. 9, 108:15 – 109:23).

558.    In his deposition, Rudy Klopfer claimed that he had never seen the VA Police report on John Doe J.D. (Exh. 8, 21:22 – 22:8).

559.    Special Agent Kerry Baker testified that the 2012 complaint made by John Doe J.D. were very similar to the allegations he investigated in 2014. (Exh. 1, 182:13-20).

560.    The VA purportedly decided not to renew Wisner's contract after the May 2014 complaints because there had been a prior complaint in 2012. (Exh. 1, 23:10-23, 24:6-16, 27:8-20, 43:1-5, 43:23 – 44:5; Exh. 16).

561.    Dr. Leeson was produced by the United States pursuant to a Rule 30(b)(6) deposition notice to provide testimony on, *inter alia*, why Wisner was permitted to engage in patient care after February of 2012 without a chaperone. (Exh. 10, 52:11 – 53:10, 149:12-18, 205:19 – 206:13).

562.    Dr. Leeson testified that the VA should have investigated the claims that were made in February of 2012. (Exh. 10, 55:1-21, 150:10 – 151:6, 151:7-23).

563.    Dr. Leeson testified that after looking for evidence, he could find no evidence that the VA investigated the complaint made in February of 2012. (Exh. 10, 149:22 - 150:9, 151:24 – 152:4).

564.    Dr. Leeson testified that the failure to report the 2012 Wisner complaint to the service line manage was a "failure on the part of the V.A." (Exh. 10, 56:7-9).

565.    On April 2, 2013, the VA received a report from a patient, identified for purposes of this record as John Doe J.E., who stated he did not feel that Wisner had his best interests at heart and the veteran requested another provider.  (Exh. 55, at 1; Exh. 8, 26:19 – 28:3).

566.    According to the complaint, Wisner told John Doe J.E. that he could "put more pain medication up his rear end and it wouldn't do any good." (Exh. 8, 28:4-11).

567.    John Doe J.E.'s complaint against Wisner was made approximately six (6) months after John Doe J.D.'s complaint. (Exh. 9, 114:25 – 115:3, 115:12-16; *See also,* Exh. 55).

568.    Patient Advocate Richard Lawrenz testified that if he had known about John Doe J.E.'s complaints against Wisner, coupled with the complaints from John Doe J.D. and John Doe T.S., he would have gone to his supervisor, Wisner's supervisor, and possibly the police. (Exh. 9, 114:2-19, 115:12 – 116:5, 118:13).

569.    In fact, Patient Advocate Richard Lawrenz testified that he did not have the discretion, but had a duty to report these complaints. (Exh. 9, 117:18 – 118:9).

570.    Rudy Klopfer claimed that this incident was never reported to him until sometime in 2016 – after Wisner had already been allowed to retire. (Exh. 8, 26:22 – 28:25).

571.    Rudy Klopfer testified that there was no investigation of this report. (Exh. 8, 28:12-25).

572.    On September 20, 2013, VA employee Richard Lawrenz received a report from a veteran requesting a new provider because he would be more comfortable with someone other than Wisner.  (Exh. 99, at 1).

573.    On January 23, 2014, VA social worker Melanie Lehman received a report from a veteran who reported feeling "uncomfortable" and "creeped out" by his medical visits with Wisner; the veteran reported having two testicular exams in a two-week time frame; and the

veteran stated the testicular exams felt "different" compared to testicular exams he had in the past by other providers.  (Exh. 76, at 1).

574.    On February 12, 2014, VA employee Richard Lawrenz received a report from a veteran requesting a new provider because the PCP told him the pharmacy didn't send narcotics by UPS anymore.  (Exh. 100, at 1).

575.    On February 20, 2014, a patient identified for the purposes of this record as John Doe M.S. made a complaint regarding Wisner's genital exams. (Exh. 8, 33:9 – 34:1, 171:9 – 20, 172:5 – 173:13. Exh. 76, Exh. 85).

576.    Mark Wisner's supervising physician, Dr. Daniel Cline, was made aware of John Doe M.S.'s complaint and purportedly looked into it. (Exh. 8, 35:25 – 36:19).

577.    Rudy Klopfer claimed that nobody ever brought this complaint to his attention until May of 2014. (Exh. 8, 33:9 – 34:1, 35:4-16).

578.    On March 6, 2014, Dr. Cline sent an email to Dr. Desai, referring to a patient complaining of inappropriate genital exams by Wisner, that the patient had come to the VA on January 2, 2014, and met with social worker Dawn Clouse.  (Exh. 77; 7/7/2020 Tr., 135:18 – 136:8).

579.    On March 28, 2014, supervising physician Daniel Cline sent an email to Wisner reviewing recent discussions instructing Wisner to "Always ask permission to examine a patient, particularly for genitourinary examinations" and to "Ask patients if they would like a chaperone to be present."   (Exh. 78, at 1).

580.    On May 15, 2014, a patient identified for the purpose of this record as John Doe A.C. made a complaint regarding Wisner's conduct during a physical exam. (Exh. 8, 37:4-17).

581.    The report was made to social worker Dawn Clouse. (Exh. 8, 37:4-17).

582.    Patient advocate Richard Lawrenz was also apprised of this complaint. (Exh. 8, 38:21 – 39:10).

583.    Though it was not, Patient Advocate Richard Lawrenz testified that John Doe A.C.'s complaint should have been entered into the PATS system. (Exh. 9, 142:10 – 143:1; See also, Exh. 65).

584.    The patient reported that John Doe A.C. stayed in the examination room in order to get his medications. (Exh. 80).

585.    John Doe A.C. thought that he would not get his medications if he left. (Exh. 80).

586.    Rudy Klopfer claimed that neither Richard Lawrenz nor Dawn Clouse ever reported this complaint to him. (Exh. 8, 37:4-17).

587.    Richard Lawrenz had received prior reports similar to those made by John Doe A.C.. (Exh. 8, 39:11 – 40-6).

588.    Dawn Clouse had received prior repots similar to those made by John Doe A.C... (Exh. 8, 39:11 – 40-6).

589.    Rudy Klopfer testified that Richard Lawrenz and Dawn Clouse should have noted the fact that prior reports similar to John Doe A.C.'s should have been noted in the Report of Contact. (Exh. 8, 40-7-13).

590.    In May 2014, the VA received additional patient complaints concerning Wisner's conduct and Wisner's comments during physical examinations.  (Exh. 80, 65, 102).

591.    Dr. Leeson testified that he could not find any evidence of any follow-up or investigations into any of the complaints made against Wisner prior to his retirement. (Exh. 10, 135:12-22).

592.    This included failure to investigate a complaint from a patient who reported that Wisner used an instrument to conduct an anal exam for hemorrhoids when Wisner was not even authorized to perform anoscopies. (Exh. 10, 135:23-14).

593.    Records indicated that a complaint against Wisner from 2012 was to be submitted to peer review; however, Dr. Leeson could find no evidence that his actually happened. (Exh. 10, 137:1-21).

594.    Dr. Leeson testified that he did not see anything "at all" to verify that the VA followed its own visitor abuse policy in investigating the 2012 complaints against Wisner. (Exh. 10, 208:24 – 210:12, 211:3-9, 211:11 – 212:1).

595.    Dr. Leeson testified that the same reporting/investigation process used regarding a similar VA sex abuse case should have been followed regarding the 2012 allegations against Wisner, but they were not followed. (Exh. 10, 212:8 – 213:9, 213:11-15, 213:25 – 214:4, 214:14-20. See also, Exh. 51).

596.    Dr. Leeson testified that mistakes were made by the VA in their responses to complaints made against Wisner. (Exh. 10, 145:20-24).

597.    Dr. Leeson agreed that VA employees did not do their jobs in supervising Wisner and properly investigating complaints made about Wisner. (Exh. 10, 163:21 – 164:12).

598.    Denni Woodmansee testified that the VA Leavenworth director, Rudy Klopfer, is responsible for investigating what happened to ensure it would not happen again. (Exh. 14, 151:20 – 152:13).

599.    Rudy Klopfer testified that though it is his duty to make sure staff did not violate any policies or standards of care, he never conducted an internal review/investigation, either before or after Wisner retired. (Exh. 8, 74:9 – 75:25, 83:24 – 84:21, 106:14 – 109:5, 121:2 – 122:11,

122:14 – 125:8, 125:15 – 126:25, 128:2-9, 141:15 – 142:6, 142:11 – 143:2, 144:1 – 4, 145:6 –

145:18, 147:11 – 149:19, 149:24 – 154:22, 166:19 – 169:22, 174:5 – 175:14, 175:25 – 176:20,

177:15 – 179:10, 180:1-16, 181:21-182:7, 182:8 – 183:12, 183:23 – 185:13, 185:20 – 187:1,

188:21 – 190:10, 190:25 – 191:18, 192:10:25, 214:23-25, 215:3-8, 215:15 – 217:6, 260:18 – 23,

261:8 – 264:2, 267:2 – 25; Exh. 86; Exh. 87; Exh. 88; Exh. 89; Exh. 64; Exh. 35).

600.    Under VHA Directive 2012-026, the VA Leavenworth director, Dr. Rudy Klopfer,
was responsible for ensuring that all employees are provided "with knowledge or information
about actual or possible violations of criminal law related only to public safety and sexual assault
issues within VA programs." (Exh. 14, 120:18 – 122:4. See also, Exh. 27).

601.    Under VHA Directive 2012-026, the VA Leavenworth director, Dr. Rudy Klopfer,
was responsible for "[e]nsuring that all employees are informed about the requirement to report
instances or allegations of sexual assault." (Exh. 14, 193:23 – 194:8, 231:19 – 232:14. See also,
Exh. 27).

602.    Patient Advocate Richard Lawrenz does not recall if he ever saw VHA Directive
2012-026, nor does he remember ever receiving any training on it. (Exh. 9, 176:16 – 177:2; *See
also*, Exh. 27).

603.    Patient Advocate Richard Lawrenz does not believe that the VA Leavenworth
Director, Rudy Klopfer, ever "implemented a centralized and comprehensive policy on the
reporting and tracking of sexual assaults, sexual assault incident and other public safety incidents."
(Exh. 9, 177:3-21).

604.    Denni Woodmansee testified that the social workers, patient advocates, and
supervising physicians at VHA Leavenworth were required to know that under VHA Directive
2012-026, sexual assault is defined as "any type of sexual contact or attempted sexual contact that

occurs without the explicit consent of the recipient of the unwanted sexual activity." (Exh. 14, 195:22 – 196:4. See also, Exh. 27).

605.     Denni Woodmansee testified that the social workers, patient advocates, and supervising physicians at VHA Leavenworth were required to know that under VHA Directive 2012-026, sexual assaults "may involve psychological coercion, physical force, or victims who cannot consent due to mental illness or other factors". (Exh. 14, 196:5-12. See also, Exh. 27).

606.     Denni Woodmansee testified that the social workers, patient advocates, and supervising physicians at VHA Leavenworth were required to know that under VHA Directive 2012-026, the definition of sexual assaults included "molestation" and "fondling." (Exh. 14, 196:13-20. See also, Exh. 27).

607.     Patient Advocate Richard Lawrenz testified that he never received training on the VA's "Abuse, Neglect or Exploitation Policy," (Exh. 9, 165:20 – 166:11; *See also*, Exh. 61).

608.     The VA's policy states, "If abuse could possibly have been by staff member, it should be reported on VAF 10-2633, Report of Special Incident Involving a Beneficiary.· And, in any event, if the abuse occurred on VA property, VA police should be immediately notified." (Exh. 9, 166:20 – 167:2; *See also*, Exh. 61).

609.     Patient Advocate Richard Lawrenz admitted that he was not trained on, nor was he aware of this policy, or that he was supposed to report such complaints to the VA police. (Exh. 9, 167:6 – 168:25, 170:15-23, 171:1-24, 172:25 – 173:6; See also, Exh. 61; Exh. 108).

610.     Patient Advocate Richard Lawrenz testified that despite clear written policies on reporting sexual complaints, he oftentimes made judgment calls, to went by a "gut feeling" as to whether the complaint should be reported and to whom. (Exh. 9, 239:7 – 241:9).

611.     Though he was a mandatory reporter, Patient Advocate Richard Lawrenz testified that he received complaints against Wisner wherein he was "on the fence" about reporting to the VA Police. (Exh. 9, 275:3 - 17).

612.     Patient Advocate Richard Lawrenz testified that when he received a complaint about a healthcare provider his first step was to determine if the "person is really giving a legitimate complaint." (Exh. 9, 34:4-10).

613.     Patient Advocate Richard Lawrenz testified that the VA Leavenworth did not have any policy or rule on how to handle or investigate complaints of sexual exploitation against VA health care providers. (Exh. 9, 47:13-18, 49:11).

614.     Even though his job required him to "detect patterns of behavior and take actions to stop it from happening, "Patient Advocate Richard Lawrenz testified that he did not "have time" to research patient complaints against healthcare providers. 120:22-25, 121:18 – 122:8, 124:3-24, 125:8 – 10, 177:22 – 178:24 – 179:11; 179:20 – 181:11; *See also*, Exh. 99).

615.     In fact, Patient Advocate Richard Lawrenz characterized such investigations as "fishing" expeditions. (Exh. 9, 133:3 – 134:5).

616.     Patient Advocate Richard Lawrenz admitted that he is "duty bound" to report any allegations of sexual exploitation against a VA health care provider to the service line manager. (Exh. 9, 49:12 – 50:3).

617.     Patient Advocate Richard Lawrenz testified that he had access to the VA Leavenworth tracking system for patient medical records, CPRS. (Exh. 9, 145:4 – 146:12).

618.     At least one of the complaints against Wisner was recorded in the CPRS system, however Patient Advocate Richard Lawrenz never looked for it. (Exh. 9, 143:6-19, 144:2-15, 145:4 – 146:12; *See also,* Exh. 102).

619.    Patient Advocate Richard Lawrenz testified that if he had authored or seen all of the complaints against Wisner he would have "see[n] a pattern." (Exh. 9, 162:3-25).

620.    Under VHA Directive 2012-022, the VA Leavenworth was to follow the policy of the state of Kansas in terms of reporting allegations of sexual abuse. (Exh. 14, 199:8 – 200:23. See also, Exh. 27).

621.    In addition to reporting Wisner complaints to their supervisors and the VA Police, Wisner's co-workers were required by law to report these incidents to the state of Kansas. (Exh. 14, 199:8 – 200:23, 201:4 – 202:3, 202:8 – 203:22. See also, Exh. 27).

622.    Even if the allegation did not rise to the level or reporting it to the state, all of the allegations made against Wisner should have been reported to the patient advocate and the service chief. (Exh. 14, 206:1-11).

623.    Denni Woodmansee testified that the patient advocate's job is to investigate complaints. (Exh. 14, 207:18 – 208:17).

624.    Denni Woodmansee testified that "some [VA] employees" failed their patients. (Exh. 14, 236:3-11).

625.    Rudy Klopfer testified that the VA Leavenworth violated its own policies and intentionally withheld information regarding Wisner-related complaints from his patients. (Exh. 8, 239:16 – 243:9, 278:12 – 279:5; Exh. 27).

626.    Dr. Leeson testified that under national policy, the VA is required to disclose adverse events, such as complaints to its patients. (Exh. 10, 27:6-11, 27:21 – 28:15; Exh. 109).

627.    Denni Woodmansee was produced by the United States pursuant to a Rule 30(b)(6) deposition notice to provide testimony on, *inter alia*, "VA policies that required Wisner's coworkers to report any other party allegations of patient abuse involving VA health care workers."

(Exh. 14, 112:18 – 113:20).

628.    Denni Woodmansee testified that Wisner's coworkers were required to "report . . . any activities that they had significant suspicions of or belief that there was sexual abuse occurring." (Exh. 14, 115:1-12, 118:7-24).

629.    Under the VA Patient Bill of Rights, and the Code of Federal Regulations, the VA had an obligation to reach out to all of Wisner's potential victims and notify them that they may have been harmed. (Exh. 14, 243:6 – 146:17).

630.    Special Agent Kerry Baker interviewed over one hundred patients who made allegations regarding sexual impropriety against Wisner. (Exh. 1, 197:17 – 198:6).

631.    All of the healthcare providers at VA Leavenworth were mandatory reporters under 38 CFR.  (Exh. 1, 123:15 – 124:16).

632.    Special Agent Kerry Baker testified that there were "a lot of fails" in terms of detecting Wisner's conduct among VA Leavenworth employees, including, but not limited to, his supervising physician and the patient advocate. (Exh. 1, 180:3:15, 211:14 – 212:13).

633.    Special Agent Kerry Baker also testified that his investigation showed that there was "a lack of oversight" and "accountability." (Exh. 1, 185:23 – 186:13).

634.    Special Agent Kerry Baker also testified that he strongly felt that this should not have happened "to this degree" and he felt that the VA let its patients down. (Exh. 1, 185:23 – 186:13).

635.    Patient complaints concerning Wisner date back to 2011.  (8/31/20 Tr., 150:10-25).

636.    Overall, the complaints indicate red flag upon red flag where there are deviations throughout the complaints of the standard of care as it relates to physical exams and particularly genital exams.  (8/31/20 Tr., 151:3-16).

637.     On February 17, 2012, Dr. Anil Desai and Dr. Daniel Cline were aware that Wisner exceeded his privileges on at least two occasion by carrying out procedures he did not have approved privileges to carry out.  (8/31/20 Tr., 151:22 – 152:22; Exh. 32).

638.     Dr. Desai recommended Wisner not carry out such procedures he did not have privileges for, which is not an adequate response.  (8/31/20 Tr., 152:23 – 154:12; Exh. 32).

639.     On February 21, 2012, Richard Lawrenz, a patient advocate, received a report from a veteran who felt "uncomfortable" with some conversation Wisner made during a clinic visit; that the veteran was "very upset" with what went on; that Wisner stated the veteran was so easy he could make pictures and post them on Facebook; that Wisner asked the veteran if he had ever been violated and then said "okay, I just did" after using a scope to do a rectal exam.  (8/31/20 Tr., 153:13 – 155: 9; Exh. 29).

640.     Mr. Lawrenz noted the veteran was embarrassed to describe Wisner's conduct in front of his girlfriend who was not in the room during the exam as seen by his blushing face.  (8/31/20 Tr., 155:4-13; Exh. 29).

641.     It is significant that a patient's perceptions of what occurred are such that the veteran was noted to be embarrassed and blushing recounting the event. (8/31/20 Tr., 155:20 – 156:7).

642.     Mr. Lawrenz suggested the veteran could change providers as the veteran voiced not returning to the VA.  (8/31/20 Tr., 155:14-19; Exh. 29).

643.     Providing a different provider is not an adequate response given what was reported by the veteran.  (8/31/20 Tr., 156:18-21).

644.    On March 29, 2012, a veteran being admitted to the acute psychiatry unit stated he was sexually assaulted by his VA primary care provider, identified as Wisner, on March 28, 2012, during an examination.  (8/31/20 Tr., 156:22 – 157:25; Exh. 56).

645.    The veteran stated the provider put his hand down his underwear to his groin area without letting him know what he was going to do and later grabbed his bottom and moved him out of the way, which is a red flag.  (8/31/20 Tr., 158:8-14; Exh. 56).

646.    The veteran stated he was homicidal towards the provider and the provider should be kept out of the VA.  (8/31/20 Tr., 158:15-20; Exh. 56).

647.    The fact that the patient perceived what occurred in the examination room with Wisner caused him to be homicidal towards Wisner is significant and should send up red flags. (8/31/20 Tr., 158:21 – 159:6).

648.    After the VA police contacted Wisner and received Wisner's account of the clinic visit and physical examination of the patient's genital area, the investigation was closed as unsubstantiated on March 30, 2012.  (8/31/20 Tr., 159:7 – 161:2; Exh. 56, p. 2; Exh. 40).

649.    Dr. Cline testified that if there were two complaints, Wisner should have been removed from clinical practice.  (8/31/20 Tr., 161:12-24).

650.    On May 4, 2016, a veteran expressed concern that in 2102 he told social worker Dawn Clouse that he felt uncomfortable with Wisner's exams, that Ms. Clouse told him he had nothing to worry about, and that the veteran told Ms. Clouse Wisner was inappropriate during his exams and the veteran demanded a new provider.  (8/31/20 Tr., 164:11 – 166:5; Exh. 66)

651.    When the veteran asked for copies of his record, he noted that Ms. Clouse was always extremely thorough in her progress notes with the two exceptions of the times he spoke negatively about Wisner.  (8/31/20 Tr., 166:10-16; Exh. 66).

652.    On April 2, 2013, the VA received a report from a veteran who recently moved back to the area, had Wisner for his PCP before and was reassigned to him, and requested another provider because he did not feel that Wisner has his best interests at heart.  (8/31/20 Tr., 167:2-23; Exh. 55).

653.    The veteran stated in reference to wanting an increase in pain medication, he was told by Wisner that he could put more pain medication up his rear and it wouldn't do any good, which he took offense to, and the veteran was told to stop his oxycodone cold turkey, which he knows isn't right.  (8/31/20 Tr., 168:3-20; Exh. 55).

654.    On September 20, 2013, patient advocate Richard Lawrenz received a report from a veteran wanting a new PCP, referring to Wisner, because he would be more comfortable with somebody else.  (8/31/20 Tr., 168:21 – 170:7; Exh. 99).

655.    On February 20, 2014, social worker Melanie Lehman issued a report stating a veteran was seen by her on January 23, 2014, for psychotherapy and the veteran discussed feeling uncomfortable with his medical care at the Leavenworth VAMC, specifically with his recent medical visits with Wisner.  (8/31/20 Tr., 172:23 – 174:1; Exh. 76).

656.    The veteran reported having two testicular exams in a two-week time frame, that he was unsure of the medical necessity of those exams, that the medical visits made him feel "creeped out" and he was unsure if he wanted to continue his medical care at the facility.  (8/31/20 Tr., 174:2-9; Exh. 76).

657.    On February 20, 2014, the veteran discussed with Mr. Lehman that he continued to feel upset about his medical visits with Wisner, and stated the testicular exams felt "different" compared to testicular exams by other providers.  (8/31/20 Tr., 174:6-24; Exh. 76).

658.    Following February 20, 2014 report, Wisner went on to conduct another genital exam on Plaintiff.  (8/31/20 Tr., 175:21-23).

659.    On March 6, 2014, Dr. Cline sent an email to Dr. Desai, referring to a patient complaining of inappropriate genital exams by Wisner, that the patient had come to the VA on January 2, 2014, and met with social worker Dawn Clouse.  (8/31/20 Tr., 175:24 – 177:2; Exh. 77).

660.    Dr. Cline's March 6, 2014, email clearly indicates there was no medical substantiation for the exams, and the inappropriate comments and actions by Wisner.  (8/31/20 Tr., 177:2 – 178:15)

661.    On March 28, 2014, supervising physician Daniel Cline sent an email to Wisner reviewing recent discussions instructing Wisner to "Always ask permission to examine a patient, particularly for genitourinary examinations" and to "Ask patients if they would like a chaperone to be present."  (8/31/20 Tr., 178:16 – 180:8; Exh. 78, p. 1).

662.    Dr. Cline's response was not adequate because there was red flag after red flag going back for years with an escalation in Wisner's behavior over those years, which demonstrates a complete disregard for the safety and welfare of VA patients.  (8/31/20 Tr., 180:9 – 181:1).

663.    On May 15, 2014, patient advocate Richard Lawrenz received a report from a veteran who was upset over his interactions with Wisner, including comments by Wisner about the veterans penis, ejaculation, and referring to the veteran as a stud.  (8/31/20 Tr., 181:2 – 182:19; Exh. 80).

664.    The veteran reported Wisner stretched his testicles, fondled his penis, touched him inappropriately during the prostate exam, and made inappropriate comments to the veteran's friend.  (8/31/20 Tr., 182:182:15 – 183:7; Exh. 80).

665.    Mr. Lawrenz noted he did not have to ask why he didn't speak up or leave because the veteran volunteered that he stayed in the examination only to get his [medications].  (8/31/20 Tr., 183:8-15; Exh. 80, p. 2).

666.    The report on May 15, 2014 reflects an escalation in Wisner's behavior.  (8/31/20 Tr., 183:16-23).

667.    On May 20, 2014, social worker Dawn Clouse received a report from the same veteran reporting that he was sexually assaulted by Wisner on May 15, 204, that Wisner made inappropriate comments, and that the veteran did not leave the appointment even though he was sexually assaulted because he needed his pain medication. (8/31/20 Tr., 183:24 – 185:23; Exh. 64).

668.    Overall, the reports demonstrate red flag after red flag, escalation in Wisner's behavior over the years, and complete disregard for the veteran's welfare and safety, and that Wisner should have been removed from his duties a long time ago.  (8/31/20 Tr., 187:25 – 188:9).

### *Plaintiff's Military Service*

669.    Plaintiff wanted to be in the United States Marine Corps since a very young age.  (9/3/20 Tr., 51:6-12).

670.    Plaintiff wanted to be in the Marines because his dad was a Marine.  (9/3/20 Tr., 51:13-20).

671.    Plaintiff wanted to be in the Marines because it represented the greatest challenge of all the services.  (9/3/20 Tr., 51:13-20).

672.    Plaintiff comes from a family of men who served their country.  (9/3/20 Tr., 51:24-52:1).

673.    The Delayed Entry Program is a program used by recruiters to help candidates get immersed in the culture of the military and especially the Marine Corps.  (9/3/20 Tr., 52:8-13).

674.    Plaintiff entered the Delayed Entry Program shortly after his 17th birthday.  (9/3/20 Tr., 52:14-19).

675.    Plaintiff signed the military contract and took the oath when entering the delayed entry program.  (9/3/20 Tr., 52:20-25).

676.    Recruit training is what Marines call boot camp.  (9/3/20 Tr., 53:1-4).

677.    Plaintiff went to recruit training at the Marine Corps Depot in San Diego, California.  (9/3/20 Tr., 52:53:5-7).

678.    Plaintiff did well at boot camp, and was in a leadership position 75-80% of the time.  (9/3/20 Tr., 53:8-13).

679.    The Eagle, Globe and Anchor is the Marine Corps emblem.  (9/3/20 Tr., 53:14-19).

680.    The Marine Corps emblem represents the capacity of the Marine Corps and that they can be anywhere in the world in 24 hours.  (9/3/20 Tr., 53:14-19).

681.    It is a significant experience in the Marine Corps to be handed an Eagle, Globe and Anchor.  (9/3/20 Tr., 53:20-24).

682.    Plaintiff received his first Eagle, Globe and Anchor, and was first called "Marine" on August 31, 2001 at his graduation.  (9/3/20 Tr., 53:24-54:7).

683.    The crucible is a Marine Corps training evolution that consists of nearly 100 miles of hiking over a four-day period.  (9/3/20 Tr., 54:10-23).

684.    During the crucible, recruits get minimal sleep.  (9/3/20 Tr., 54:10-23).

685.     The crucible training is designed to break a person down physically and mentally, leaving only the fire inside that leads to an element of working together and brotherhood.  (9/3/20 Tr., 54:10-23).

686.     Plaintiff chose the infantry as his military occupational specialty.  (9/3/20 Tr., 58:18-23).

687.     Plaintiff chose the infantry because it presented the greatest challenge.  (9/3/20 Tr., 58:24-59:3).

688.     Plaintiff attended the Marine Corps School of Infantry at Camp Pendleton, California.  (9/3/20 Tr., 59:4-8).

689.     After the School of Infantry, Plaintiff was sent to his first permanent duty station.  (9/3/20 Tr., 59:13-18).

690.     Plaintiff was sent to the marine barracks 8th and I in Washington, D.C.  (9/3/20 Tr., 59:19-24).

691.     Plaintiff was in the silent drill school at first, but then went to a standard honor bearer platoon.  (9/3/20 Tr., 59:25-60:3).

692.     In the honor bearer platoon, Plaintiff was primarily responsible for funerals at Arlington National Cemetery.  (9/3/20 Tr., 60:16-22).

693.     After Plaintiff went to the fleet, he had to lay to rest someone he knew.  (9/3/20 Tr., 61:13-14).

694.     In November 2003, Plaintiff was transferred to first battalion, fourth marines in Camp Pendleton, where marine force units deploy overseas.  (9/3/20 Tr., 61:19-25).

695.    A West Pac is a type of deployment that marines do when they are attached to a Navy vessel.  They tour the Western Pacific, which is why they are called a West Pac. (9/3/20 Tr., 62:1-14).

696.    Plaintiff's West Pac started in San Diego, sailed to Hawaii for training for a week, then across the Pacific Ocean, through the Indian Ocean, through Straits of Hormuz and into the Kuwait Navy base where they crossed into Iraq.  (9/3/20 Tr., 62:1-14).

697.    A Marine Expeditionary Unit ("MEU") is a expeditionary force that did the West Pac deployment Plaintiff described.  (9/3/20 Tr., 62:16-21).

698.    A MEU is known as America's 911 force.  (9/3/20 Tr., 63:15-24).

699.    Plaintiff's MEU was the first time since Vietnam that marines attached to a Navy Vessel were separated from the vessel.  The Navy ships went home and the marines stayed in Iraq.  (9/3/20 Tr., 62:22-63:6).

700.    Plaintiff was certified Special Operations Capable ("MEUSOC").  (9/3/20 Tr., 63:7-14).

701.    Plaintiff's MEU was sent to Iraq.  (9/3/20 Tr., 63:25-64:4).

702.    Plaintiff had a number of responsibilities which in Iraq.  (9/3/20 Tr., 64:18-65:12).

703.    Plaintiff was station of a Fallujah Hotel.  (9/3/20 Tr., 64:18-65:12).

704.    While in Iraq, Plaintiff had people shoot at him.  (9/3/20 Tr., 65:13-15).

705.    Under the rules of engagement, Plaintiff was not always allowed to return fire.  (9/3/20 Tr., 65:18-20).

706.    Plaintiff was in the Battle of Najaf for 22 days. (9/3/20 Tr., 65:21-23).

707.    Plaintiff received training on how to clear houses, huts, hotels and other structures.  (9/3/20 Tr., 66:3-13).

708.    While in Iraq, Plaintiff had to clear houses, huts and other structures.  (9/3/20 Tr., 66:16-20).

709.    Plaintiff cleared more than 50, but less than 100, structures.  (9/3/20 Tr., 66:16-20).

710.    It is stressful to go into these houses because Plaintiff didn't know what was on the other side of the door.  (9/3/20 Tr., 66:21-67:4).

711.    Clearing structures is mentally exhausting.  (9/3/20 Tr., 67:5-6).

712.    Clearing structures is terrifying.  (9/3/20 Tr., 67:7-8).

713.    When in a combat zone, patrol is a squad of marines that go on a route and look for contact.  (9/3/20 Tr., 67:9-18).

714.    Going on patrol involves leaving the safety of a defended position and going out and looking for enemy contact.  (9/3/20 Tr., 67:9-18).

715.    Going on patrol is stressful.  (9/3/20 Tr., 67:19-20).

716.    Going on patrol is actually looking to get into a fight.  (9/3/20 Tr., 67:21-22).

717.    There are foot patrols and mounted patrols.  (9/3/20 Tr., 68:1-10).

718.    Plaintiff estimates he went on 10-15 mounted patrols.  (9/3/20 Tr., 68:11-14).

719.    Plaintiff estimates he went on 20-25 foot patrols.  (9/3/20 Tr., 68:15-17).

720.    The person on point during a patrol is at the very front of the formation and the most exposed to the enemy.  (9/3/20 Tr., 68:22-69:1).

721.    In practicality, if there is an ambush, the person on point is going to be the first one hit.  (9/3/20 Tr., 69:2-4).

722.    The same person is not on point every patrol; there is a rotation.  (9/3/20 Tr., 69:5-9).

723.    Plaintiff was on point probably five times.  (9/3/20 Tr., 69:23-25).

724.    There are some battles in Iraq that stick with Plaintiff more than others - the battle of Alu Mon Cemetery in Najaf and Kuja.  (9/3/20 Tr., 70:1-18).

725.    The battle at Kufa was a raid on a technical college where Plaintiff was exposed to friendly fire that was particularly frightening.  (9/3/20 Tr., 70:1-18).

726.    The battle of Najaf took place in a cemetery after a mountain patrol took fire.  (9/3/20 Tr., 70:20:71:14:).

727.    The structures in the cemetery made it more difficult to maneuver engage in combat.  (9/3/20 Tr., 72:7-22).

728.    The restrictions of the cemetery increased the stress and fear Plaintiff felt.  (9/3/20 Tr., 73:17-74:6).

729.    The restrictions of the cemetery increased Plaintiff's exposure to enemy fire.  (9/3/20 Tr., 70:1-18).

730.    Under the cemetery were catacombs that the insurgents had tunnelled through, so Plaintiff never knew where they would pop up.  (9/3/20 Tr., 74:7-17).

731.    The battle in the cemetery lasted 22 days.  (9/3/20 Tr., 75:6-8).

732.    While in the Battle of Najaf, Plaintiff received incoming small weapons fire.  (9/3/20 Tr., 75:9-11).

733.    While in the Battle of Najaf, Plaintiff received incoming heavy machine gun fire.  (9/3/20 Tr., 75:12-13).

734.    While in the Battle of Najaf, Plaintiff received incoming mortars constantly.  (9/3/20 Tr., 75:14-21).

735.    While in the Battle of Najaf, the receipt of incoming mortar fire was unnerving for Plaintiff.  (9/3/20 Tr., 75:22-23).

736.    While in the Battle of Najaf, Plaintiff received incoming fire from rocket propelled grenades ("RPG").  (9/3/20 Tr., 76:3-5).

737.    RPGs were a daily occurrence.  (9/3/20 Tr., 76:6-9).

738.    Being in battle for 24 hours a day, for 22 days was physically and emotionally exhausting, frightening, and terrifying.  (9/3/20 Tr., 77:10-16).

739.    While in Iraq, Plaintiff took human lives with his service rifle.  (9/3/20 Tr., 76:17-19).

740.    While in Iraq, Plaintiff took human lives with his M203 grenade launcher.  (9/3/20 Tr., 76:22-24).

741.    Plaintiff witnessed his fellow Marines take human lives.  (9/3/20 Tr., 76:25-77:1).

742.    Plaintiff witnessed his fellow marines be killed.  (9/3/20 Tr., 77:2-3).

743.    Plaintiff witnessed his fellow marines be maimed.  (9/3/20 Tr., 77:4-5).

744.    Plaintiff lost three marines that he was really close with: Parkerson, Patterson, and Maehr.  (9/3/20 Tr., 79:5-12).

745.    There was a policy against leaving behind U.S. military gear after you leave a combat zone because insurgents would use it as propaganda.  (9/3/20 Tr., 79:21-80:2).

746.    At this time, names were taped to the back of helmets.  (9/3/20 Tr., 80:3-5).

747.    At this time, the insurgents paraded around a helmet with a name on it, it was picked up by the news, and that is how the soldier's family learned of the death.  (9/3/20 Tr., 80:6-10).

748.    An order came from the battalion commander that no gear was to be left behind, even if someone was killed in action.  (9/3/20 Tr., 80:11-17).

749.    Plaintiff took the order not to leave gear behind very seriously.  (9/3/20 Tr., 80:11-17).

750.    On the night Parkerson died, a marine had been gravely injured.  (9/3/20 Tr., 80:18-21).

751.    The team that brought the injured marine, Lance Corporal Myricks, back left behind his helmet and flak jacket.  (9/3/20 Tr., 80:22-81:14).

752.    Plaintiff was there when Myricks was hit.  (9/3/20 Tr., 81:15-16).

753.    After Myricks was brought in for medical treatment, Plaintiff received an order from his squad leader to go back out and find the gear.  (9/3/20 Tr., 81:17-25).

754.    Sergeant Parkerson was with Plaintiff when they went to look for the gear.  (9/3/20 Tr., 82:3-4).

755.    Almost instantaneously after Parkerson found the helmet, mortars landed on him and killed Parkerson immediately.  (9/3/20 Tr., 82:5-14).

756.    Plaintiff was told that Parkerson's family was told Parkerson died a hero.  (9/3/20 Tr., 82:15-16).

757.    Parkerson really died getting a $75 helmet.  (9/3/20 Tr., 82:17-18).

758.    Sergeant Parkerson's wife and Plaintiff's wife were partnered up like battle buddies.  (9/3/20 Tr., 84:10-85:4).

759.    Plaintiff learned from his wife that Parkerson's wife had been told that Parkerson died heroically engaging the enemy.  (9/3/20 Tr., 84:10-85:4).

760.    Plaintiff felt a moral dilemma because part of him wanted Parkerson's family to know the truth.  (9/3/20 Tr., 84:10-85:4).

761.    In Plaintiff's estimation, Parkerson died over a helmet when the orders could have been to take the tape names off the helmet.  (9/3/20 Tr., 84:10-85:4).

762.    Sergeant Patterson was killed by friendly fire.  (9/3/20 Tr., 80:82:19-23).

763.   Plaintiff was not there when Patterson was killed.  (9/3/20 Tr., 82:24-25).

764.   Corporal Maehr committed suicide.  (9/3/20 Tr., 83:1-4).

765.   When a marine dies, someone is sent from the unit as a representative at the funeral.  (9/3/20 Tr., 83:5-15).

766.   Plaintiff was sent to Maehr's funeral as the unit representative.  (9/3/20 Tr., 83:5-15).

767.   At the time Corporal Maehr took his own life, Plaintiff was no longer in Iraq.  (9/3/20 Tr., 83:18-20).

768.   Plaintiff had to notify Maehr's family of the death.  (9/3/20 Tr., 84:4-6).

769.   Plaintiff was specifically told not to tell Maehr's mom the circumstances surrounding his death, which caused Plaintiff a great deal of conflict.  (9/3/20 Tr., 85:5-13).

770.   Corporal Maehr was at the second battle of Fallujah.  (9/3/20 Tr., 91:2-9).

771.   After the second battle of Fallujah, Corporal Maehr could not take it anymore.  (9/3/20 Tr., 91:10-92:1).

772.   Plaintiff and Corporal Maehr had a kindred spirit.  (9/3/20 Tr., 91:10-92:1).

773.   Plaintiff felt like he was expendable in Iraq.  (Exh. 272, 9/3/20 Tr., 85:14-86:16).

774.   Plaintiff wrote his mother a letter and said that the "reality of war far exceeds anything caught on film."  (Exh. 272, 9/3/20 Tr., 87:6-19).

775.   Plaintiff testified that there is a sensory experience you can't get from watching a war movie, such as smell, booming sounds, and how surreal the whole experience is.  (Exh. 272, 9/3/20 Tr., 87:6-19).

776.   Plaintiff wrote his mother a letter that said "my thoughts will remain here even after I come home", which turned out to be true  (Exh. 272, 9/3/20 Tr., 87:20-25).

777.    This trial is the most Plaintiff has talked about his time in war.  (9/3/20 Tr., 88:1-4).

778.    Plaintiff was having seizures in Iraq.  (9/3/20 Tr., 103:3-8).

779.    Plaintiff was told he was having stress induced seizures.  (9/3/20 Tr., 104:8-11).

780.    Plaintiff was angry at his wife for writing letters to congress trying to get Plaintiff home from Iraq because of his seizure.  (9/3/20 Tr., 92:2-93:2).

781.    Plaintiff was angry because he had guys dependent on him.  (9/3/20 Tr., 92:2-93:2).

782.    Plaintiff felt like he let his guys down.  (9/3/20 Tr., 92:2-93:2).

783.    Corporal Maehr did not have a friend after Fallujah because Plaintiff went home.  (9/3/20 Tr., 92:2-93:2).

784.    Plaintiff wonders if he was there whether Corporal Maehr would have killed himself.  (9/3/20 Tr., 92:2-93:2).

785.    Plaintiff did not want to let his guys down.  (9/3/20 Tr., 93:13-21).

786.    Plaintiff feels he did not have any right to do any less than his guys. (9/3/20 Tr., 93:13-21).

787.    Plaintiff did not go to war for medals and ribbons.  (9/3/20 Tr., 93:22-24).

788.    Plaintiff did not go to war for recognition.  (9/3/20 Tr., 93:25-94:1).

789.    Plaintiff wanted to do his duty.  (9/3/20 Tr., 94:2-3).

790.    Plaintiff does not talk to people about his time in-country.  (9/3/20 Tr., 94:4-5).

791.    Plaintiff was on active duty from June 4, 2001 to June 3, 2005.  (Exh. 298, 9/3/20 Tr., 95:8-10).

792.    Plaintiff was in foreign service for 11 months and 26 days.  (Exh. 298, 9/3/20 Tr., 95:18-20).

793.    Plaintiff was honorably discharged.  (Exh. 298, 9/3/20 Tr., 95:21-24).

794.    Plaintiff was an expert shooter.  (9/3/20 Tr., 96:5-12).

795.    Plaintiff earned a Marines Corps Good Conduct Medal.  (Exh. 298, 9/3/20 Tr., 97:17-22).

796.    Plaintiff earned a Global War on Terrorism Service Medal.  (Exh. 298, 9/3/20 Tr., 98:1-2).

797.    Plaintiff earned a Sea Service Deployment Medal.  (Exh. 298, 9/3/20 Tr., 98:3-4).

798.    Plaintiff earned a Global War on Terrorism Expeditionaly Medal.  (Exh. 298, 9/3/20 Tr., 98:5-6).

799.    Plaintiff earned a National Defense Service Medal.  (Exh. 298, 9/3/20 Tr., 98:12-13).

800.    Plaintiff received a Navy Unit Commendation and two certificates of appreciation.  (Exh. 298, 9/3/20 Tr., 98:14-16).

801.    Plaintiff received the Combat Action Ribbon.  (Exh. 296, 9/3/20 Tr., 98:24-99:8).

802.    The Combat Action Ribbon is the most prestigious of all.  (Exh. 296, 9/3/20 Tr., 98:24-99:8).

803.    To receive the Combat Action Ribbon, the marine has to actively participate in ground or surface combat.  (Exh. 297, 9/3/20 Tr., 100:5-8).

804.    To receive the Combat Action Ribbon, you not only have to be in combat but you have to perform satisfactory under enemy fire while actively participating in ground or surface engagement.  (Exh. 297, 9/3/20 Tr., 100:9-14).

805.    A marine cannot get a Combat Action Ribbon just for being exposed to enemy fire.  (Exh. 297, 9/3/20 Tr., 100:18-20).

806.    Because of his time in Iraq, Plaintiff felt that he had a newfound appreciation for life.  (Exh. 272, 9/3/20 Tr., 86:22-25).

807.    Plaintiff had plans for when he got out of Iraq.  (9/3/20 Tr., 87:1-3).

808.    Plaintiff felt he had his whole life ahead of him.  (9/3/20 Tr., 87:4-4).

809.    Plaintiff finds himself thinking about his time in Iraq.  (9/3/20 Tr., 89:11-14).

810.    Iraq was terrifying for Plaintiff.  (9/3/20 Tr., 89:15-16).

811.    Plaintiff suffers flashbacks.  (9/3/20 Tr., 89:18-19).

812.    Plaintiff's flashbacks can be more terrifying.  (9/3/20 Tr., 89:22-23).

813.    Plaintiff suffers from survivor's guilt.  (9/3/20 Tr., 90:7-91:25).

814.    Plaintiff has PTSD from combat.  (9/3/20 Tr., 145:10-15).

815.    Being sexually assaulted by an adult man is even harder on Plaintiff.  (9/3/20 Tr., 89:25-90:6).


### _Post-Wisner VA Medical Care_

816.    Plaintiff's current disability rating is 80%.  (9/3/20 Tr., 104:14-15).

817.    Plaintiff does not have any other health insurance besides the VA.  (9/3/20 Tr., 104:18-21).

818.    The last time Plaintiff had private health insurance was in 2008 when he was still on his mother's plan.  (9/3/20 Tr., 104:22-105:3).

819.    Plaintiff goes to the VA because he doesn't have any other choice.  (9/3/20 Tr., 105:11-17).

820.    Plaintiff goes to the VA because he doesn't want to struggle with "this stuff" forever.  (9/3/20 Tr., 105:11-17).

821.    The vast majority of Plaintiff's visits to the VA are for substance abuse and PTSD treatment.  (9/3/20 Tr., 105:18-21).

822.    Plaintiff cannot afford to go elsewhere for care.  (9/3/20 Tr., 105:22-23).

823.    Plaintiff's substance abuse and PTSD have destroyed his life.  (9/3/20 Tr., 105:18-25).

824.    With the exception of Dr. Black, Plaintiff has not had any consistency with providers at the VA to say he's had successful treatment.  (9/3/20 Tr., 106:1-8).

825.    Plaintiff's relationship with Dr. Black at the VA was built and predicated on trust.  (9/3/20 Tr., 108:10-21).

826.    Dr. Black was Plaintiff's doctor for five years and Plaintiff did not talk with Dr. Black about a lot of the stuff covered in Plaintiff's testimony.  (9/3/20 Tr., 108:10-21).

827.    Plaintiff is only sharing because he is under oath and has to.  (9/3/20 Tr., 108:10-21).

828.

829.    In 2019, Plaintiff drove to the Topeka VA to see Dr. Black.  (9/3/20 Tr., 106:9-20).

830.    Dr. Black told Plaintiff to return to the Leavenworth VA.  (9/3/20 Tr., 106:21-107:1).

831.    Dr. Black told Plaintiff that he now is leading a program so he couldn't see Plaintiff one on one anymore.  (9/3/20 Tr., 106:21-107:1).

832.    Plaintiff would like to get his healthcare somewhere other than the VA.  (9/3/20 Tr., 107:5-7).

833.    Plaintiff would like to get his healthcare somewhere other than the VA because his current primary care physician is located in Leavenworth in the same clinic, same floor, down the same hallway, in the same exam room as Wisner.  (9/3/20 Tr., 107:5-13).

### *Dr. Peterson's Forensic Psychiatric Evaluation*

834.    Dr. Peterson is board-certified in general psychiatry.  (9/1/20 Tr., 77:1-7).

835.    Dr. Peterson also has qualifications in forensic psychiatry.  (9/1/20 Tr., 77:1-7).

836.    Dr. Peterson is licensed in Kansas and Missouri to practice medicine.  (9/1/20 Tr., 77:16-18).

837.    Dr. Peterson is license to dispense controlled substances through Drug Enforcement Administration.  (9/1/20 Tr., 78:11-16).

838.     Dr. Peterson graduated with honors from St. Louis University Medical School in 1986.  (9/1/20 Tr., 75:15-17).

839.    Dr. Peterson did his four-year psychiatry residency at the Menninger Clinic in Topeka, Kansas.  (9/1/20 Tr., 75:22-76:7).

840.    Dr. Peterson also trained at the Topeka VA Medical Center / Colmery O'Neil Medical Center.  (9/1/20 Tr., 79:16-25).

841.    While at the Topeka VA Medical Center, Dr. Peterson helped run an inpatient unit.  (9/1/20 Tr., 79:16-25).

842.    While at the Topeka VA Medical Center, Dr. Peterson did a fair amount of his internship, including internal medicine, neurology, and substance abuse.  (9/1/20 Tr., 79:16-25).

843.    Dr. Peterson is a member of the American Academy of Psychiatry and the Law ("AAPL".  (9/1/20 Tr., 78:19-79:4).

844.    Dr. Peterson has served on the AAPL Trauma and Stress Committee and the Developmental Disabilities Committee.  (9/1/20 Tr., 78:19-79:4).

845.    While serving on the AAPL Trauma and Stress Committee, Dr. Peterson has lectured on PTSD, including relating to veterans. (9/1/20 Tr., 78:19-79:4).

846.    Dr. Peterson has specifically lectured on PTSD as it relates to military personnel who have served in combat.  (9/1/20 Tr., 79:4-6).

847.    As part of his work with the AAPL Trauma and Stress Committee, Dr. Peterson assisted in making comments on the DSM-V diagnosis for post-traumatic stress disorder.  (9/1/20 Tr., 79:-7-15).

848.    Dr. Peterson has evaluated veterans from every major conflict except for World War I. (9/1/20 Tr., 80:15-81:2).

849.    Dr. Peterson maintains a clinical practice.  (9/1/20 Tr., 86:17-87:1).

850.    Dr. Peterson has 33 years of clinical experience.  (9/1/20 Tr., 91:3-5).

851.    Dr. Peterson has evaluated person who have suffered PTSD as a result of sexual or physical abuse.  (9/1/20 Tr., 91:6-10).

852.    Most of the sexual abuse survivors Dr. Peterson has evaluated have been men. (9/1/20 Tr., 91:11-16).

853.    Dr. Peterson has experience in evaluating persons who are fabricating symptoms. (9/1/20 Tr., 91:17-19).

854.    Dr. Peterson has experience in evaluating persons who might present false presentations of PTSD.  (9/1/20 Tr., 91:20-1).

855.    Dr. Peterson is aware of typical versus atypical presentation of PTSD, and is on the lookout for this each and every time he does an evaluation.  (9/1/20 Tr., 92:2-7).

856.    Dr. Peterson has examined over 200 people in mentor abuse cases.  (9/1/20 Tr., 92:8-10).

857.    Dr. Peterson conducted a face-to-face forensic psychiatric evaluation of Plaintiff. (9/1/20 Tr., 94:9-18).

858.    Dr. Peterson reviewed Plaintiff's medical records.  (9/1/20 Tr., 96:15-17).

859.    Dr. Peterson reviewed Plaintiff's VA records, disability records, and compensation and pension exams.  (9/1/20 Tr., 96:18-97:2).

860.    When conducting his evaluation of Plaintiff, Dr. Peterson took a background history, a mental status history, psychiatrist's physical, and psychological testing.  (9/1/20 Tr., 97:15-24).

861.    During his evaluation of Plaintiff, Dr. Peterson charted that Plaintiff felt emasculated in reference to Wisner's conduct.  (9/1/20 Tr., 103:4-18).

862.    During his evaluation, Dr. Peterson charted that Plaintiff reported his self-esteem was destroyed due to Wisner's conduct.  (9/1/20 Tr., 103:4-18).

863.    During his evaluation, Dr. Peterson charted that Plaintiff reported that his is unable to perform sexually due to Wisner's conduct. (9/1/20 Tr., 103:4-18).

864.    Dr. Peterson noted that Plaintiff felt soiled or dirty because of Wisner's actions. (9/1/20 Tr., 103:24-104:7).

865.    Plaintiff described to Dr. Peterson what happened with Wisner as "the worst that ever happened to him."  (9/1/20 Tr., 104:8-12).

866.    Dr. Peterson found Plaintiff's statement of "the worst that's ever happened to him" significant for two reasons: (1) Plaintiff described sexual molestation or sexual abuse actions that

were well-established by Wisner; and (2) Plaintiff had very severe PTDS that's well-documented. (9/1/20 Tr., 104:13-105:22).

867.    Mr. Wisner's actions detailed the treatment processes of Plaintiff getting help at the VA for his combat related PTSD.  (9/1/20 Tr., 104:13-105:22).

868.    The reason Plaintiff was at the VA was to get help for his combat related PTSD.  (9/1/20 Tr., 104:13-105:22).

869.    It was a traumatic event for Plaintiff to experience a second event traumatic event while he was getting help for the combat related PTSD.  (9/1/20 Tr., 104:13-105:22).

870.    Plaintiff is unable to get help because he doesn't trust the system itself.  (9/1/20 Tr., 104:13-105:22).

871.    Plaintiff is unable to help because he has a new problem caused by the system.  (9/1/20 Tr., 104:13-105:22).

872.    Inability to get help is a very common dual problem for persons who are sexually abused when they go somewhere for help because now they have nowhere to turn.  (9/1/20 Tr., 104:13-105:22).

873.    Persons in the marine military service are taught never to quit, never to be weak, never to cry, never show anything that might be feminine or subservient.  (9/1/20 Tr., 105:23-107:7).

874.    In his experiences with Wisner, Plaintiff believed it was ok to be vulnerable with Wisner while getting treatment for mind and body.  (9/1/20 Tr., 105:23-107:7).

875.    Wisner used that trust against Plaintiff, groomed Plaintiff that the VA was safe, that they were battle buddies, and that Wisner was an officer who would take care of men.  (9/1/20 Tr., 105:23-107:7).

876.     Once Plaintiff recognized he was manipulated and taken advantage of, this traumatized Plaintiff because of the actions by Wisner.  (9/1/20 Tr., 105:23-107:7).

877.     Once Plaintiff recognized he was manipulated and taken advantage of, this traumatized Plaintiff because he reached out to the VA for help and was burned by it.  (9/1/20 Tr., 105:23-107:7).

878.     Once Plaintiff recognized he was manipulated and taken advantage of, he felt humiliated.  (9/1/20 Tr., 105:23-107:7).

879.     Once Plaintiff recognized he was manipulated and taken advantage of, he felt emasculated.  (9/1/20 Tr., 105:23-107:7).

880.     Once Plaintiff recognized he was manipulated and taken advantage of, he felt weak.  (9/1/20 Tr., 105:23-107:7).

881.     Once Plaintiff recognized he was manipulated and taken advantage of, he felt helpless.  (9/1/20 Tr., 105:23-107:7).

882.     Once Plaintiff recognized he was manipulated and taken advantage of, he felt more disabled.  (9/1/20 Tr., 105:23-107:7).

883.     Plaintiff volunteered for the marines.  (9/1/20 Tr., 107:8-10).

884.     Plaintiff volunteered for the infantry.  (9/1/20 Tr., 107:11-12).

885.     Plaintiff did not volunteer for what Wisner did to him.  (9/1/20 Tr., 107:22-23).

886.     Plaintiff was "programmed to follow orders", which created a power imbalance between Plaintiff and Wisner.  (9/1/20 Tr., 110:3-13).

887.     Dr. Black treated Plaintiff as an outpatient from 2013 - 2018.  (9/1/20 Tr., 110:18-111:16).

888.    Dr. Black stopped treating Plaintiff when Dr. Black went to work in an inpatient unit.  (9/1/20 Tr., 110:18-111:16).

889.    It took Plaintiff about five years to open up to Dr. Black.  (9/1/20 Tr., 110:18-111:16).

890.    Dr. Black is the only therapist Plaintiff had been able to open up to.  (9/1/20 Tr., 110:18-111:16).

891.    Plaintiff expressed a loss because of how long it took him to say anything of substance to Dr. Black and to get through the old layers of war and Wisner.  (9/1/20 Tr., 110:18-111:16).

892.    As a person develops a better therapeutic alliance with a provider, they are able to peel back layers, like the layers of an onion, until the core issue is finally dealt with.  (9/1/20 Tr., 111:17-25).

893.    It is difficult in general for people to feel away the onion.  (9/1/20 Tr., 112:1-16).

894.    Plaintiff had great difficulty trusting anyone with the events of his wartime traumas.  (9/1/20 Tr., 112:1-16).

895.    Plaintiff has even more trust issues after what happened with Wisner.  (9/1/20 Tr., 112:1-16).

896.    The fact that it took Plaintiff so long to open up to Dr. Black is clinically significant.  (9/1/20 Tr., 112:17-113:4).

897.    Plaintiff will need long-term therapy where he can develop enough trust to talk about what's important to him.  (9/1/20 Tr., 112:17-113:4).

898.    Plaintiff will need long-term therapy with a single clinician so the person can establish a rapport.  (9/1/20 Tr., 112:17-113:4).

899.    Plaintiff will need long-term therapy with a single clinician so the clinician can establish increased trust.  (9/1/20 Tr., 112:17-113:4).

900.    Plaintiff will need long-term therapy with a single clinician so that Plaintiff can share things without having to feel emotionally destroyed again.  (9/1/20 Tr., 112:17-113:4).

901.    VA records are confidential but not very private.  Any clinician who can sign on to the computer can access a patient's progress notes, including psychiatric or psychological progress notes.  (9/1/20 Tr., 113:11-114:8).

902.    Plaintiff told Dr. Peterson that "we all have crosses to bear".  (9/1/20 Tr., 114:9-22).

903.    Dr. Peterson opined that Plaintiff has quite a number of topics related to his wartime experience that he's not shared.  (9/1/20 Tr., 114:9-22).

904.    Dr. Peterson believes Plaintiff uses defense mechanisms to avoid dealing with actual events. (9/1/20 Tr., 114:23-115:1).

905.    Saying "we all have crosses to bear" in the therapeutic onion is like someone recognizing they are getting too close to something bothersome and they don't want to talk about it or can't talk about it.  In other words, the person is effectively saying they are not able to express at that point what their crosses are.  (9/1/20 Tr., 115:2-11).

906.    Plaintiff told Dr. Peterson that Wisner's actions killed his spirit. (9/1/20 Tr., 115:12 - 116:1).

907.    Plaintiff has recited with Wisner over and over without making any therapeutic progress.  (9/1/20 Tr., 116:14-117:3).

908.    Plaintiff has recognized a need to make more progress with his PTSD.  (9/1/20 Tr., 116:14-117:3).

909.    A person uses their military bearing to not allow others to control them; it is about how a person holds themselves.  (9/1/20 Tr., 117:18-23).

910.    The military bearing is that one never shows weakness.  (9/1/20 Tr., 118:7-19).

911.    Never showing weakness is why it is very difficult for men who are sexually abused when they are seeking help.  (9/1/20 Tr., 118:7-19).

912.    This is especially true for particularly masculine men who have been in the military where overcoming difficulties is drilled into them as a way to survive.  (9/1/20 Tr., 118:7-19).

913.    When these men break through that compartmentalization to seek help and are taken advantage of, it makes it even more difficult to get help later.  (9/1/20 Tr., 118:7-19).

914.    Plaintiff isolates himself from other people.  (9/1/20 Tr., 118:3-8).

915.    Plaintiff felt worn down so he stayed away from other people.  (9/1/20 Tr., 118:3-8).

916.    Plaintiff is frustrated with his academic studies.  (9/1/20 Tr., 119:4-17).

917.    Plaintiff prided himself on attending classes and getting successful academic marks before meeting Wisner.  (9/1/20 Tr., 118:7-19).

918.    As a consequence of the interactions with Wisner, Plaintiff could not continue at school.  (9/1/20 Tr., 118:7-19).

919.    As a consequence of the interactions with Wisner, Plaintiff required guardianship by his mother to control illegal drug use and out of control prescription drug use provided by the VA.  (9/1/20 Tr., 118:7-19).

920.    Dr. Peterson noted Plaintiff suffered ego death after Wisner, which is Plaintiff describing that at his core, he was injured and part of him died.  (9/1/20 Tr., 119:18-23).

921.    Plaintiff uses overly intellectualized language as a psychological defense mechanism.  (9/1/20 Tr., 120:11-24).

922.    Plaintiff uses psychological defense mechanisms because he was not sure how he would survive if he lost the lawsuit.  (9/1/20 Tr., 120:11-24).

923.    Plaintiff uses psychological defense mechanisms as a way to keep others at a distance.  (9/1/20 Tr., 120:11-24).

924.    Plaintiff had severe problems with combat related PTSD when he went to get treatment with Wisner.  (9/1/20 Tr., 121:13-122:13).

925.    Plaintiff had severe problems with combat related PTSD when he trusted Wisner.  (9/1/20 Tr., 121:13-122:13).

926.    Plaintiff had severe problems with combat related PTSD when he trusted Wisner's words that he was safe.  (9/1/20 Tr., 121:13-122:13).

927.    Plaintiff had severe problems with combat related PTSD when he trusted that the VA was a place for veterans by veterans.  (9/1/20 Tr., 121:13-122:13).

928.    Plaintiff had severe problems with combat related PTSD when he then felt fooled or hoodwinked by Wisner.  (9/1/20 Tr., 121:13-122:13).

929.    At the time Dr. Peterson evaluated Plaintiff, Plaintiff felt he wouldn't be able to forgive the the VA or Wisner, which shows how much Plaintiff is protecting himself from what happened.  (9/1/20 Tr., 122:14-20).

930.    Because Plaintiff is not in a position to forgive, any treatment at the VA is going to be a failure.  (9/1/20 Tr., 122:21-25).

931.    Even though Plaintiff does not trust the VA, he is trying to get medicine and some ongoing help.  (9/1/20 Tr., 123:1-10).

932.    Plaintiff is frustrated because his former treatment had been hour-long sessions and his new psychiatrists sees him 15 minutes every 90 days.  (9/1/20 Tr., 123:1-10).

933.    With Dr. Black, it was hour-long sessions once per month.  (9/1/20 Tr., 123:11-14).

934.    Plaintiff has to re-establish therapeutic alliance with a new psychiatrist, which will be extremely difficult to do if the sessions are only one quarter of the time and the interval between sessions is three times as long.  (9/1/20 Tr., 123:19-124:1).

935.    Dr. Peterson noted that it was clinically significant in Plaintiff's medical history, he was not being treated with any psychiatric medication even though he had obvious trauma, depression, and anxiety.  (9/1/20 Tr., 124:2-15).

936.    Dr. Peterson noted that it was clinically significant in Plaintiff's medical history that he had difficulties with sexual identity and capacity as a consequence of the distress of the experience with Wisner and the ongoing problem with opiates.  (9/1/20 Tr., 124:2-15).

937.    Before Wisner, Plaintiff's sexual interest was much higher, much more frequent and much more satisfying.  (9/1/20 Tr., 124:16-125:6).

938.    Subsequent to Wisner, Plaintiff felt much less sexual interest.  (9/1/20 Tr., 124:16-125:6).

939.    Subsequent to Wisner, the things Wisner did to Plaintiff would intrude of Plaintiff's sexual thinking and sexual arousal, and Plaintiff would lose interest and capacity.  (9/1/20 Tr., 124:16-125:6).

940.    There are active instructions of the events by Wisner into Plaintiff's sexual functioning.  (9/1/20 Tr., 124:16-125:6).

941.    Dr. Peterson did not find any evidence in Plaintiff's medical history of pre-existing severe traumatic brain injury or severe psychosexual injuries.  (9/1/20 Tr., 126:3-127:5).

942.    Plaintiff has a particularly difficult substance abuse issue which he acknowledged fully to Dr. Peterson.  (9/1/20 Tr., 126:3-127:5).

943.    Despite his distress, Plaintiff knows he has problems that need to be addressed in psychotherapy.  (9/1/20 Tr., 126:3-127:5).

944.    Plaintiff is fully aware that because of his PTSD, he is likely to sabotage relationships, which is a common experience for those with PTSD.  (9/1/20 Tr., 126:3-127:5).

945.    Plaintiff, on his own, felt of all the things he needed to work on, the most important was to learn how to develop trust with a treating physician.  (9/1/20 Tr., 127:6-10).

946.    Plaintiff met Wisner through the Operation Enduring Freedom / Operation Iraqi Freedom post-deployment clinic.   (9/1/20 Tr., 129:11-130:7).

947.    Plaintiff went to the OEF/OIF Clinic because he had significant musculoskeletal problems.   (9/1/20 Tr., 129:11-130:7).

948.    At the time Plaintiff first went to the OEF/OIF Clinic, he had opiate and other addiction problems.   (9/1/20 Tr., 129:11-130:7).

949.    At the time Plaintiff first went to the OEF/OIF Clinic, he was judged to be 80% service connected disabled for PTSD and lumbosacral spine degenerative arthritis.   (9/1/20 Tr., 129:11-130:7).

950.    Plaintiff experienced interactions with Wisner that were minimally focused on Plaintiff's pain complaints and maximally focused on examining Plaintiff for scrotal injuries and the size of Plaintiff's penis.   (9/1/20 Tr., 129:11-130:7).

951.    Plaintiff received large and continuous prescriptions for opiates and benzodiazepines, even though Plaintiff had an opiate addiction.   (9/1/20 Tr., 130:10-15).

952.    Plaintiff experienced Mr. Wisner as providing excess amounts of opiate medications without much exam.  (9/1/20 Tr., 130:16-25).

953.    At one point, the VA was well-known to provide very large doses of opiates for their patient group. (9/1/20 Tr., 131:18-132:1).

954.     Plaintiff felt there was a quid pro quo interaction with Wisner:  If Wisner was not able to do the genital exam, then medications would not be written for Plaintiff.  (9/1/20 Tr., 132:2-8).

955.    Plaintiff was an addict and very manipulatable.  (9/1/20 Tr., 132:2-8).

956.    Even though each case is individual, Wisner had a consistent approach.  (9/1/20 Tr., 132:9-12).

957.    The quid pro quo was a consistent finding in the OIG's report and in Wisner's criminal case.  (9/1/20 Tr., 132:13-20).

958.    Plaintiff believed he saw Wisner 13 times.  (9/1/20 Tr., 132:21-133:15).

959.    At least 10 of the 13 exams there was cupping or soft stroking of Plaintiff's penis.  (9/1/20 Tr., 132:21-133:15).

960.    Wisner's actions included things such as not wearing gloves, using KY lubricant, and not washing his hands before or after.  (9/1/20 Tr., 132:21-133:15).

961.    Wisner "floated" the idea that Plaintiff needed a prostate stimulation exam to see if his erections were impacted by the low back pain, which is not a standard exam.  (9/1/20 Tr., 132:21-133:15).

962.    Wisner's proposed prostate exam is evidence of Wisner's attempt to manipulate Plaintiff by calling a non-medical exam a medical exam.  (9/1/20 Tr., 132:21-133:15).

963.    The impression Plaintiff got from Wisner is that there was no top end to the amount of opiate equivalent he could be prescribed, which is inaccurate.  (9/1/20 Tr., 134:2-10).

964.    Plaintiff retrospectively had an understanding of what the opiates and pain pill were doing to his perception of reality.  (9/1/20 Tr., 134:20-135:4).

965.    Plaintiff retrospectively recognized that the medications from Wisner clouded his thinking and made him less capable to manage other parts of his life.  (9/1/20 Tr., 134:20-135:4).

966.    Plaintiff was impaired from the medications.  (9/1/20 Tr., 135:5-12).

967.    Plaintiff eventually came to recognize the quid pro quo, which was the elicit sexual genital exams for Wisner's own pleasure for the high doses of opiates, which Plaintiff thought he needed.  (9/1/20 Tr., 135:5-12).

968.    Someone impaired is easier to exploit.  (9/1/20 Tr., 135:13-19).

969.    Plaintiff was exploitable because of his combat related PTSD, his untreated PTSD, and his opiate use.  (9/1/20 Tr., 135:13-19).

970.    Plaintiff has tried to engage in self-help education outside of psychotherapy.  (9/1/20 Tr., 135:20-24).

971.    Plaintiff read a book called "Sexual Assault Survivors".  (9/1/20 Tr., 136:8-17).

972.    Plaintiff felt comradery with the people who had been sexually abused but he did not learn anything that would create a great, new understanding or some sort of therapeutic epiphany.  (9/1/20 Tr., 136:18-23).

973.    Plaintiff reported to Dr. Peterson that he felt feminized.  (9/1/20 Tr., 137-7-8).

974.    Psychosomatic problems means that a person suffered enough distress that they were manifesting their psychological stress through physical symptoms.  (9/1/20 Tr., 137:9-19).

975.    An example of a psychosomatic sexual difficulty is men having problems with erections.  The problem is not with their genital equipment but with their thinking.  (9/1/20 Tr., 137:9-25).

976.    Plaintiff was having trouble with psychosomatic sexual difficulty.  (9/1/20 Tr., 137:9-25).

977.    Plaintiff's erection difficulties are related to Wisner's actions.  (9/1/20 Tr., 138:1-4).

978.    Plaintiff told Dr. Peterson that he didn't feel strong and desirable as a man.  (9/1/20 Tr., 138:5-139:2).

979.    Plaintiff feels he has lost his masculinity.  (9/1/20 Tr., 138:5-139:2).

980.    The last exam Plaintiff had with Wiser was in April 2014, where there was no genital exam and Wisner stopped his medications.  (9/1/20 Tr., 140:2-10).

981.    At one point Wisner became under investigation by the VA for his prescribing practices and started to confront people about the opiates he had been providing them.  All of a sudden these patients were addicts even though Wisner was in charge of their medications.  It was a switch from Wisner.  (9/1/20 Tr., 140:11-19).

982.    Dr. Peterson had Plaintiff take a Shipley II test and a Personality Assessment Inventory ("PAI").  (9/1/20 Tr., 141:3-9).

983.    Dr. Peterson did not find any evidence that Plaintiff was trying to defeat the tests.  (9/1/20 Tr., 142:25-143:11).

984.    The PAI revealed that Plaintiff was responding honestly and showed a lack of malingering.  (9/1/20 Tr., 145:3-11).

985.    The PAI revealed that Plaintiff was downplaying the severity of his problems.  (9/1/20 Tr., 146:8-147:12).

986.    The PAI results were consistent with the diagnoses that included psychoactive substance abuse, PTSD, and major depressive disorder.  (9/1/20 Tr., 146:8-147:12).

987.    The PAI results were consistent with Plaintiff's medical records.  (9/1/20 Tr., 146:8-147:12).

988.    The PAI results showed Plaintiff was experiencing ongoing anxiety that was part of his identity.  (9/1/20 Tr., 147:13-148:9).

989.    The PAI results showed Plaintiff has traumatic stressors that still bother him.  (9/1/20 Tr., 147:13-148:9).

990.    The PAI results showed that Plaintiff was depressed.  (9/1/20 Tr., 147:13-148:9).

991.    The PAI results showed that Plaintiff is socially detached from others.  (9/1/20 Tr., 147:13-148:9).

992.    The PAI is somewhat useful for gauging a person's capacity to undertake therapy in the future.  (9/1/20 Tr., 148:10-14).

993.    Plaintiff recognized the importance and value of therapy.  (9/1/20 Tr., 147:13-148:9).

994.    The PAI results showed that Plaintiff's anxiety is very high.  (9/1/20 Tr., 149:4-24).

995.    The PAI results were consistent with major depression.  (9/1/20 Tr., 149:25-150:9).

996.    The PAI results showed that Plaintiff was likely to feel isolated.  (9/1/20 Tr., 150:10-25).

997.    The PAI results showed that Plaintiff has difficulty maintaining close relationships with others.  (9/1/20 Tr., 151:1-14).

998.   The PAI results showed that Plaintiff had significant drug problems, that he answered honestly about the drug problems, and that Plaintiff is extremely stressed about his drug use.  (9/1/20 Tr., 151:19-25).

999.   The PAI results showed that Plaintiff his stress level impaired his life functioning.  (9/2/20 Tr., 5:16-6:2).

1000.   In conducting a mental status exam, Dr. Peterson observed that Plaintiff was anxious.  (9/2/20 Tr., 7:7-8:13).

1001.   In conducting a mental status exam, Dr. Peterson observed that Plaintiff was depressed in terms of public outlooks, feeling like he had little drive to live.  (9/2/20 Tr., 5:16-6:2).

1002.   In conducting a mental status exam, Dr. Peterson noted Plaintiff suffered sleep disturbance and didn't feel like he could rest.  (9/2/20 Tr., 5:16-6:2).

1003.   In reviewing Plaintiff's medical records, Dr. Peterson did not see any records where Plaintiff went into details about the things Plaintiff saw and did in Iraq.  (9/2/20 Tr., 8:19-22).

1004.   In reviewing Plaintiff's medical records, Dr. Peterson did not see any records where Plaintiff went into details about being a victim of sexual trauma.  (9/2/20 Tr., 9:4-7).

1005.   Not having details of tramas in the medical records is clinically significant because it demonstrates a lack of ability to trust what the information would be used for.  (9/2/20 Tr., 9:8-17).

1006.   Plaintiff's suicidal ideation started after the events with Wisner.  (9/2/20 Tr., 10:25-11:5).

1007.   Plaintiff reported suicidal ideation at least four times a month.  (9/2/20 Tr., 11:9-18).

1008.   Plaintiff has a decreased sex drive because of intrusions of experiences with Wisner.  (9/2/20 Tr., 13:5-22).

1009.   Plaintiff's wartime experience caused him to prefer not to be touched at all.  Plaintiff's experience with Wisner caused him difficulty with sexual touch as well. (9/2/20 Tr., 14:8-14).

1010.   Plaintiff feels broken by Wisner's actions.  (9/2/20 Tr., 14:15-15:25).

1011.   Plaintiff does not want to be a sucker.  (9/2/20 Tr., 14:15-15:25).

1012.   Plaintiff wants to avoid people.  (9/2/20 Tr., 14:15-15:25).

1013.   Plaintiff is hypervigilant.  (9/2/20 Tr., 14:15-15:25).

1014.   Plaintiff feels humiliated by Wisner's conduct.  (9/2/20 Tr., 16:1-16).

1015.   Plaintiff suffered a double whammy of sexual abuse and that he attempted to trust Wisner's reassurrances that Plaitniff was safe.  (9/2/20 Tr., 16:1-16).

1016.   Plaintiff distrusts his own judgment.  (9/2/20 Tr., 16:1-16).

1017.   Plaintiff believes that Wisner "broke him" and he has not recovered.  (9/2/20 Tr., 16:17-24).

1018.   Plaintiff feels nullified as a person.  (9/2/20 Tr., 17:5-9).

1019.   Plaintiff cannot compartmentalize the difference between a proper exam and what Wisner did to him.  (9/2/20 Tr., 17:15-18:2).

1020.   Plaintiff doubts his ability to judge what are appropriate interactions.  (9/2/20 Tr., 17:15-18:2).

1021.   Plaintiff felt taken advantage of by the VA and while he knows he needs treatment, Plaintiff cannot figure out how to engage with the VA.  (9/2/20 Tr., 18:3-9).

1022.   It is quite common for victims of severe trauma to use opiates as a coping mechanism.  (9/2/20 Tr., 21:25-22:5).

1023.   Victims turn to opiates to help dull the pain and to help distance themselves emotionally.  (9/2/20 Tr., 22:6-23:7).

1024.   Dr. Peterson's perception is that Plaintiff's opiate abuse worsened after Wisner. (9/2/20 Tr., 23:8-12).

1025.   For the most part, Plaintiff feels empty or cold, meaning life that very little quality.  (9/2/20 Tr., 24:17-25:7).

1026.   Plaintiff feels closed off from treaters to be able to talk with them.  (9/2/20 Tr., 25:8-17).

1027.   Plaintiff feels anxious, doom, and panic all the time.  (9/2/20 Tr., 28:1-23).

1028.   Plaintiff feels so anxious about what's going on in his head that he doesn't feel valued enough by others to be able to talk about what's important.  (9/2/20 Tr., 28:1-23).

1029.   Plaintiff believed that the VA should have been a place that was safe for him and believed would be a place that is safe for him but he feels betrayed.  (9/2/20 Tr., 29:21-30:17).

1030.   Wisner's actions took away Plaintiff's feeling that the VA was a safe place. (9/2/20 Tr., 29:21-30:17).

1031.   Plaintiff had significant problems with trust related to his wartime PTSD, which he somewhat overcame to get treatment.  (9/2/20 Tr., 29:21-30:17).

1032.   Plaintiff now continues to doubt his judgment about getting treatment at the VA because he was manipulated by Wisner. (9/2/20 Tr., 29:21-30:17).

1033.   Plaintiff has a triple whammy of wartime PTSD, sexual abuse by Wisner and a sense of being fooled.  (9/2/20 Tr., 29:21-30:17).

1034.   The triple whammy traumas are commingled but they are also separate events.  (9/2/20 Tr., 29:21-30:17).

1035.   Plaintiff does not want to take his clothes off in a physical exam.  (9/2/20 Tr., 31:1-11).

1036.   Dr. Peterson's testing revealed that Wisner's actions worsened Plaintiff's PTSD.  (9/2/20 Tr., 34:23-35:1).

1037.   Dr. Peterson diagnosed Plaintiff with posttraumatic stress disorder, major depressive disorder, moderate severity, chronic musculoskeletal pain related to lumbar spine, back and shoulder, and a severe opiate and sedative hypnotic use disorder. (9/2/20 Tr., 39:24-42:11).

1038.   There are two parts to Plaintiff's PTSD: the wartime experiences and the sexual abuse.  (9/2/20 Tr., 39:24-42:11).

1039.   When Plaintiff realized he had been sexually abused, that caused an additional element of PTSD.  (9/2/20 Tr., 39:24-42:11).

1040.   Plaintiff has a moderately severe level of depression that is a part of his daily functioning.  (9/2/20 Tr., 39:24-42:11).

1041.   The PTSD and depression cause Plaintiff to have abnormal sleep patterns, decreased energy, isolated feelings, and some suicidal ideations.  (9/2/20 Tr., 39:24-42:11).

1042.   Plaintiff has chronic pain that has been treated at the VA with predominantly medications.  (9/2/20 Tr., 39:24-42:11).

1043.   Plaintiff's use of medications worsened after his experiences with Wisner.  (9/2/20 Tr., 39:24-42:11).

1044.   Since the trauma caused by Wisner, Plaintiff has suffered very serious and negative consequences.  (9/2/20 Tr., 42:17-19).

1045.   Plaintiff suffered a severe fall of his self-esteem since Wisner.  (9/2/20 Tr., 42:20-21).

1046.   Plaintiff has suffered shame based self-condemnation since Wisner.  (9/2/20 Tr., 42:23-24).

1047.   Plaintiff suffers from ongoing embarrassment since Wisner.  (9/2/20 Tr., 42:25-43:1).

1048.   Plaintiff feels a loss of his personal space since Wisner.  (9/2/20 Tr., 43:2-4).

1049.   Plaintiff has lost trust in the entire VA medical program since Wisner.  (9/2/20 Tr., 43:5-7).

1050.   Plaintiff has had a loss of sex drive since Wisner.  (9/2/20 Tr., 43:8-9).

1051.   Plaintiff has had worsened depression since Wisner.  (9/2/20 Tr., 43:10-11).

1052.   Plaintiff has had feelings of hopelessness since Wisner.  (9/2/20 Tr., 43:12-13).

1053.   Plaintiff has had feelings of helplessness from the effects of Wisner's exams.  (9/2/20 Tr., 43:14-16).

1054.   Plaintiff has persistent feelings of emasculation since Wisner.  (9/2/20 Tr., 43:17-19).

1055.   Plaintiff feels he has no energy or direction to move forward in his life since Wisner.  (9/2/20 Tr., 43:20-24).

1056.   Plaintiff feels a sense of loss since Wisner.  (9/2/20 Tr., 43:25-44:1).

1057.   Plaintiff losses since Wisner were caused by the conduct of Wiser and the VA.  (9/2/20 Tr., 44:2-4).

1058.   There is a difference in Plaintiff's level of functioning and his traumas before Wisner versus after Wisner.  (9/2/20 Tr., 44:12-45:6).

110

1059.   Plaintiff now needs to restart his therapeutic work for his wartime PTSD.  (9/2/20 Tr., 44:12-45:6).

1060.   Plaintiff had well-established wartime PTSD and now has a new aspect of sexaul abuse, making it more difficult to engage in treatment.  (9/2/20 Tr., 44:12-45:6).

1061.   Plaintiff reports his combat related PTSD separately from his PTSD relating to Wisner.  (9/2/20 Tr., 45:7-46:1).

1062.   Plaintiff is capable of engaging in treatment.  (9/2/20 Tr., 46:2-14).

1063.   Plaintiff has acknowledged his need for treatment.  (9/2/20 Tr., 46:15-17).

1064.   Plaintiff has been unable to engage in meaningful treatment at the VA.  (9/2/20 Tr., 46:18-47:5).

1065.   Plaintiff is able to tolerate the VA to maintain minimal functioning.  (9/2/20 Tr., 46:18-47:5).

1066.   Men experience sexual trauma different than women.  (9/2/20 Tr., 48:15-51:4).

1067.   Men feel they should have protected themselves from sexual trauma, should have known it was happened, or should have protected other men.  (9/2/20 Tr., 48:15-51:4).

1068.   Men perceive themselves as strong, capable, protectors of others and if they fail to protect themselves, they doubt their own judgment about who to trust.  (9/2/20 Tr., 48:15-51:4).

1069.   Men tend to be much more reluctant to get treatment because they feel they can white-knuckle through it, which is a particular vulnerability for military men.  (9/2/20 Tr., 48:15-51:4).

1070.   Men often have to reassure themselves of their own heterosexuality.  (9/2/20 Tr., 48:15-51:4).

1071.   Plaintiff has experienced all of the aspects that male victims of sexaul abuse tend to experience.  (9/2/20 Tr., 51:5-10).

1072.   It is very common for a victim to lose faith in the institution where their abuse occurred.  (9/2/20 Tr., 53:4-8).

1073.   Grooming in sexaul abuse relationships are the behaviors the abuser utilizes to foster the abuse.  (9/2/20 Tr., 56:23-58:7).

1074.   Wisner groomed Plaintiff by attaching the idea that Plaintiff was receiving the best care possible.  (9/2/20 Tr., 56:23-58:7).

1075.   Wisner took advantage of the fact that Plaintiff had untreated PTSD, untreated depression, and was at high risk for drug dependency.  (9/2/20 Tr., 56:23-58:7).

1076.   Victims do not often recognize that they are being manipulated.  (9/2/20 Tr., 87:8-12).

1077.   It is Dr. Peterson's opinion that Plaintiff did not realize he was a victim of sexual molestation until he received the letter from OIG.  (9/2/20 Tr., 58:13-18).

1078.   It is Dr. Peterson's opinion that Plaintiff should not have to go back to the VA other than for compensation and pension exams due to Plaintiff's lack of trust in the system.  (9/2/20 Tr., 61:1-6).

1079.   A person cannot have a therapeutic alliance for treatment of severe or complex trauma with the healthcare system that betrayed them.  (9/2/20 Tr., 62:7-10).

1080.   A person cannot have a therapeutic alliance with a healthcare system they hate.  (9/2/20 Tr., 62:11-14).

1081.   Plaintiff had 137 different mental healthcare providers at the VA.  (9/2/20 Tr., 63:5-15).

1082.   Dr. Peterson recommends that Plaintiff be treated indefinitely with four classes of psychiatric medication.  (9/2/20 Tr., 64:8-66:8).

1083.   Dr. Peterson recommends that Plaintiff have prolonged exposure therapy.  (9/2/20 Tr., 64:8-66:8).

1084.   Dr. Peterson recommends that Plaintiff have cognitive processing therapy.  (9/2/20 Tr., 64:8-66:8).

1085.   Dr. Peterson recommends that Plaintiff have monthly psychotherapy appointments for the first one-to-two years and the quarterly for the rest of his life.  (9/2/20 Tr., 69:7-13).

1086.   Dr. Peterson estimated the cost of psychologists or psychiatrists in the Kansas City area to be between $175 and $300 per hour.  (9/2/20 Tr., 69:14-20).

1087.   It would be ideal for Plaintiff to be treated by a psychiatrist with trauma focused understanding and will prescribe medications so that it is very clear what interventions are being used for Plaintiff.  (9/2/20 Tr., 69:21-70:13).

1088.   Plaintiff needs the recommended treatments in Dr. Peterson's expert medical opinion.  (9/2/20 Tr., 70:16-19).

1089.   Plaintiff experienced a worsening of his wartime PTSD as a result of Wisner and the VA.  (9/2/20 Tr., 70:20-22).

1090.   Plaintiff experienced a worsening of major depression as a result of Wisner and the VA.  (9/2/20 Tr., 70:23-25).

1091.   Plaintiff experience a worsening of his substance abuse disorders as a reuslt of Wisner and the VA.  (9/2/20 Tr., 71:1-3).

1092.   The fact that somebody doesn't report sexual trauma right away doesn't mean they aren't traumatized by it.  (9/2/20 Tr., 160:13-161:5).

1093.   Plaintiff needs a meaningful therapeutic relationship to report the sexual trauma.  (9/2/20 Tr., 161:6-9).

1094.   Plaintiff saw Dr. Ohlde, a psychologist at the VA.  (Exh. 436; 9/2/20 Tr., 169:11-24).

1095.   Dr. Ohlde did a comprehensive psychological assessment of Plaintiff.  (Exh. 436; 9/2/20 Tr., 169:11-24).

1096.   Plaintiff told Dr. Ohlde he had been sexaully assaulted by a VA doctor.  (Exh. 436; 9/2/20 Tr., 169:11-24).

1097.   Dr. Ohlde's findings are consistent with Dr. Peterson's findings.  (Exh. 436; 9/2/20 Tr., 169:11-24).

1098.   Dr. Ohlde's findings are not consistent with Dr. Abrams' findings.  (Exh. 436; 9/2/20 Tr., 169:11-24).

1099.   The subject of sexual abuse is much more embarassing, more shame inducting, more difficult to share openly.  (9/2/20 Tr., 204:11-205:3).

1100.   Anger about parents is much easier to share.  (9/2/20 Tr., 204:11-205:3).

1101.   Prior to Wisner, Plaintiff did not see a man's face when trying to be sexual with a partner.  (9/2/20 Tr., 206:8-10).

1102.   Prior to Wisner, Plaintiff did not hear Wisner's noive in his head when trying to be sexual with a partner.  (9/2/20 Tr., 206:8-10).

1103.   Dr. Peterson stated all of his opinions to a reasonable degree of medical certainty.  (9/2/20 Tr., 71:16-18).

### *Defendant's Psychiatric Opinions*

1104.   Dr. Abrams agrees that that treatment with a psychotherapist could be "profoundly important" to Plaintiff's life, for reasons that include harm caused by Wisner.  (9/4/20 Tr., 33:4-5).

1105.   Dr. Abrams does not believe that Plaintiff's use of narcotics is the cause of Plaintiff's psychological problems. (9/4/20 Tr., 36:25-37:2).

1106.   Dr. Abrams agrees that there are often underlying reasons for people to become dependent on opiates.  (9/4/20 Tr., 37:3-5).

1107.   Dr. Abrams believes hysical pain can contribute to somebody becoming dependent on opiates.  (9/4/20 Tr., 37:6-8).

1108.   Dr. Abrams believes emotion pain can contribute to an individual becoming dependent on opiates.  (9/4/20 Tr., 37:9-11).

1109.   Dr. Abrams believes trauma can contribute to an individual becoming dependent on opiates.  (9/4/20 Tr., 37:12-14).

1110.   Dr. Abrams believes that combat trauma can contribute to somebody becoming dependent on opiates.  (9/4/20 Tr., 37:15-17).

1111.   Dr. Abrams believes that PTSD can contribute to an individual becoming dependent on opiates.  (9/4/20 Tr., 37:18-20).

1112.   Dr. Abrams agrees that providers at the VA have consistently found that Plaintiff does indeed suffer from PTSD  (9/4/20 Tr., 38:4-7).

1113.   Dr. Abrams did not review Plaintiff's military records.  (9/4/20 Tr., 38:17-19).

1114.   On the MMPI-2, a high PK score can report intense emotional distress, symptoms of anxiety, sleep disturbance, feelings of guilt, depression, unwanted disturbing thoughts, fear of

loss of emotion cognitive control, and feeling misunderstood or mistreated.   (9/4/20 Tr., 42:25-43:6).

1115.   An elevated PK score is above 65.  (9/4/20 Tr., 44:17-19).

1116.   Plaintiff's PK score is 80.  (Exh. 307, 9/4/20 Tr., 45:18-21).

1117.   Dr. Abrams did not mention Plaintiff's PK score in his report.  (9/4/20 Tr., 45:24-46:1).

1118.   Dr. Abrams understands that the Defendant has stipulated that unwanted sexual touching occurred to Plaintiff.  (9/4/20 Tr., 47:8-18).

1119.   Dr. Abrams agrees that PTSD is the most common mental health diagnosis related to any sexual trauma.  (9/4/20 Tr., 49:1-7).

1120.   Dr. Abrams testified that healthcare sex abuse is a known problem going back to the 1940s in this country.  (9/4/20 Tr., 49:8-11).

1121.   Dr. Abrams has never authored or published any peer reviewed publications on sexual trauma.  (9/4/20 Tr., 49:12-15).

1122.   Dr. Abrams has never offered any peer reviewed publications on PTSD.  (9/4/20 Tr., 49:16-18).

1123.   Dr. Abrams has never authored any peer reviewed publications on combat-related PTSD.  (9/4/20 Tr., 49:19-21).

1124.   Dr. Abrams has never authored any peer review publications on sexual assault causing PTSD.  (9/4/20 Tr., 49:22-50:1).

1125.   Dr. Abrams has never authored any peer reviewed publications on sexual assault at all.  (9/4/20 Tr., 50:2-4).

1126.   Dr. Abrams was not able to assess whether Plaintiff suffered from combat related PTSD cause of one notation in the records that Plaintiff had convulsions.  (9/4/20 Tr., 50:18-51:18).

1127.   Plaintiff's seizures do not disqualify a diagnosis of PTSD.  (9/4/20 Tr., 52:10-17).

1128.   Even though the VA has determined that Plaintiff has service-connected PTSD, Dr. Abrams cannot assess whether Plaintiff has PTSD because Dr. Abrams needs more information.  (9/4/20 Tr., 53:2-23).

1129.   Dr. Abrams cannot confirm any combat-related trauma for Plaintiff because the photo does not show Plaintiff with a weapon in his hand.  (Exh. 287-C, 9/4/20 Tr., 55:4-56:19).

1130.   Dr. Abrams believes that VA may have broken federal law because they knew Plaintiff was a narcotic addict when they prescribed him opiates.  (9/4/20 Tr., 60:10-14).

### *Harm to Wisner's Patients*

1131.   Wisner's deviations from the standard of care harm patients because these are intimate exams on vulnerable patients with multiple psychiatric problems, patients on multiple medications.  (8/31/20 Tr., 188:10-24).

1132.   Wisner's deviations from the standard of care involve a terrible violation of trust that has profound impacts on how these veterans relate to the medical community going forward.  (8/31/20 Tr., 188:10-24).

1133.   Wisner has done great harm to a multitude of people.  (8/31/20 Tr., 188:25 – 189:12).

### *Harm to Plaintiff*

1134.   As a result of Wisner's deviations from the standard of care, for Plaintiff there is distrust in the medical community, embarrassment, emotional distress, shame, and humiliation. (8/31/20 Tr., 188:25 – 189:12).

1135.   As a child, Plaintiff enjoyed reading, playing video games, drawing and writing.  (9/3/20 Tr., 49:11-15).

1136.   As a child, Plaintiff enjoyed sports, but wasn't particularly good at them.  (9/3/20 Tr., 49:11-15).

1137.   Plaintiff enjoys music and found that it has been therapeutic for him in terms of negotiating his PTSD.  (9/3/20 Tr., 49:16-19).

1138.   Plaintiff has been sober for one year, five months, and twenty days.  (9/3/20 Tr., 49:20-25).

1139.   Plaintiff is currently working for a call center.  (9/3/20 Tr., 50:6-12).

1140.   Plaintiff is the manager of the training department for two locations.  (9/3/20 Tr., 50:6-12).

1141.   Plaintiff began working at the call center on November 18, 2019.  (9/3/20 Tr., 50:13-15).

1142.   This is the longest Plaintiff has held a job since leaving the Marine Corps.  (9/3/20 Tr., 50:16-18).

1143.   Plaintiff believes he is good at his job.  (9/3/20 Tr., 50:21-22).

1144.   Plaintiff received a letter from the Office of Inspector General that led him to believe the letter might have been referring to himself.   (9/3/20 Tr., 132:11-16).

1145.   Plaintiff received a letter from the Office of Inspector General and had an "a ha" moment.  (9/3/20 Tr., 132:11-16).

1146.   When Plaintiff received the OIG letter, he felt hollow.  (9/3/20 Tr., 132:20-23).

1147.   When Plaintiff received the OIG letter, he felt betrayed.  (9/3/20 Tr., 132:20-23).

1148.   When Plaintiff received the OIG letter, he felt hurt.  (9/3/20 Tr., 132:20-23).

1149.   When Plaintiff received the OIG letter, he felt taken advantage of.  (9/3/20 Tr., 132:20-23).

1150.   When Plaintiff received the OIG letter, he felt lied to.  (9/3/20 Tr., 132:20-23).

1151.   When Plaintiff received the OIG letter, he felt dreadful.  (9/3/20 Tr., 132:20-23).

1152.   When Plaintiff received the OIG letter, he felt anger.  (9/3/20 Tr., 132:24-25).

1153.   When Plaintiff received the OIG letter, he felt rage.  (9/3/20 Tr., 133:1-2).

1154.   When Plaintiff received the OIG letter, he felt hatred.  (9/3/20 Tr., 133:3-4).

1155.   Plaintiff recalls giving a phone interview to Special Agent Baker.  (Exh. 17, 9/3/20 Tr., 133:14-15).

1156.   Plaintiff did not see Baker's summary after the interview.  (Exh. 17, 9/3/20 Tr., 134:5-8).

1157.   Plaintiff never read Baker's summary for accuracy.  (Exh. 17, 9/3/20 Tr., 134:9-10).

1158.   Plaintiff never signed Baker's summary.  (Exh. 17, 9/3/20 Tr., 134:11-12).

1159.   Exhibit 17 is a summary of Agent Baker's notes from his conversation with Plaintiff.  (Exh. 17, 9/3/20 Tr., 134:15-17).

1160.   Baker's summary is accurate regarding at least ten genital exams from Wisner, no gloves, no chaperon, and door closed.  (Exh. 17, 9/3/20 Tr., 135:5-9).

119

1161.   Plaintiff does not think Baker's summary of a 7-15 minute exam is correct, because Wisner's exams were typically 25-30 minutes and annual exams were an hour.  (Exh. 17, 9/3/20 Tr., 135:10-24).

1162.   Plaintiff was literally yelling and venting when speaking to Agent Baker.  (9/3/20 Tr., 136:10-15).

1163.   When Plaintiff told Special Agent Baker "it was all for Wisner's sexual gratification", Plaintiff was referring to the genital exam and not the entire medical exam.  (Exh. 17, 9/3/20 Tr., 137:12-19).

1164.   Plaintiff did not have trouble trusting people before Wisner.  (9/3/20 Tr., 138:6-7).

1165.   Plaintiff spiraled down after realizing the gravity and reality of the situation. (9/3/20 Tr., 138:14-19).

1166.   Plaintiff had his first hospitalization in three years in 2013.  (9/3/20 Tr., 125:8-12).

1167.   Plaintiff had not been hospitalized since February 2010.  (9/3/20 Tr., 125:13-15).

1168.   Plaintiff suffered a psychotic break in October 2013.  (9/3/20 Tr., 125:25-126:1).

1169.   Plaintiff was primarily in rehab or psychiatric hospitals from October 2013 to January 2014.  (9/3/20 Tr., 138:20-14).

1170.   By August 2014, Plaintiff was getting his sea legs back.  (9/3/20 Tr., 139:3-5).

1171.   The OIG letter took the wind out of Plaintiff's sails.  (9/3/20 Tr., 139:6-13).

1172.   Plaintiff came unglued after the OIG letter.  (9/3/20 Tr., 139:14-15).

1173.   Plaintiff felt like the light went out. (9/3/20 Tr., 139:16-19).

1174.   Plaintiff felt isolated.  (9/3/20 Tr., 139:19-20).

1175.   Plaintiff felt hurt.  (9/3/20 Tr., 139:21-22).

1176.   Plaintiff felt shame.  (9/3/20 Tr., 139:23-24).

1177.   Plaintiff felt embarrassed.  (9/3/20 Tr., 139:25-140:1).

1178.   Plaintiff felt humiliation.  (9/3/20 Tr., 140:2-3)

1179.   Plaintiff felt betrayal.  (9/3/20 Tr., 140:4-5).

1180.   Plaintiff felt anger.   (9/3/20 Tr., 140:6-7).

1181.   Plaintiff did not know how to deal with the physical and psychological pain caused by the OIG letter, so he self-medicated.  (9/3/20 Tr., 139:6-13).

1182.   Plaintiff volunteered for the Marines and the Infantry knowing there could be consequences.  (9/3/20 Tr., 140:8-24).

1183.   Plaintiff did not sign up for Wisner.  (9/3/20 Tr., 140:25-141:13).

1184.   Signing up for the Marines was a conscious decision Plaintiff made with a lot of deliberation. (9/3/20 Tr., 140:25-141:13).

1185.   What happened with Wisner was Plaintiff seeking help for the things that came as a product of his service, and Plaintiff did not sign up for that.  (9/3/20 Tr., 140:25-141:13).

1186.   Plaintiff did not expect to be betrayed in such a spectacular fashion.  (9/3/20 Tr., 140:25-141:13).

1187.   After Wisner, Plaintiff stated he did not want to spend a moment of his waking life sober because the pain was too great.  (9/3/20 Tr., 141:14-142:1).

1188.   The VA provides community for veterans who are otherwise isolated by experiences.  (9/3/20 Tr., 141:14-142:1).

1189.   Plaintiff does not have the community of the VA because it's stained with Wisner.  (9/3/20 Tr., 141:14-142:1).

1190.   Plaintiff cannot be in the VA building and not be in that place and time with Wisner.  (9/3/20 Tr., 141:14-142:1).

1191.   The opiates and benzodiazepines were a way for Plaintiff to not feel what he's feeling.  (9/3/20 Tr., 142:2-7).

1192.   After Wisner, Plaintiff's depression got worse.  (9/3/20 Tr., 142:8-9).

1193.   After Wisner, Plaintiff's anxiety got worse.  (9/3/20 Tr., 142:10-11).

1194.   After Wisner, Plaintiff's drug abuse got worse.  (9/3/20 Tr., 142:12-13).

1195.   After Wisner, Plaintiff's self-esteem got worse.  (9/3/20 Tr., 142:14-15).

1196.   After Wisner, Plaintiff's functionality got worse.  (9/3/20 Tr., 142:16-143:2).

1197.   Up until Wisner, Plaintiff felt he was doing well in school.  (9/3/20 Tr., 142:16-143:2).

1198.   Up until Wisner, Plaintiff felt he was able to compartmentalize his Marine Corps experiences.  (9/3/20 Tr., 142:16-143:2).

1199.   Up until Wisner, Plaintiff felt like he was starting to heal.  (9/3/20 Tr., 142:16-143:2).

1200.   Wisner undid all of it.  (9/3/20 Tr., 142:16-143:2).

1201.   Plaintiff became unraveled.  (9/3/20 Tr., 142:16-143:2).

1202.   The thing inside Plaintiff that makes his strive to be better is gone.  (9/3/20 Tr., 142:16-143:2).

1203.   Plaintiff wants to slink off into a hole and hide in his apartment, which is effectively what he has done for the past six years.  (9/3/20 Tr., 142:16-143:2).

1204.   Plaintiff has been lonely for six years.  (9/3/20 Tr., 143:3-4).

1205.   Plaintiff does not like to be around people because he cannot judge their motives.  (9/3/20 Tr., 143:8-10).

1206.   Plaintiff blames himself.  (9/3/20 Tr., 143:11-12).

1207.   After work, Plaintiff goes home.  (9/3/20 Tr., 143:16-17).

1208.   Plaintiff lives alone, with two cats.  (9/3/20 Tr., 143:18-23).

1209.   Plaintiff sometimes feels the cats are too much.  (9/3/20 Tr., 143:24-144:2).

1210.   Plaintiff has a primary care doctor at the VA but does not know her name.  (9/3/20 Tr., 144:3-5).

1211.   Plaintiff has an appointment at the VA in February and no intention of going because the appointment is in the same building, same clinic, and possibly the same exam room where his abuse occurred.  (9/3/20 Tr., 144:3-10).

1212.   Plaintiff feels it is unreasonable to ask him to go back to the VA.   (9/3/20 Tr., 144:3-10).

1213.   Plaintiff has medical issues he needs treatment for.   (9/3/20 Tr., 144:13-15).

1214.   Plaintiff has PTSD.   (9/3/20 Tr., 144:16-17).


### *Harm to Plaintiff Witnessed by His Mother*

1215.   Ramona Miller is Plaintiff's mother.   (8/31/20 Tr., 212:8-9).

1216.   Plaintiff was hilarious as a boy and liked to play jokes.  (8/31/20 Tr., 213:16-23).

1217.   Ramona Miller wanted everyone to understand that Plaintiff had a wonderful personality.  (Exh. 273; 8/31/20 Tr., 214:2-11).

1218.   Plaintiff wanted to be a marine since he was a little boy.  (8/31/20 Tr., 216:16-217:2).

1219.   Plaintiff didn't think he would leave Iraq -- that his thoughts would remain even after he came home.  (Exh. 272; 8/31/20 Tr., 222:25-224:22).

1220.   When Plaintiff returned from Iraq, Ms. Miller noticed that Plaintiff had a very vacant look in his eyes, his smile was fake and his eyes were distant. (9/1/20 Tr., 3:13-20).

1221.   After Plaintiff was discharged from the Marines in May, Ms. Miller realized her son may be in trouble around the 4th of July.  (9/1/20 Tr., 4:10-19).

1222.   On the 4th of July, Plaintiff was in the backyard when Black Cat fireworks went off, and Plaintiff began running around the yard scared.  Ms. Miller found him under a bush begging for his gun.  (9/1/20 Tr., 4:20-5:3).

1223.   Ms. Miller told Plaintiff he needed to go to the VA for treatment. (9/1/20 Tr., 5:4-11).

1224.   Ms. Miller did not find the treatment at the VA to be consistent because they could get appointment notifications followed by cancellation notifications.  (9/1/20 Tr., 6:13-22).

1225.   Plaintiff was diagnosed with PTSD.  (9/1/20 Tr., 6:25-7:2).

1226.   Plaintiff had trouble with nightmares.  (9/1/20 Tr., 7:3-9).

1227.   Plaintiff had trouble with flashbacks.  (9/1/20 Tr., 7:10-15).

1228.   To Ms. Miller, it seemed that Plaintiff was getting a lot of drugs from the VA.  (9/1/20 Tr., 7:25-8:10).

1229.   In Ms. Miller's opinion the VA got Plaintiff addicted to drugs.  (9/1/20 Tr., 63:11-12).

1230.   Plaintiff took a handful of pills and swallowed them in front of Ms. Miller and told her he hadn't felt this peaceful in a long time.  (9/1/20 Tr., 7:4-23).

1231.   After Plaintiff took the pills, Ms. Miller called an ambulance.  (9/1/20 Tr., 7:4-23).

1232.   After that, Plaintiff was doing okay for a while.  (9/1/20 Tr., 9:10-12).

1233.   In 2010, Plaintiff was getting better, coming around more, and able to maintain a relationship with his daughter.  (9/1/20 Tr., 50:8-13).

1234.   Ms. Miller believed Plaintiff was coming out of his shell in 2010.  (9/1/20 Tr., 66:8-10).

1235.   From February 2010 to October 2013, Plaintiff had not required inpatient treatment.  (9/1/20 Tr., 68:1-4).

1236.   Ms. Miller had to deal with two incidents in St. Joseph in 2013.  (9/1/20 Tr., 9:19-21).

1237.   The first incident involved Plaintiff's mental instability.  (9/1/20 Tr., 9:22-10:7).

1238.   The second incident involved Plaintiff being admitted for psychiatric care.  (9/1/20 Tr., 10:8-20).

1239.   The doctors in St. Joseph told Ms. Miller that her son had to many medications and they were a "cocktail for death".  (9/1/20 Tr., 13:25-14:9).

1240.   Plaintiff was transferred to the Topeka VA for 90 days.  (9/1/20 Tr., 14:21-15:4).

1241.   The doctor at the Topeka VA told Ms. Miller it was not unusual to hear that Leavenworth VA was overprescribing medications.   (9/1/20 Tr., 17:6-14).

1242.   The doctor at the Topeka VA recommended "skills not pills".  (9/1/20 Tr., 17:15-20).

1243.   After finishing his 90 days at the Topeka VA, Plaintiff had to go back to Leavenworth.  (9/1/20 Tr., 17:23-18:1).

1244.   The first appointment back at Leavenworth they tried to give Plaintiff pills again.  (9/1/20 Tr., 18:2-19:3).

1245.   Between the time Plaintiff tried to take his own life and 2013, Plaintiff was making progress.  (9/1/20 Tr., 15:16-21).

1246.   Plaintiff's health declined in the years after he started treating with Wisner.  (9/1/20 Tr., 16:9-15).

1247.   Plaintiff's battle with pills came back after he started treating with Wisner.  (9/1/20 Tr., 16:16-23).

1248.   Plaintiff told Ms. Miller that if the doctor was prescribing the pills, it must be all right.  (9/1/20 Tr., 16:16-23).

1249.   Ms. Miller was Plaintiff's legal guardian from 2013 through 2016.  (9/1/20 Tr., 19:4-12).

1250.   As his guardian, Ms. Miller was intimately involved in Plaintiff's medical care.  (9/1/20 Tr., 19:14-16).

1251.   As his guardian, Ms. Miller was constantly at battle with the VA over prescription pain medication.  (9/1/20 Tr., 21:25-22:2).

1252.   The guardianship hurt Ms. Miller's relationship with Plaintiff.  (9/1/20 Tr., 22:3-9).

1253.   Ms. Miller was getting in the way of medication Plaintiff thought he needed.  (9/1/20 Tr., 22:10-12).

1254.   After Plaintiff came home from war, he was ashamed he left his men and ashamed he killed people.  (9/1/20 Tr., 25:18-26:2).

1255.   After Wisner, Plaintiff was ashamed of the sexual assault.  (9/1/20 Tr., 25:18-26:2).

1256.   Plaintiff declined rapidly in the years after Wisner.  (9/1/20 Tr., 25:18-26:2).

1257.   Plaintiff's PTSD was much worse  after Wisner.  (9/1/20 Tr., 26:6-11).

1258.   Plaintiff's battles with addiction were much worse after Wisner.  (9/1/20 Tr., 12-15).

1259.   Plaintiff told Ms. Miller he was questioned by investigator Kerry Baker.  (9/1/20 Tr., 27:5-13).

1260.   Plaintiff told Ms. Miller what happened at the appointments, and that Wisner grabbed Plaintiff's penis.  (9/1/20 Tr., 27:5-13).

1261.   Ms. Miller felt betrayed by the VA because the VA was supposed to make Plaintiff better and instead made Plaintiff worse.  (9/1/20 Tr., 27:14-20).

1262.   Plaintiff has told Ms. Miller that when he tries to have sexual intercourse he hears Wisner.  (9/1/20 Tr., 27:21-28:2).

1263.   Ms. Miller does not believe Plaintiff's PTSD is the same before Wisner versus after Wisner.  (9/1/20 Tr., 28:3-7).

1264.   Before Wisner, Plaintiff was coming back around, attending family dinners, easier to be around, was not as mad, and starting to joke a little bit.  (9/1/20 Tr., 28:6-14).

1265.   After Wisner, Plaintiff is mad all the time and has a hard time controlling his temper.  (9/1/20 Tr., 28:15-29:4).

1266.   After Wisner, Plaintiff is sad.  (9/1/20 Tr., 29:5-6).

1267.   After Wisner, Plaintiff is a loner.  (9/1/20 Tr., 29:7-11).

1268.   Ms. Miller believes Plaintiff is embarrassed and disappointed in himself.  (9/1/20 Tr., 29:7-11).

1269.   Ms. Miller testified that Plaintiff's pain is so deep it affects his heart and soul.  (9/1/20 Tr., 29:12-20).

1270.   Plaintiff does not let anyone touch him.  (9/1/20 Tr., 29:21-22).

1271.   Plaintiff has not told anyone else in his family about Wisner because he is ashamed.  (9/1/20 Tr., 29:23-30:5).

1272.   Plaintiff's family knows he has PTSD from war.  (9/1/20 Tr., 30:2-14).

1273.   Plaintiff's granddad, dad and other men will tell Plaintiff they are proud of him.  (9/1/20 Tr., 30:2-14).

1274.   Plaintiff fears that if the men in his family knew about Wisner, they would not be proud of him anymore.  (9/1/20 Tr., 30:2-14).

1275.   Plaintiff cannot go to the VA because the treatment is inconsistent.  (9/1/20 Tr., 31:18-21).

1276.   Plaintiff cannot go to the VA because the trust isn't there.  (9/1/20 Tr., 31:18-21).

1277.   Plaintiff has told Ms. Miller he does not trust the VA.  (9/1/20 Tr., 31:22-32:3).

1278.   Plaintiff struggles with addiction because the VA put Plaintiff on very addictive medications and continued to put him on the addictive medications.  (9/1/20 Tr., 68:9-13).

1279.   Plaintiff has traumas from war and then he suffered traumas from Wiser, who was supposed to be making Plaintiff better.  (9/1/20 Tr., 68:14-17).

1280.   Plaintiff was taken to the emergency room for reasons other than drugs.  (9/1/20 Tr., 69:8-19).

1281.   Plaintiff has also taken to the emergency room for anxiety and flashbacks.  (9/1/20 Tr., 69:8-19).

1282.   Plaintiff struggles with PTSD because of things Wisner did. (9/1/20 Tr., 71:4-6).

1283.   Plaintiff's PTSD is worse after Wisner.  (9/1/20 Tr., 71:7-9).

### *The VA Cannot and Will Not Provide Care to Plaintiff for PTSD related to Wisner*

1284.  The only meaningful discussions Plaintiff has had with anybody at the VA about what Wisner did were with Dr. Black.  (9/3/20 Tr., 153:25-154:2).

1285.  Plaintiff has had countless mental health care providers at the VA.  (9/3/20 Tr., 108:7-9).

1286.  Dr. Patterson is a psychiatrist at the VA who prescribes Plaintiff medications, but does not do talk therapy.  (9/3/20 Tr., 158:25-159:8).

1287.  The VA has changed their policy as to the number of appointments one can have, so Plaintiff cannot have an indefinite ongoing clinical relationship at the VA like he had with Dr. Black.  (9/3/20 Tr., 177:2-17).

1288.  Plaintiff does not want to get involved with a VA doctor he would lose in a short amount of time.  (9/3/20 Tr., 177:2-17).

1289.  Plaintiff declined the VA Choice Program for private therapy when he learned it would only be for a limited number of appointments.  (9/3/20 Tr., 182:5-16).

1290.  When Plaintiff asked the VA for care regarding sexual trauma, the VA told Plaintiff they would not provide the care because Plaintiff was suing them.  (9/3/20 Tr., 199:18-24).

1291.  Plaintiff believes he should be able to choose his own therapist.  (9/3/20 Tr., 200:14-16).

1292.  To ask Plaintiff to go to the VA is to ask him to return to the place of his abuse repeatedly.  (9/3/20 Tr., 107:5-13).

1293.  Plaintiff feels that the whole reason a veteran goes to the VA is because the VA is meant to be a safe place that veterans can go and find a sense of safety and community.  (9/3/20 Tr., 107:14-108:6).

1294.   One percent of the population joins the military, and one percent of that population sees combat, so by experience a veteran has isolated themself.  (9/3/20 Tr., 107:14-108:6).

1295.   The VA is meant to be a place of brotherhood.  (9/3/20 Tr., 107:14-108:6).

1296.   The VA is no longer a place of shared military experience for Plaintiff, but a place of abuse.  (9/3/20 Tr., 107:14-108:6).

1297.   The one thing that the VA is supposed to do for veterans is that if they don't feel safe anywhere, they should feel safe at the VA.  (9/3/20 Tr., 107:14-108:6).

1298.   Plaintiff does not feel safe at the VA.  (9/3/20 Tr., 107:14-108:6).

1299.   Plaintiff does not feel looked after at the VA.  (9/3/20 Tr., 107:14-108:6).

1300.   Plaintiff does not feel like anyone at the VA takes responsibility.  (9/3/20 Tr., 107:14-108:6).

1301.   It is triggering for Plaintiff to return to the VA.  (9/3/20 Tr., 108:22-25).

1302.   It is triggering for Plaintiff to return to the VA because it is the same waiting room, same hallway, same exam rooms, and same pharmacy window.  (9/3/20 Tr., 108:22-25).

1303.   Plaintiff does not feel the VA system can protect him.  (9/3/20 Tr., 109:1-13).

1304.   Plaintiff worried about being able to care for himself in the future.  (9/3/20 Tr., 109:17-19).

1305.   Plaintiff feels his sobriety is fragile.  (9/3/20 Tr., 109:17-110:1).


### *Plaintiff is Committed to Recovery*

1306.   Plaintiff will never trust the VA with his medical care again.  (9/3/20 Tr., 154:5-6).

1307.   Plaintiff wants treatment for his PTSD.  (9/3/20 Tr., 154:7-8).

1308.  Plaintiff wants to be better.  (9/3/20 Tr., 154:9-10).

1309.  Plaintiff wants to maintain his sobriety.  (9/3/20 Tr., 154:11-12).

1310.  Plaintiff understands that Dr. Peterson has recommended medications for the rest of Plaintiff's life.  (9/3/20 Tr., 154:13-15).

1311.  Plaintiff is willing to take his medications if the Court provides him an economic means to do so.  (9/3/20 Tr., 155:3-6).

1312.  Plaintiff understands that Dr. Peterson has recommended extensive psychiatric treatment for PTSD from war and Wiser.  (9/3/20 Tr., 155:7-12).

1313.  Plaintiff understands that Dr. Peterson has recommended treatment for Plaintiff's depression from war and severe depression from Wisner.  (9/3/20 Tr., 155:13-18).

1314.  Plaintiff understands that Dr. Peterson recommends Plaintiff go not less than monthly for 1-2 years, and if he shows progress, four times a year for the rest of his life.  (9/3/20 Tr., 155:19-25).

1315.  Plaintiff is willing to get treatment.  (9/3/20 Tr., 156:1-2).

1316.  If the Court awards Plaintiff damages, Plaintiff commits to using it for treatment.  (9/3/20 Tr., 156:3-5).


### *Dr. Ward's Calculation of Economic Damages*

1317.  John Ward holds a Ph.D. in economics.  (Exh. 145, 9/3/20 Tr., 8:9-14).

1318.  Dr. Ward has a Bachelors and Masters degree in economics from the University of Toledo, Ohio, acquired in 1965 and 1976 respectively.  (9/3/20 Tr., 8:25-9:16).

1319.  Dr. Ward completed his Ph.D. while teaching at the University of Oklahoma.  (9/3/20 Tr., 8:25-9:16).

1320.   Dr. Ward taught as a professor at the University of Missouri Kansas City.  (9/3/20 Tr., 8:25-9:16).

1321.   While at the University of Missouri Kansas City, Dr. Ward served as Chair of economics on two occasions.  (9/3/20 Tr., 9:21-10:2).

1322.   Dr. Ward also served as Dean of the College of Arts and Sciences.  (9/3/20 Tr., 10:3-5).

1323.   Forensic economics began in the 1970s as a distinct field.  (9/3/20 Tr., 11:10-12:1).

1324.   Dr. Ward was the founder of the National Association of Forensic Economics in the 1980s, and the organization's first president.  (9/3/20 Tr., 11:10-12:1).

1325.   Dr. Ward started the Journal of Forensic Economics.  (9/3/20 Tr., 11:10-12:1).

1326.   Dr. Ward is considered the father of forensic economics.  (9/3/20 Tr., 13:9-14).

1327.   Dr. Ward assisted with determining a method to provide compensation to the victims of 9/11.  (9/3/20 Tr., 13:15-14:12).

1328.   Dr. Ward tries to determine the value of a particular economic loss.  (9/3/20 Tr., 14:16-15:7).

1329.   Dr. Ward calculated the value of economic loss for Plaintiff in this case.  (9/3/20 Tr., 16:7-10).

1330.   Dr. Ward has reached his opinions in this case to a reasonable degree of economic certainty.  (9/3/20 Tr., 16:11-14).

1331.   Dr. Ward has no opinion on liability or cause of action.  (9/3/20 Tr., 18:8-14).

1332.   Dr. Ward puts present value on specific costs he's asked to calculate.  (9/3/20 Tr., 18:8-14).

1333.   Dr. Ward considered that Plaintiff is entitled to free medical care through the VA system.  (9/3/20 Tr., 18:15-19:10).

1334.   There is no private insurance plan in the open market that provides the same level of coverage as the VA.  (9/3/20 Tr., 19:11-14).

1335.   Even the best insurance plans have deductibles, co-pays, and are subject to judgments, such as which medications a person can take.  (9/3/20 Tr., 19:11-20:3).

1336.   Some types of care are not covered under a gold plan.  (9/3/20 Tr., 19:11-20:3).

1337.   There is no plan comparable to that offered by the VA.  (9/3/20 Tr., 19:11-20:3).

1338.   No matter what private insurance plan Dr. Ward used in his calculations, some portion of Plaintiff's damages were still left on the table.  (9/3/20 Tr., 20:4-8).

1339.   In choosing an insurance plan, Dr. Ward used a ZIP code, and chose the one with the smallest co-pay.  (9/3/20 Tr., 20:9-25).

1340.   The co-pay would be $5,900 per year.  (9/3/20 Tr., 20:9-25).

1341.   Dr. Ward did not choose the most expensive insurance plan.  (9/3/20 Tr., 20:9-25).

1342.   Dr. Ward used the government's Affordable Care Act website to determine the cost of insurance.  (9/3/20 Tr., 21:1-9).

1343.   The current cost of the insurance plan would be $14,793 per year.  (9/3/20 Tr., 21:1-9).

1344.   Dr. Ward also considered the cost of Medicare after Plaintiff turns 65.  (9/3/20 Tr., 21:10-12).

1345.   Dr. Ward considered the cost of Medicare as the equivalent of what Plaintiff would get at the VA for the rest of his life after age 65.  (9/3/20 Tr., 21:13-22:3).

1346.  The cost of medicare was $9,520 per year or $793.33 per month.  (9/3/20 Tr., 21:13-22:3).

1347.  Dr. Ward used the Medicare.gov website as his source for the cost of Medicare.  (9/3/20 Tr., 22:4-9).

1348.  There is no published data or information about the cost of the coverage through the VA.  (9/3/20 Tr., 22:10-23:2).

1349.  Dr. Ward included the maximum out-of-pocket costs associated with the gold plan, $5,900 per year, in his calculations.  (9/3/20 Tr., 23:3-13).

1350.  Dr. Ward included the maximum in all of the plans - medical, vision, dental - as costs Plaintiff would not have to pay at the VA.   (9/3/20 Tr., 23:3-13).

1351.  The PTSD treatment costs come from Dr. Peterson.   (9/3/20 Tr., 23:17-24:14).

1352.  Dr. Ward does not have any opinion about the PTSD treatment other than their present value.  (9/3/20 Tr., 23:17-24:14).

1353.  Dr. Ward took the costs provided by Dr. Peterson and ran them forward to Plaintiff's life expectancy.  (9/3/20 Tr., 23:17-24:14).

1354.  Plaintiff's current life expectancy is age 78.35, or 41.35 additional years.  (9/3/20 Tr., 24:15-19).

1355.  In discounting numbers to present value, Dr. Ward used current rates on treasury inflation index bonds.  (9/3/20 Tr., 25:3-11).

1356.  Dr. Ward did not do any calculations for noneconomic loss.  (9/3/20 Tr., 26:6-11).

1357.  Dr. Ward did not calculate pain and suffering.  (9/3/20 Tr., 26:12-14).

1358.  Dr. Ward did not make a calculation for past medical expenses. (9/3/20 Tr., 42:5-16).

1359.   Dr. Ward did not consider Plaintiff's past medical expenses because he does not need to review them to make the calculations in this case.  (9/3/20 Tr., 42:5-16).

1360.   Dr. Ward was not asked to calculate lost wages in this case.  (9/3/20 Tr., 44:7-9).

1361.   The total cost reduced to present value for Plaintiff's health, dental and vision premiums to age 65 is $667,659.00.  (9/3/20 Tr., 27:14-25).

1362.   The total cost reduced to present value for Plaintiff's Medicare premiums starting at age 65 is $250,958.00.  (9/3/20 Tr., 28:1-8).

1363.   The total cost of Plaintiff's PTSD life care costs is $429,405.00.  (9/3/20 Tr., 28:9-19).

1364.   Plaintiff's total economic loss is $1,348,022.00.  (9/3/20 Tr., 28:20-25).


### *Accountability of the VA*

1365.   Denni Woodmansee testified that in a medical setting, victims might not even know that they are being sexually assaulted or molested. (Exh. 14, 202:4-7).

1366.   Dr. Leeson testified that victims of sexual misconduct do not always immediately recognize that they have been victimized. (Exh. 10, 121:19 – 123:19).

1367.   Dr. Leeson testified that he understood why, and believed it was reasonable that, some of Wisner's patients did not even think to question what Wisner was doing. (Exh. 10, 124:16 – 125:4, 125:5-25).

1368.   Melanie Lehman is a clinical social worker at the VA.  (Exh. 11, 10:2-7).

1369.   VA Social Worker Melanie Lehman testified that more veterans did not come forward because being a man, concerns relating to genital exams are difficult, embarrassing and shameful.  (Exh. 11, 38:1-9).

1370.   The VA Patient Bill of Rights states that veterans "will be informed about how to request compensation and other remedies for any serious injuries."  (Exh. 11, 159:20-160:9).

1371.   VA Social Worker Melanie Lehman did not know whether she had an obligation to inform veterans about compensation under the VA Patient Bill of Rights, nor was she instructed to inform veterans by her supervisors.  (Exh. 11, 161:7-14).

1372.   VA Social Worker Melanie Lehman admitted that there is detailed information from patient complaints that she told her supervisor and the VA Police, but did not put in her charts.  (Exh. 11, 237:9-14).

1373.   VA Chief Quality Officer Michelle Boylan admitted that clinical disclosures should have been made to each of Wisner's former patients, but no such disclosures have been made by the VA.  (Exh. 3, 190:3-7; 190:25-191:4).

1374.   VA Chief Quality Officer Michelle Boylan cannot identify a single Wisner patient that has received an apology from the VA.  (Exh. 3, 201:11-15).

## MEMORANDUM OF LAW

### A.  INTRODUCTION

Defendant does not assert a statute of limitations defense to Plaintiff's claims, and therefore no briefing is necessary concerning the timeliness of Plaintiff's claims.  Defendant made no request for imposition of reversionary trust at trial, and did not suggest imposition of a reversionary trust during opening statements.  To the extent that request is contained in Defendant's written closing argument submission, Plaintiff refers the Court to Plaintiff's Proposed Findings Of Fact & Memorandum Of Law [ECF #158] at pp. 93-94, filed in *Leininger v. United States, et al.*, Case No. 16-cv-02627.  Plaintiff incorporates the legal authority cited therein for the rationale as to why a reversionary trust is not appropriate in the absence of Plaintiff's consent.  Plaintiff does not consent to imposition of reversionary trust.

This memorandum does not regurgitate all legal authority previously submitted and briefed extensively with this Court.  To the extent such regurgitation is necessary, Plaintiff incorporates the legal authority and argument contained in Plaintiff's Proposed Findings Of Fact & Memorandum Of Law [ECF #158] at pp. 83-95, filed in *Leininger v. United States, et al.*, Case No. 16-cv-02627.

### B.  NONECONOMIC DAMAGES

The FTCA dictates the law of the place where the tort occurred should determine questions of substantive liability.  *See Harvey v. United States*, 685 F.3d 939, 947 (10th Cir. 2012); *see also* 28 U.S.C. § 1346(b)(1).  In Kansas, there is no statutory cap on noneconomic damages in personal injury actions.  *See Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1150, 442 P.3d 509, 524 (2019) (cap on damages imposed by K.S.A. 60-19a02 is facially unconstitutional because it violates section 5 of the Kansas Constitution Bill of Rights).  K.S.A. 60-19a02 previously applied to limit

noneconomic damages in all personal injury actions, including medical malpractice claims. *See generally Miller v. Johnson*, 295 Kan. 636, 644-46, 289 P.3d 1098, 1107-08 (2012) (abrogated by *Hilburn v. Enerpipe Ltd.*) for a history of legislative attempts to limit noneconomic damages in medical malpractice claims. Post *Hilburn*, no applicable statutory authority limits the amount of Plaintiff's claim for noneconomic damages.

Despite legislative attempts to limit noneconomic damages, Kansas courts have consistently recognized the determination of noneconomic damages is an issue of fact and a fundamental part of a jury trial at common law. *See Hilburn* at 1134 (citations omitted). "Noneconomic losses include claims for pain and suffering, mental anguish, injury and disfigurement not affecting earning capacity, *and losses which cannot be easily expressed in dollars and cents.*" *McKissick v. Frye*, 255 Kan. 566, 588, 876 P.2d 1371, 1387 (1994) (emphasis added). There is no limitation on noneconomic damages at common law. Concepts of fairness and reasonableness govern pain and suffering awards, without being limited by any mathematical formula or other preconceived limitation. "There is no exact relationship between money and physical or mental injury or suffering . . . . For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered . . . ."). *See McKissick*, 255 Kan. at 588, 876 P.2d at 1387, quoting *Ratterree v. Bartlett*, 238 Kan. 11, 23, 707 P.2d 1063 (1985).

The Kansas Pattern Instructions reflect these fundamental concepts. The types of damages allowed in medical malpractice cases are no different from other personal injury actions. *See* P.I.K. 4th 171.03 (withdrawn because statutes no longer treat medical malpractice actions differently from other personal injury actions). Kansas Pattern Instruction 171.02 reflects the types of damages allowed in personal injury actions, and provides in pertinent part:

When determining the amount of damages sustained by the plaintiff, you must allow the amount of money that will reasonably compensate plaintiff for his/her injuries and losses resulting from the occurrence in question. These injuries and losses may include any of the following shown by the evidence:

\*\*\*\*\*

3. NONECONOMIC LOSS. Noneconomic loss includes pain, suffering, disabilities, disfigurement and any accompanying mental anguish suffered as a result of plaintiff's injuries to date and the noneconomic loss plaintiff is reasonably expected to suffer in the future.

\*\*\*\*\*

When determining the amount of plaintiff's damages you must consider plaintiff's age, condition of health before and after the occurrence in question, and the nature, extent and duration of the plaintiff's injuries.

If you find plaintiff suffered an injury or injuries and more than minimal discomfort as a result of the occurrence, then you must compensate the plaintiff for plaintiff's pain and suffering. There is no unit value and no mathematical formula the court can give you for determining items such as pain, suffering, disability, and mental anguish. You must establish an amount that will fairly and adequately compensate the plaintiff. This amount rests within your sound discretion.

P.I.K. 4th 171.02. *See also* K.S.A. 60-249a. Loss of enjoyment of life is properly considered as it relates to disability, as well as pain and suffering, in assessing noneconomic damages. *See Gregory v. Carey*, 246 Kan. 504, 514, 791 P.2d 1329, 1336 (1990). As the fact finder, the Court is similarly equipped with the authority and discretion to determine what is fair and reasonable under the circumstances in assessing Plaintiff's claim for noneconomic damages, without any further constraint or limitation imposed by Kansas law.

Kansas pattern jury instructions further authorize damages for *aggravation* or *activation* of a preexisting condition:

> Plaintiff is not entitled to recover for any physical ailment, defect, or disability that existed prior to the occurrence. However, if the plaintiff had a preexisting physical ailment, defect or disability and you find this condition was aggravated or made active causing increased suffering or disability, then the plaintiff is entitled to recover for such increase suffering and disability.

P.I.K. 4th 171.43.  Hence, the mere fact that Plaintiff suffered from PTSD before he was a patient of Wisner does not foreclose an award of noneconomic (and economic) damages for aggravation or activation of that condition.  Moreover, Plaintiff has diagnoses of PTSD from his combat trauma and PTSD from the subsequent trauma caused by Wisner and the VA.

## C.  SCOPE OF EMPLOYMENT

The United States is liable for tortious acts committed by employees "acting within the scope of [their] office or employment." 28 U.S.C. § 1346(b)(1). State law governs scope of employment determinations in FTCA cases. *Fowler v. United States*, 647 F.3d 1232, 1237 (10th Cir. 2011).  An employee acts within the scope of his employment when (1) he performs services for which he has been employed, or (2) he does anything reasonably incidental to his employment. *O'Shea v. Welch*, 350 F.3d 1101, 1103 (10th Cir. 2003) (citing Pattern Instructions Kansas 3d 107.06; *Williams v. Cmty. Drive-In Theater, Inc.*, 520 P.2d 1296, 1301–02 (Kan. 1974)). The test is not whether the employer expressly authorized or forbid the conduct. *Id.* Instead, the proper inquiry is whether the employer should have fairly foreseen the conduct from the nature of the employment and the duties relating to it. *See Id.*; *see also Commerce Bank of St. Joseph, N.A. v. State*, 833 P.2d 996, 999 (Kan. 1992). If Wisner's personal acts constitute a "slight deviation," those acts remain within his scope of employment. *See O'Shea* at 1107.

This Court previously found that Wisner's conduct was plausibly within his scope of employment. In *John Doe D.E .v. U.S.*, 2:16-cv-02162-CM TJJ, ECF Doc. 67[1], this Court reviewed the *O'Shea* six-factor analysis to assess the plausibility that Wisner's conduct was a slight deviation from the scope of his employment. Specifically, the Court observed:

> Still, at this stage, plaintiff has presented a plausible negligence claim that is supported by facts consistent with the allegations in complaint. Arguably, Wisner was furthering the VA's interests in treating and examining plaintiff, even though it may have been done in excess.
>
> * * * * *
>
> Moreover, full physical examinations (including examination of the VA patients' genitalia and prostates) are not necessarily unexpected. The failure to wear gloves and/or an excessive number of examinations might be improper, but this conduct in general is not unforeseeable or unexpected of a PA hired to treat VA patents [sic]. Likewise, obtaining personal information from a patient for diagnosis and treatment is expected and often necessary for effective treatment. While Wisner's conduct may have been unprofessional or forbidden, that is not the test. *See O'Shea*, 350 F.3d at 1103.

*Id.* at pp. 7-8. The foregoing observations are exemplified by undisputed evidence presented at this trial, wherein Plaintiff presented evidence that genital exams are one of the regular, core, routine job duties of Wisner <u>and</u> the VA received numerous patient reports indicating Wisner was improperly or unnecessarily performing genital exams. Such conduct was fairly foreseeable to the VA before and during the time period Wisner was providing medical care to Plaintiff.

Any suggestion that this Court must ignore <u>actual</u> knowledge on the part of the VA in adjudicating whether the VA should have "fairly foreseen the conduct from the nature of the employment and the duties relating to it," is wholly unsupportable.  No authority places such an illogical stricture on the analysis under *O'Shea*.  First, the very nature of Wisner's employment involved the provision of medical treatment to veterans at the OEF/OIF clinic.  The very nature of

---

[1] While this Memorandum and Order addresses another plaintiff's Complaint at the pleading stage, the allegations concerning Wisner's conduct are remarkably consistent with the evidence of Wisner's conduct presented at this trial.

his employment involved interaction between those veterans and the OEF/OIF clinic in the provision of medical care. Complaints from veterans concerning the manner and method in which Wisner was providing that care goes to the very heart of the nature of his employment i.e. providing medical care to patients at the clinic. In other words, Wisner was not a janitor at the OEF/OIF clinic. Second, the standard of foreseeability demands determination of what was "<u>fairly</u> foreseeable" to the employer, and fairness demands consideration of <u>actual</u> knowledge on the part of the employer of the employee's repeated deviations throughout the course of employment. No case exists which ignores evidence of actual knowledge in determining foreseeability pursuant to the *O'Shea* analysis.

Similarly, the *O'Shea* "slight deviation" factors are largely beyond dispute based on the evidence presented at trial. The court considers: (1) the employee's intent; (2) the nature, time, and place of the deviation; (3) the time consumed in the deviation; (4) the work for which the employee was hired; (5) the incidental acts reasonably expected by the employer; and (6) the freedom allowed the employee in performing his job responsibilities. *See O'Shea*, 350 F.3d at 1108. Factors 2, 3, 4, 5, and 6, are beyond dispute. The deviations at issue all occurred during regularly scheduled medical appointments, in clinic exam rooms, and during normal clinic hours. The deviations consumed approximately two minutes of medical appointments lasting thirty minutes. The VA hired Wisner, quite literally, to perform genital exams as a component of complete physical exams. Genital exams are a core job responsibility for Wisner, and the incidental acts arise directly from the manner in which Wisner performed those exams. Finally, the VA allowed Wisner freedom in providing medical care at the clinic where he served as the only primary care provider for up to 1,000 veterans.

Defendant relies entirely on Wisner's intent to argue sexual assault is beyond the scope of his employment. Importantly, *O'Shea* does not require all six factors to be met, or consider one factor to the exclusion of the remaining factors. This Court summarily rejected Defendant's over-simplification in this case when the Court denied summary judgement. *See* Memorandum And Order filed 01/06/20, ECF Doc. 73, p. 6 ("Rather, defendant merely focuses on Wisner's intent and the fact that defendant did not hire Wisner to sexually molest patients – a fact that seems rather obvious."). Now, the undisputed evidence adduced at trial empowers proper application of the *O'Shea* factors in favor of finding Wisner's conduct to be reasonably incidental to his employment.

An employee can pursue dual-purpose ventures without the conduct amounting to an entire departure from the scope of employment. *See O'Shea*, 350 F.3d at 1107. "Incidental personal acts" or "slight deflections for a personal or private purpose" do not remove the conduct from the course of employment where the employee's "main purpose is still to carry on the business of his employer." *Id.* (citations omitted). Deviations "which do not amount to a turning aside *completely* from the employer's business, so as to be inconsistent with its pursuit, are often reasonably expected and the employer's assent may be fairly assumed." *Id.* (emphasis added) (citations omitted). Here, Wisner's deviations lasting two minutes in the course of a genital exam in the context of a longer clinical appointment, does not amount to completely turning aside from the VA's business. Moreover, given the numerous patient complaints in evidence, the VA should have reasonably expected the deviation because what is "<u>fairly</u> foreseeable" cannot ignore <u>actual</u> knowledge on the part of the VA.

The fact that Wisner has expressed a mixed intent or acted intentionally in relation to the genital exams does not remove his conduct from the scope of employment. The employer is responsible for tortious acts incidental to the business of the employer "even if such acts are done

willfully or in excess of the authority conferred." *Williams v. Cmty. Drive-In Theater, Inc.*, 520 P.2d 1296, 1301 (Kan. 1974) (citation omitted). The relation of the act to the employer's business becomes an important criterion. *Id.* at 1302. Hence, assaults committed by bartenders, cashiers, restaurant or hotel managers, often lead to vicarious liability because those employees are expected to maintain order about the premises. *See Id.* at 1303. Where the employer must contemplate the use of force from the nature of employment, the employer will be held liable for the willful or malicious act "even though he had no knowledge that the act was to be done and although the act was in disobedience of express order or instructions given by him." *Id.* at 1302-03. Here, the VA must contemplate the manner in which Wisner touches patients during genital exams, and the discretion he routinely exercises in performing those exams, from the very nature of Wisner's employment. Based on the undisputed evidence at trial, the VA is vicariously liable for Wisner's conduct towards Plaintiff.

### D. IMMUNITY

This Court has already noted the applicability of the VA Immunity Statute, 38 U.S.C. § 7376, to permit liability on the part of the VA for intentional torts committed by its employees in furnishing health care or treatment while in the exercise of the employee's duties. *See* Memorandum And Order filed 01/06/20, ECF Doc. 73, pp. 7-8. The statute clearly does not limit its waiver to "claims of medical battery," as the U.S. has suggested in the past. *See Ingram v. Farugque*, 728 F.3d 1239, 1245-46 (10th Cir. 2013); *see also* ECF Doc. 62, pp. 7-8. The statute provides no limitation at all, stating that the FTCA's exclusion of coverage for intentional torts "shall not apply to any claim arising out of a negligent or wrongful act or omission of any person described in subsection (a) in furnishing medical care or treatment . . . while in the exercise of such

person's duties in or for the Administration." 38 U.S.C. § 7316(f).[2]

The *Ingram* court first stated that the FTCA, standing alone, constituted a limited waiver of sovereign immunity: "the FTCA allows the United States to be sued for claims arising out negligent or wrongful acts or omissions of its employees, when such employees are acting within the scope of their duties. 28 U.SC. § 1346(b)(1); *Id*. at 1245. Although the *Ingram* decision noted the FTCA normally excludes its coverage from intentional acts, the *Ingram* court concluded:

> In other words, "§ 2680(h) does not bar application of the FTCA to [intentional] tort claims arising out the conduct of VA medical personnel within the scope of" 38 U.S.C. § 7316(f). *Franklin v. United States*, 992 F.2d 1492, 1502 (10th Cir. 1993).

*Id*. at 1246. Therefore, the current controlling Tenth Circuit authority absolutely permits Plaintiff's claim against the VA, even if the claims arose from intentional torts, because those intentional torts occurred directly in the context of the provision of VA healthcare services.

The undisputed evidence demonstrates that the "wrongful acts" occurred while Wisner was furnishing medical care or treatment in the exercise of his duties. Again, this Court has already rejected Defendant's over-simplified contention that "sexual molestation" is not "medical care or treatment." *See* ECF Doc. 73, pp. 8-9. This Court has already refused Defendant's invitation to "look only at Wisner's discrete act of conducting improper genital and rectal examinations—not the surrounding actions of conducting a medical appointment." *See* ECF Doc. 73, p. 8. Now, the undisputed evidence adduced at trial convincingly proves that Wisner was indeed furnishing medical care in the exercise of his duties when he committed wrongful acts. Genital exams were indisputably a core, routine job duty for Wisner. All the exams occurred in the context of lengthy clinical visits consisting of many aspects of primary medical care. In several clinic visits, some

---

[2] Subsection (a) specifically includes "physician assistant" in the definition of "health care employee of the Administration." *See* § 7316(a)(2).

medical justification existed for the genital exams, even though the manner of the exams was improper and wrongful. Deviations in the manner or duration of the exams does not alter the fact that the wrongful acts occurred while furnishing medical care.

### E.  CONCLUSION

The foregoing authority applied to the facts adduced at trial demands accountability on the part of the VA and justice for Plaintiff.  The provision of primary medical care, by definition, empowers the medical provider to conduct sensitive and uncomfortable physical exams on patients that are in a vulnerable position.  The law demands accountability on the part of the employer when the primary care medical practitioner deviates from the standard of care in the manner and method of performing those physical exams.  The fact that this patient population consists largely of combat veterans suffering from combat-related PTSD and even drug-dependency only compounds the severity of the violation of trust involved, and the degree of harm suffered by Plaintiff and his fellow combat veterans who relied on Wisner and the VA to care for their medical needs.  Application of the established legal authority cited herein to the egregious facts established at trial demands true accountability on the part of Defendant United States of America, and justice for Plaintiff.


Respectfully submitted,

HUMPHREY, FARRINGTON, & McCLAIN, P.C.


*/s/ J'Nan C. Kimak*
J'Nan  C. Kimak       #21927
Daniel A. Thomas       *Pro Hac Vice*
Michael S. Kilgore       #23025
Nichelle L. Oxley       *Pro Hac Vice*
HUMPHREY, FARRINGTON & MCCLAIN, P.C.
221 West Lexington Ave., Ste. 400

146

Independence, MO 64051
(816) 836-5050
(816) 836-8966 –fax
msk@hfmlegal.com
jck@hfmlegal.com
dat@hfmlegal.com
nlo@hfmlegal.com
**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of September 2020, the foregoing was filed using the ECF system, which will send a notice of electronic filing to all registered attorneys of record:

Christopher Benson
Sarah Haston
Virginia Jackson Elliott
U.S. Dept. of Justice – Torts Branch
1331 Pennsylvania Ave., N.W., Room 8010N
Washington, D.C. 20004
(202) 616-4561
Fax: (202) 616-5200
sarah.e.haston@usdoj.gov
christopher.Benson@usdoj.gov
Virginia.j.elliott@usdoj.gov
ATTORNEYS FOR DEFENDANT USA

I further certify that a true copy of the foregoing was sent via first-class, postage prepaid U.S. Mail this same date upon Defendant Mark E. Wisner, who appears pro se, at the following address:

Mark E. Wisner
Norton Correctional Facility
PO Box 546
Norton, KS 67654-0546
PRO SE DEFENDANT

*/s/ J'Nan C. Kimak*
Attorney for Plaintiff