## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **JOHN DOE P.M.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 16-2315-DDC** |
| **UNITED STATES OF AMERICA AND MARK WISNER,** | |
| **Defendants.** | |

## MEMORANDUM OF DECISION UNDER RULE 52(a)

Over the course of a week in August-September 2020, the court conducted a bench trial via Zoom video technology with the active parties in this case, plaintiff John Doe P.M. and defendant United States of America.  Both parties consented to the trial being conducted in this manner, given the global pandemic affecting our country.  Defendant Mark Wisner—who is an inmate in a Kansas correctional facility—did not participate in the trial, although his deposition was taken to preserve his testimony for trial.

Post-trial, the court allowed the parties to submit optional briefing and proposed findings of fact.  The court has reviewed the evidence from trial—including the evidence submitted for review outside the (virtual) courtroom.  At the conclusion of the parties' presentation of evidence, several evidentiary questions remained for the court's decision.  To the extent necessary to resolve the case, the court makes the requisite determinations on relevance and admissibility in this Memorandum and Order.  If this Memorandum and Order does not refer to contested evidence or its admissibility, the court found the evidence immaterial to its ruling and decided that no ruling was necessary.

At a very high level, this case involves the repeated improper touching of plaintiff's genitals during medical appointments with Wisner at the Veterans Administration Medical Center in Leavenworth, Kansas.  Plaintiff seeks to hold the United States responsible for Wisner's actions, on theories of medical malpractice and intentional infliction of emotional distress.  The parties don't dispute plaintiff's allegation that Wisner examined plaintiff's genitals when unnecessary, without gloves, and took too long to examine them.  Instead, the disputes here focus on:

> (1) whether the United States can be held liable at all for Wisner's actions because
>
>> (a) the acts were not within the scope of his employment, and
>>
>> (b) the acts were not taken "in furnishing medical care"; and, if so,
>
> (2) whether Wisner caused plaintiff any—or, at most, minimal—injury; and, if so,
>
> (3) how much plaintiff should recover as damages for that injury.

As required by Fed. R. Civ. P. 52(a)(1), this Memorandum and Order includes separate findings of fact and conclusions of law.  "A district court's findings of fact 'should be sufficient to indicate the factual basis for the court's general conclusion as to ultimate facts[,] . . . should indicate the legal standards against which the evidence was measured[,] . . . [and] should be broad enough to cover all material issues.'"  *OCI Wyo., L.P. v. PacifiCorp*, 479 F.3d 1199, 1203 (10th Cir. 2007) (quoting *Otero v. Mesa Cty. Valley Sch. Dist.*, 568 F.2d 1312, 1316 (10th Cir. 1977); further citations omitted).  But "Rule 52(a) does not require the district court to set out its findings and conclusions in excruciating detail."  *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 902 (10th Cir. 2013) (Martinez, J., dissenting) (citation omitted).  On the other hand, "too little detail frustrates meaningful appellate review by requiring the parties and this court to guess at

why the district court reached its conclusion." *OCI Wyo., L.P.*, 479 F.3d at 1204 (citation omitted).

With these standards in mind, the court turns to its Findings of Fact and Conclusions of Law.

### Findings of Fact

1. Plaintiff saw Wisner ten to 13 times between March 11, 2011 and April 19, 2014. During every appointment but the final one, Wisner performed a genital examination of plaintiff. He never wore gloves during any of those exams. Also, the genital exams were excessively long.

2. During the exams, Wisner made unnecessary and inappropriate sexualized comments about plaintiff's penis and its effect on "the ladies."

3. While plaintiff felt uncomfortable during some of his visits with Wisner, he did not realize, immediately, that Wisner was doing anything inappropriate and he did not voluntarily stop seeing Wisner for appointments.

4. Before plaintiff began seeing Wisner for medical appointments, he suffered from wartime PTSD and lumbosacral spine degenerative arthritis. Plaintiff also had opiate and other addiction and abuse problems. Over time, Wisner "generously" increased the medications plaintiff was prescribed.[1] Wisner ignored a note from a doctor (Dr. Aron) dated March 14, 2012, indicating that plaintiff exhibited drug-seeking/substance abuse

---

[1]  In a pretrial motion in limine, defendant asked the court to exclude evidence of Wisner's "generous" prescribing practices because plaintiff did not exhaust a claim for negligent prescription. As the court ruled before trial began, the evidence is probative of plaintiff's relationship with Wisner and why he might continue to engage in medical care despite Wisner's improper touching. It also is probative of the freedom Wisner had in providing medical care, which is a factor for determining whether Wisner was acting within the scope of his employment. Finally, there was much trial testimony about plaintiff's addictions. It is fair for plaintiff to use Wisner's prescription practices to explain some of the reason for his addictions and give context for broader events.

behavior.  Despite the note, Wisner continued prescribing plaintiff's medications, including oxycodone, on March 20, 2012.  He added Tramadol, another opioid narcotic medication, in November 2012 and Tylenol No. 3 in May 2013.  In July 2013, plaintiff asked Wisner to taper him off hydrocodone.  Wisner took plaintiff off the hydrocodone but replaced it with more powerful opiates.  Three months later, plaintiff was hospitalized with a massive addiction issue.  Finally, in March 2014, Wisner added morphine IR, a highly addictive narcotic pain medication, to plaintiff's regimen.  The narcotic medications that Wisner prescribed impaired plaintiff, making him "not very lucid," foggy, and hazy.  They also exacerbated plaintiff's addiction problems.  By the time of plaintiff's last appointment with Wisner, both plaintiff's mental health and his addiction problems were much worse than they were in 2011.  The doctor who took over plaintiff's care after Wisner immediately discontinued these medications.  One of the physicians who took over Wisner's patients, Dr. Hamidjaja, said that Wisner's prescriptions for plaintiff were "extremely high, unnecessary, and disproportionate to plaintiff's symptoms."  But Wisner had convinced plaintiff that plaintiff's pain gave him legitimate reasons to be prescribed opiates, so when plaintiff's prescriptions were stopped, he turned to street drugs and became a street addict for years.

A.     **Findings About the Scope of Employment Question**

**The Work Which the VA Hired the Employee to Perform**

5.   Wisner was hired by the Department of Veterans Affairs ("VA") in 2008 as a Physician Assistant ("PA").

6. A PA administers basic medical care and screenings.  These duties include genital, rectal, and prostate examinations when medically indicated.  These exams may involve sensitive, intimate, or uncomfortable matters.

7. As a primary care provider, Wisner compiled the personal history of patients.  In this role, sometimes providers have to ask questions about sensitive and private matters, like sexual history, practices, and habits.

8. In short, Wisner was hired to conduct, among other things, genital examinations.  He also was expected to ask personal questions that might make patients uncomfortable—all with the proper goal of compiling a comprehensive medical history.

**The Freedom Allowed the Employee in Performing His Job Responsibilities**

9. Wisner led the OEF-OIF Clinic (Operation Enduring Freedom and Operation Iraqi Freedom) in Leavenworth, Kansas.  In that role, he had a great deal of autonomy.  He was the only primary care practitioner at the clinic, and was responsible for nearly a thousand patients, although there was a 750-patient limit.

10. No supervisor or chaperone was required to be present during Wisner's examinations of male patients.

11. Daniel Cline, M.D. was Wisner's first-line supervisor.  Dr. Cline was unaware that he was supposed to review Wisner's charts, and he did not monitor Wisner's activities.[2]  This omission violated VHA Directive 2004-029, which required monitoring and

---

[2] Defendant repeatedly has challenged admissibility of this evidence—evidence about what Wisner's supervisors did or did not do.  Defendant maintains that this evidence is not relevant because the court has dismissed plaintiff's claims for negligent supervision.  The court ruled before trial that evidence of this nature was relevant to the foreseeability of Wisner's conduct.  This ruling stands.  While it's true that this evidence overtly supports a negligent supervision claim, the court already has granted summary judgment against this legal theory.  Still, the evidence tends to make it more probable than not that the VA should have foreseen Wisner's misconduct, and therefore should be held responsible for it.  The court has considered throughout this Memorandum and Order evidence showing what Wisner's supervisors did or didn't do, and what various employees knew or didn't know, as evidence relevant to foreseeability.

evaluation of a PA's clinical activities.  No one at the VA told Dr. Cline about rules

governing him as a supervising doctor or ensured that he was monitoring Wisner's

clinical activities.

12. In determining Wisner's competency, Dr. Cline relied on what Wisner said he did.  He

did not investigate complaints about Wisner.

13. VHA Directive 1063 required oversight, consultation, and assistance with patient care

management, but the VA did not follow any of these requirements with Wisner.

14. VHA Directive 1063 gives PAs varying levels of autonomy based on their experience:

"full," "limited," and "supervised."  Wisner had full autonomy; he had "full leeway to do

his job, make independent medical decisions, and decide what tests to order, and perform

diagnoses."

15. Wisner thus enjoyed unfettered authority to decide when and how to do genital, rectal,

and prostate exams.  The court finds that Wisner had substantial freedom—in retrospect,

far too much freedom—in performing his job duties.

**The Incidental Acts Reasonably Expected by the Employer**

16. The VA Eastern Kansas Health Care System issued a Policy Memorandum on February

5, 2010, to identify and address suspected abuse (including sexual abuse) among the

patient population.  On May 21, 2013, the VA Eastern Kansas Health Care System issued

another Policy Memorandum addressing incidents of patient abuse.

17. The Leavenworth VA's policy recognizes the potential for patient abuse.

18. Healthcare provider abuse is a known risk in the healthcare community.

19. Given the acknowledgment of the risk of patient abuse by the VA and the healthcare

community, the court finds the VA should have anticipated that acts of abuse could occur

in an un-monitored situation—particularly when the job, by nature, involved sensitive
and intimate examinations and discussions.

### The Nature, Time, and Place of the Deviation

20. Wisner conducted all of his examinations during working hours, in an examination room
at the VA Medical Center in Leavenworth, Kansas.

21. For a new patient, the first intake was scheduled for one hour, and included a medical
history and a head-to-toe physical.  Annual exams took about an hour, and Wisner's other
medical clinic appointments lasted about 30 minutes.

22. When Wisner performed a genital exam, it consumed only a small fraction of the time he
spent with the patient during the medical appointment.

### The Time Consumed in the Deviation

23. Wisner's genital exams of plaintiff each lasted about two minutes.

24. In the context of an office visit lasting 30 minutes, two minutes represents a small amount
of time dedicated to either unnecessary, ungloved, or needlessly extended genital exams.
Had the medically-indicated examinations been limited to a "reasonable" time, they still
would have lasted 30 seconds to one minute.

### The Employee's Intent

25. Wisner's conduct manifested his mixed motives.  Wisner wanted to be thorough in his
exams, but also had an inappropriate sexual curiosity.  As a healthcare provider, Wisner
strove to be thorough—even though his genital or rectal exams lasted too long.  Dr.
Thomas Kelley, plaintiff's expert witness, testified credibly about Wisner's mixed
motives.  The court found his testimony to be reasonable, well-supported, and consistent
with the record as a whole.  Specifically, Dr. Kelley's characterization of Wisner's

motives is consistent with Wisner's background in the military.  It also comports with the fact that Wisner appeared to conduct full physical examinations on his patients; he did not wholly abandon his role as a healthcare provider during appointments.  And during Wisner's January 23, 2015 interview with Special Agent Kerry Baker, Wisner told Agent Baker that "his method was simply thoroughness in looking for any irregularities in their genitals."  (Ex. 406, at WIS00034987.)

26. The court makes its factual finding about mixed motives despite some of Wisner's other statements in his January 23, 2015 interview with Agent Baker.  In that interview, Wisner indicated that he crossed the professional line and provided excessive genital exams.  He said he knew it was wrong but he lacked self-control.  He also said that he conducted genital exams to satisfy his own curiosity.  When the examinations were not medically indicated or necessary, Wisner admitted that he would have conducted them for his own pleasure.

27. In that same interview, Wisner acknowledged that he chose victims who were attractive and of a similar body-type.  He also took steps to avoid getting caught.  They included falsifying medical records and failing to document some of the genital examinations he performed.

28. While this evidence underscores Wisner's "sexual curiosity" motive, it does not mean that Wisner lacked motives that were unrelated to his sexual curiosity.  Conducting genital examinations was still part of his job.  It still was necessary in many instances, and it still served a valid, independent purpose.

29. Moreover, Wisner's answers were recorded by Agent Baker after the interview—not transcribed in a deposition or sworn under oath.  And they responded to questions that

appeared fairly confrontational from Agent Baker's descriptions of Wisner's responses. While Wisner was not in custody at the time of the interview, Agent Baker's Memorandum of Interview uses many words suggesting he had pressed the issue when Wisner answered in a way that appeared less than truthful or until Wisner "admitted" one thing or another.[3]  The court gives Wisner's "admissions" during this interview slightly less weight than it would had the court heard Wisner's testimony live or via a deposition with admissible answers to review.

30. All of these facts considered, the court finds that Wisner had mixed motives.

### Additional Findings on General Foreseeability

31. The Veterans Health Administration (VHA) required a centralized and comprehensive policy on reporting and tracking allegations of sexual misconduct at VHA facilities (among other things).  The Leavenworth VA wholly failed to comply with this directive. Its reporting system was decentralized and lacked any coherent plan for tracking patient complaints.  The VA should have foreseen that this omission could produce serious problems if an employee took advantage of his position with patients.  The following evidence demonstrates how the Leavenworth VA's so-called tracking "system" made

---

[3]   Examples of "admissions" included in the Memorandum of Interview include:

- "[Wisner] initially tried to rationalize the incident as a simple reaction but then admitted that what he did was wrong."

- "Wisner eventually admitted that he crossed the professional line and was excessive in his genital exams."

- "[Wisner] admitted that these exams were conducted to satisfy his own curiosity and that he ultimately hid behind his 'thoroughness' as an excuse to examine their genitals."

- "[Wisner] admitted that he knew that what he was doing to these patients was wrong and that he had no self-control."

(Ex. 406, at WIS00034986 – WIS00034987.)

Wisner's conduct both foreseeable and actually foreseen (albeit not foreseen by supervisors in a position to remove Wisner from patient care).

    a.   Patient Advocate Richard Lawrenz used a Patient Advocate Tracking System ("PATS") to record complaints he received about healthcare providers.  But other VA Leavenworth employees used a "Report of Contact" form that they did not enter into the PATS system.  In fact, the VA's social workers and medical providers lacked access to PATS.

    b.   VA Social Worker Dawn Clouse received complaints about Wisner's physical exams.  But she did not investigate any of the complaints she received.  She did not know about any centralized tracking system at VA Leavenworth for reporting sexual assaults.  Clouse told Agent Baker that while Wisner was at VA Leavenworth, "she did not believe that there was a formal process in place" for reporting patient complaints.

    c.   <u>During 2011</u>:  A patient ("R.D.") reported that Wisner failed to wash his hands when performing a physical examination.  But Clouse never brought this complaint to Rudy Klopfer's attention.  Klopfer was the Director and CEO of VA Eastern Kansas Healthcare System, and in that role, he was principally responsible for ensuring that the PA supervising policies were implemented. (During part of the time relevant to this lawsuit, Klopfer shared this responsibility with others, including Dr. Anil Desai, Chief of Service).

    d.   <u>February 17, 2012</u>:  Wisner's supervisors, Dr. Desai and Dr. Cline, knew that Wisner, at least twice, had performed knee injections without having privileges to

perform those procedures.  In response, Dr. Desai merely recommended that

Wisner not carry out any procedures for which he did not have privileges.

e. February 21, 2012:  Lawrenz received a report from a patient ("T.S.") who was

"uncomfortable" with comments made by Wisner during a medical visit.  The

patient also reported that Wisner used a scope to perform a rectal exam.  Lawrenz

issued a "heads up" to Drs. Cline and Desai.  He also coded the complaint as an

allegation of "negligence/malpractice."  Although the patient reported feeling

"violated," Lawrenz did not report the complaints to the VA police because the

patient was not "graphic" when he described what had occurred.  But in seven and

a half years, it was the only time Lawrenz coded a complaint in the PATS system

as "allegations of negligence/malpractice."

f. During 2012:  Another patient ("N.A.") made a complaint about Wisner to

Clouse.  The patient said that he felt uncomfortable with Wisner's genital exams

and that Wisner acted inappropriately during his exams.  The patient demanded a

new provider.

g. March 29, 2012:  Another patient ("J.D.") reported to VA police that Wisner had

sexually assaulted him during a medical appointment.  Specifically, J.D. alleged

that Wisner sexually assaulted him the day before this report in an exam room by

putting his hand down his underwear in his groin area without warning the patient

in advance.  J.D. was admitted to the VA acute psychiatry unit that same day,

stating he felt "homicidal" toward Wisner.

h. April 2, 2013:  Another patient ("J.E.") reported to the VA that he did not feel that

Wisner had his best interests at heart.  According to the complaint, Wisner told

J.E. that he could "put more pain medication up his rear end and it wouldn't do any good."  J.E. requested another provider.

i.  September 20, 2013:  Another veteran reported to Lawrenz that he would like another provider because he would be more comfortable with someone other than Wisner.

j.  January 23, 2014:  A veteran ("M.S.") reported to VA social worker Melanie Lehman that he felt "uncomfortable" and "creeped out" by his medical visits with Wisner; the veteran reported having two testicular exams in a two-week time frame; and the veteran stated the testicular exams felt "different" compared to past testicular exams provided by others.

k.  February 20, 2014:  M.S. made a complaint about Wisner's genital exams.  It is memorialized in a "Report of Contact" authored by Lehman.  Dr. Cline was made aware of this complaint and looked into it, but Klopfer said that no one brought this complaint to his attention until May 2014.

l.  March 6, 2014:  Dr. Cline emailed Dr. Desai about a patient who complained that Wisner conducted inappropriate genital exams.  The patient had visited the VA on January 2, 2014, and met with Clouse.  It appears that this patient was M.S.

m.  March 28, 2014:  Dr. Cline emailed Wisner, reviewing a recent discussion instructing Wisner to "Always ask permission to examine a patient, particularly for genitourinary examinations" and to "Ask patients if they would like a chaperone to be present."

32. Based on the VA receiving all of these reports before plaintiff's last visit with Wisner on April 19, 2014,[4] the court finds that Wisner's conduct toward plaintiff was foreseeable to the VA. The VA certainly had all this information about Wisner's behavior while he was treating plaintiff; the problem was that various discrete silos within the VA organization housed the information. But the VA should have collected the reports and complaints in a centralized manner that would have brought Wisner's wide-spread actions to the attention of decision-makers in a far more effective and timely manner. The VA violated its own policies by failing to implement a centralized reporting mechanism, and this violation renders unpersuasive any argument that Wisner's conduct was not foreseeable because the right people did not know about it.[5]

**B.      Whether Wisner's Actions Were Taken "In Furnishing Medical Care"**

33. The findings in this section address the question whether Wisner's actions were taken "in furnishing medical care." This phrase comes from 38 U.S C. § 7316(f). Wisner's job duties included conducting genital exams. As noted previously, every genital examination occurred within the context of a longer medical appointment. Wisner had mixed motives. Based on Wisner's notes, three of plaintiff's genital examinations were

---

[4]   At plaintiff's last documented medical appointment, Wisner did not conduct a genital examination because plaintiff declined to submit to one. Wisner's clinic note for the appointment documents, for the first time, Wisner discussing plaintiff's narcotics usage as excessive. Wisner made this note even though he had continued to increase plaintiff's narcotic medications over the years and despite receiving the note from Dr. Aron in March 2012 expressing concern that plaintiff was exhibiting drug-seeking behavior. From this curious and late decision to document concerns about plaintiff's medication practices, the court infers that Wisner, in fact, did tie plaintiff's prescriptions to his willingness to allow Wisner to conduct genital exams. This reinforces and validates plaintiff's belief that Wisner had "quid pro quo" interactions with plaintiff; plaintiff's prescriptions were dependent on Wisner's ability to conduct a genital exam.

[5]   The VA doesn't make this argument overtly. Instead, throughout this litigation, the VA has urged the court to take an overly narrow view of foreseeability—looking exclusively at the nature of the employment and the duties related to it. Respectfully, the court holds that the analysis requires more than a mere review of the job title and its duties. The court's view is consistent with the Tenth Circuit's use of the "*O'Shea* factors," as identified and applied later in this Memorandum and Order. (*See* pp. 21–25 of this Order.)

medically justified.  One was discretionary.  And failing to wear gloves or conducting a needlessly lengthy exam did not convert otherwise legitimate medical care to something that did not qualify as medical care.

34. On this point, the court finds the testimony of defendant's expert, Jeffrey Nicholson, unpersuasive and unhelpful.[6]  Mr. Nicholson opined that when Wisner's intent changed from practicing medical care to committing criminal activity, he ceased providing medical care.  But the court finds this theory unrealistic, illogical, and unsupported.  This on-again-off-again test advocated to define when a medical provider is practicing medicine relies far too heavily on subjective measurements of intent.  It also can lead to absurd results.  For example, during a single medical appointment Mr. Nicholson's test would allow a practitioner's intent to change multiple times within an hour or less.  Mr. Nicholson admitted that his theory had not been peer-reviewed, and the court rejects it.

35. The court finds that Wisner's acts, even when improper, were taken "in furnishing medical care."

**C.    Findings About Plaintiff's Medical Malpractice Claim**

36. Before seeing Wisner for the first time, plaintiff had a service-connected disability rating of 80%, for PTSD and lumbosacral spine degenerative arthritis.  Plaintiff also had opiate and other addiction problems.

37. Failing to wear gloves when conducting a genital exam is a deviation from the standard of care.

---

[6]    For this trial, the court received as evidence the testimony of Mr. Nicholson from the previous trial with Aaron Leininger.  The parties stipulated to this procedure, preserving the objections made in the prior trial, as well.

38. Wisner deviated from the standard of care at least nine times, committing malpractice when he conducted genital exams of plaintiff without wearing gloves.

39. These deviations arose out of the scope of Wisner's job duties.

40. Wisner also deviated from the standard of care when he performed unnecessary genital exams of plaintiff on March 11, 2011; October 13, 2011; February 24, 2012; March 20, 2012; and April 24, 2012.  All of these deviations arose from the scope of Wisner's job duties.

41. The genital examinations on the following dates did have some medical justification: June 1, 2011; November 26, 2012 (Dr. Kelley testified that an exam on this visit was discretionary); May 16, 2013; and March 20, 2014.  But the standard of care requires that healthcare providers make the genital exam as brief as possible—something Wisner never honored.  He thus deviated from the standard of care for a second reason by conducting needlessly lengthy genital exams.

42. A genital exam lasting from 30 seconds to one minute falls within the standard of care, but Wisner's exams exceeded this length—deviating from the standard of care.

43. Still, genital examinations can serve a medical purpose, even if they deviate from the standard of care.  And, certainly, some portions of the medical care Wisner provided plaintiff pursued a valid medical purpose:  to provide diagnostic care.

44. Wisner's deviations from the standard of care, along with other deviations not specifically listed here, harmed plaintiff.

45. Wisner's deviations from the standard of care have long range, long-term consequences for patients like plaintiff.  They can produce in distrust, anger, humiliation, shame,

embarrassment, and emotional distress.  These results are consistent with the injuries that plaintiff credibly testified he has suffered since his encounters with Wisner.

46. The court does not find credible Mr. Nicholson's theory that the standard of care evaporated based on Wisner's contemporaneous intent.  More specifically, the court does not accredit Mr. Nicholson's view that the standard of care applied until Wisner's genital exam began to exceed the length of time of an acceptable exam—*i.e.*, it essentially evaporated the moment when Wisner developed sexual curiosity or derived sexual pleasure from the exam.  The court found this testimony unpersuasive, illogical, and not based on a sound, peer-reviewed theory.

47. The court also rejects Mr. Nicholson's theory that a criminal act cannot amount to medical malpractice.  As Dr. Kelley testified, a breach of the standard of care and a criminal act may occur, or co-exist in the same moment.  A tortfeasor's exposure to criminal liability does not foreclose a finding that his wrongdoing also violated the professional standard of care.  The court found this testimony by Dr. Kelley logical and credible.

**D.**    **Damages**

48. The court finds that plaintiff unquestionably sustained additional PTSD because of his encounters with Wisner.  In reaching this finding, the court finds testimony about the following facts credible and significant:

a.   Plaintiff described to Dr. Peterson what happened with Wisner as "the worst [thing] that ever happened to him."  Plaintiff already had severe, well-documented PTSD from combat when he began seeing Wisner for treatment.  Dr. Peterson opined that Wisner's actions derailed treatment of plaintiff's combat-related

PTSD treatment at the VA.  Also, Dr. Peterson opined credibly that Wisner's actions worsened plaintiff's PTSD.

b.   In short, it was traumatic for plaintiff to experience a second traumatic event while being treated for his combat-related PTSD.

c.   Wisner's actions were particularly damaging to plaintiff because plaintiff believed he could trust Wisner while getting treatment for his mind and body.  Plaintiff was particularly vulnerable to Wisner's breach of trust because of what Marines are taught:  never quit, be weak, cry, or appear subservient.  But Wisner skillfully manipulated plaintiff's sense of trust against him—grooming him that the VA was safe, that they were battle buddies, and that Wisner was an officer who would take care of him.  Once plaintiff realized that Wisner had manipulated him, plaintiff felt humiliated, emasculated, weak, helpless, and even more disabled.  Plaintiff's self-esteem was destroyed, and plaintiff lost his ability to perform sexually.  Wisner's actions "killed [plaintiff's] spirit."  Plaintiff told Dr. Peterson that he suffered "ego death" after Wisner, meaning that plaintiff, at his core, was injured and a part of him died.  Plaintiff feels "broken" by Wisner's actions, "nullified as a person."

d.   Because of Wisner's conduct, plaintiff developed psychosomatic problems.  This means that plaintiff suffered enough distress that he manifested his psychological stress through physical symptoms such as difficulty achieving an erection.  Plaintiff told Dr. Peterson that he didn't feel strong and desirable as a man.

e.   Plaintiff himself testified credibly that, post-Wisner, he has suffered shame-based self-condemnation, ongoing embarrassment, worsened depression, and feelings of

helplessness—to name just a few aspects of his harm.  He feels a sense of loss
caused by Wisner and the VA.

f.   After Wisner, plaintiff developed suicidal ideation.  He reported suicidal ideation
at least four times a month.

g.   When plaintiff received the letter from Agent Baker about Wisner's actions,
plaintiff realized that he had been manipulated.  Plaintiff didn't know how to deal
with the physical and psychological pain caused by the letter, so he self-
medicated.  He testified that he didn't want to spend a moment of his waking life
sober because the pain was too great.  Plaintiff's drug use escalated; he used
opiates and benzodiazepines to mask when he was feeling.  Before Wisner,
plaintiff felt that he was starting to heal, but Wisner "undid all of it," and plaintiff
unraveled.  Plaintiff blames himself.

h.   Although plaintiff, by the time of trial, had been sober for nearly 18 months,
plaintiff feels his sobriety is fragile.[7]

49. The court finds credible plaintiff's assertion that requiring him to return to the VA for
psychotherapy is unreasonable and unlikely to succeed.  In reaching this finding, the
court finds testimony about the following facts credible and significant:

a.   Plaintiff has returned to the VA for treatment post-Wisner.  But plaintiff has no
other health insurance and doesn't have another choice; he can't afford to go

---

[7]   Defendant's posttrial briefing focuses heavily on plaintiff's current state of sobriety.  According to defendant,
any damage from Wisner's actions is limited in scope and time because plaintiff testified that he's now "the best
that he's been in 20 years."  Defendant points to plaintiff's current job as evidence of his recovery (even though
plaintiff is rated at 80% disability, with compensation at 100% because he has been determined unemployable).
The court commends plaintiff for taking important steps to battle his addictions, improve his mental health, and
rejoin the workforce.  The question whether plaintiff remains "unemployable" is not before this court.  But even
with his recent advancement, the court finds credible plaintiff's raw acknowledgement that his sobriety is
fragile.  Unfortunately, plaintiff's history underscores this fact.  And while the court hopes that plaintiff can
continue his current positive trend, plaintiff's continued recovery is not an assumption that the court must make.

anywhere else for care.  Plaintiff returned to the VA because he doesn't want to struggle with "this stuff" forever.  Plaintiff has been unable to engage in meaningful treatment at the VA, but has been able to tolerate the VA to maintain minimal functioning.

b.  At the VA, plaintiff has not had any consistency with providers except Dr. Black, who treated plaintiff for five years.  Plaintiff has had 137 different mental healthcare providers at the VA.  But even after five years with Dr. Black, plaintiff did not talk with Dr. Black about much of what he testified to in court—things that he shared only because he was under oath.  Dr. Black is now leading a program in Topeka, Kansas, and is not available to see plaintiff one-on-one anymore.

c.  Plaintiff's earlier relationship with Dr. Black was built and predicated on trust, and now plaintiff does not trust the VA with his care.  Plaintiff doesn't feel safe there, provided for, or looked after.

d.  Plaintiff's testimony that the VA can't provide him with effective mental health treatment is supported by Dr. Peterson's testimony that a person cannot have a therapeutic alliance for psychiatric treatment of severe or complex trauma with a healthcare system that already has "betrayed" him, or a healthcare system that he hates.

e.  Plaintiff told Dr. Peterson that he wouldn't be able to forgive Wisner or the VA. Dr. Peterson credibly explained that because plaintiff couldn't forgive, any treatment at the VA would fail.

50. The court also finds largely credible plaintiff's assertion that he can't return to the VA for his general healthcare—at least not until a significant amount of time has passed and plaintiff has undergone years of therapy.  In reaching this finding, the court finds plaintiff's testimony about the following facts credible and significant:

    a.  To ask plaintiff to go to the VA is to ask him to return to the place of his repeated abuse.

    b.  The whole reason a veteran goes to the VA is because it is intended to provide a safe place where veterans can go and find a sense of safety and community.  It also is intended to be a place for brotherhood.  But plaintiff does not feel safe or protected at the VA.  Plaintiff may not ever trust the VA with his medical care again.

    c.  Now, returning to the VA is a triggering experience for plaintiff because it involves the same waiting room, hallway, exam rooms, and pharmacy window.

    d.  For example, plaintiff has an appointment at the VA in February, but he does not intend to go because the appointment is in the same building, the same clinic, and, possibly, the same exam room where Wisner abused him.

51. The court finds, however, that plaintiff's inability to return to the VA for medical care has a reasonable limit.  It is more likely than not that plaintiff, through extensive and effective psychotherapy and medication, can overcome his traumatic experiences with the VA.  It's also more probable than not that that plaintiff can accomplish this recovery before he reaches age 65.  But based on plaintiff's credible testimony about his state of mind, the court believes that plaintiff faces a long and difficult road and he is unlikely to find a straight passage down it.  The court cannot say with any level of certainty that

plaintiff will recover to a degree that he could begin to use his VA health benefits again anytime soon—particularly when Dr. Peterson testified that plaintiff will need to continue psychotherapy indefinitely.  But the court does find by a preponderance of evidence that plaintiff will recover to the extent that, by age 65, he can begin using the VA's medical services again by the time he becomes eligible for Medicare.

52. Dr. Peterson recommends the following treatment for plaintiff, with the need for the treatment specifically arising from Wisner's actions:

    a.   four classes of psychiatric medication, indefinitely;

    b.   prolonged exposure therapy and cognitive processing therapy; and

    c.   monthly psychotherapy appointments for one-to-two years, and then quarterly for the rest of his life, at a cost between $175–$300 per session.

53. The court finds Dr. Peterson's treatment recommendations medically reasonable and appropriately tied to Wisner's conduct.

54. Dr. John Ward, plaintiff's expert witness specializing in economics, testified that the total present value of the PTSD treatment recommended by Dr. Peterson is $429,405.

55. Dr. Ward was asked to assume that plaintiff could never return to the VA for healthcare and to calculate the present value of the replacement cost of plaintiff's VA health benefits.  To calculate this cost, Dr. Ward found the insurance plan that would provide benefits most similar to those provided by the VA.  He then calculated the total cost, including deductibles and premiums for health, dental, and vision insurance from plaintiff's current age to age 65.  This value is $667,659.

56. Dr. Ward then calculated the deductibles and cost of Medicare parts A, B, D, and F from age 65 to plaintiff's life expectancy of 78.35.  That value is $250,958.

57. The total for the three elements of economic damages calculated by Dr. Ward is $1,348,022.

## Conclusions of Law

**A.     Wisner's Actions Were Within the Scope of His Employment**

1. The United States is liable under the FTCA only for tortious acts committed by its employees while "acting within the scope of [their] office or employment."  28 U.S.C. § 1346(b)(1).

2. The court determines "scope of employment" by the law of the place where the allegedly tortious act occurred—in this instance, Kansas.  *Fowler v. United States*, 647 F.3d 1232, 1237 (10th Cir. 2011); *see also* 28 U.S.C. § 1346(b)(1).

3. A Kansas employee acts within the scope of employment when (1) he performs services for which he has been employed, or (2) he does anything "reasonably incidental to [his employment]."  *O'Shea v. Welch*, 350 F.3d 1101, 1103 (10th Cir. 2003) (quoting Pattern Instructions Kansas 3d 107.06; *Williams v. Cmty. Drive-In Theater, Inc.*, 520 P.2d 1296, 1301–02 (Kan. 1974)).[8]

---

[8] The court notes that the Kansas Judicial Council has amended the Pattern Instructions Kansas 3d since *O'Shea* cited it.  The Pattern Instructions Kansas is now in its fourth edition.  Much of the language quoted in *O'Shea* has been omitted from the current model instruction.  In the fourth edition, the model instruction simply states, "The scope of employment is the complete range of activities an employee is authorized to perform and those an employee might reasonably be expected to perform while carrying out the business of the employer."  But the Comment to the revised 107.06 discussed *O'Shea* with apparent approval.  Moreover, the Kansas Supreme Court relied on the second edition of 7.04 (which became 107.06 in the third and fourth editions) in several "scope of employment" cases.  *See, e.g.*, *Williams*, 520 P.2d at 1301–02; *Commerce Bank of St. Joseph, N.A. v. State*, 833 P.2d 996, 999 (Kan. 1992).  More recently, the Kansas Court of Appeals cited *Williams* and *Commerce Bank* for the "scope of employment" standard, using the identical language from the second and third editions of the model instruction, but attributing the language to the Kansas Supreme Court itself instead of the older pattern jury instructions.  *Farmers Bank & Trust v. Homestead Cmty. Dev.*, No. 120,671, 2020 WL 5849345, at *15 (Kan. Ct. App. Oct. 2, 2020).  The Comment to the fourth edition of 107.06 also cites *Williams* and *Commerce Bank*, again with apparent approval.  Given this context, the court determines that the language in *Williams* and *Commerce Bank* remains a valid expression of the Kansas test for determining whether conduct is within the scope of employment.  The court concludes that the guidance in *O'Shea* remains relevant and useful for evaluating employees' conduct.

4.  As reiterated in *O'Shea*, the test does <u>not</u> ask whether the employer "expressly authorized or forb[ade]" the conduct.  350 F.3d at 1103 (quoting Pattern Instructions Kansas 3d 107.06).

5.  Instead, the controlling test asks whether the employer should have "fairly foreseen" the conduct "from the nature of the [employment] and the duties relating to it."  *Id.* (quoting Pattern Instructions Kansas 3d 107.06); *see also Commerce Bank of St. Joseph, N.A. v. State*, 833 P.2d 996, 999 (Kan. 1992).

6.  Applying this test, the evidence shows that the VA should have fairly foreseen Wisner's tortious conduct.  Indeed, the VA did foresee it.  Multiple patients had complained to the VA about Wisner's conduct while he was treating plaintiff.  And Wisner was in the healthcare business—one where the risk for patient abuse is widely recognized and the VA has issued a variety of directives designed to minimize that risk.  Wisner's duties included meeting one-on-one with patients in closed-door examination rooms.  He engaged in full-body exams and asked intimate and probing questions.  All of Wisner's conduct was well within the scope of his employment.

7.  In addition to this general determination, the parties agree that the "slight deviation" test, *O'Shea v. Welch*, 350 F.3d at 1106, applies to determine whether an employee's conduct was "reasonably incidental" to his employment—thereby rendering the conduct within the scope of employment.  The *O'Shea* case certainly involved different facts than this one, but it does provide helpful guidance about how Kansas determines which actions are reasonably incidental to employment, making the actions within the scope of employment.

8.  "Application of the slight deviation analysis allows for more flexibility and accuracy in the application of the law to each fact scenario.  The Kansas pattern jury instruction[] . . . does not express a bright-line rule but instead illustrates a type of slight deviation rule which requires a determination of what is reasonably incidental to employment and what conduct should have been fairly foreseen."  *Id.*

9.  The slight deviation test allows an employee to pursue "dual purpose ventures" without wholly departing from the scope of employment.  *Id.* at 1107.  In using the phrase "dual purpose ventures," the Tenth Circuit cited the following language from a California appellate court case to help explain the term:  "Where the employee may be deemed to be pursuing a business errand and a personal objective simultaneously, he will still be acting within the scope of his employment."  *Id.* (citing *Felix v. Asai*, 237 Cal. Rptr. 718, 722 (Cal. Ct. App. 1987)).

10. "An employee does not cease to be acting within the course of his employment because of an incidental personal act, or by slight deflections for a personal or private purpose, if his main purpose is still to carry on the business of his employer.  Such deviations which do not amount to a turning aside completely from the employer's business, so as to be inconsistent with its pursuit, are often reasonably expected and the employer's assent may be fairly assumed."  *Id.*

11. Under Kansas law, these factors control the analysis whether an employee has engaged in a slight or substantial deviation:  (1) the employee's intent; (2) the nature, time, and place of the deviation; (3) the time consumed in the deviation; (4) the work for which the employee was hired; (5) the incidental acts reasonably expected by the employer; and (6)

the freedom allowed the employee when performing his job responsibilities. *Id.* at 1108 (citation omitted).

12. Applying the court's factual findings, the court concludes that Wisner engaged in a slight deviation from his employment when he abused plaintiff, his patient. Specifically, his intent was mixed; he sought both to conduct thorough examinations as well as satisfy his sexual curiosity. The deviations took place within the context of medical examinations that generally lasted about 30 minutes, in a medical exam room during regular clinic hours. The deviations themselves lasted two minutes or less, but Wisner properly could have devoted as much as one minute of that time to a proper genital exam. Wisner was hired to physically examine patients, which would include genital and rectal examinations when medically recommended. The VA received many complaints about Wisner's practices while he was seeing plaintiff as a patient, making his deviations foreseeable. Moreover, the VA was well aware of the risks of patient abuse, rendering it reasonable to expect acts of sexual abuse could occur if it exercised legally inadequate supervision—which it did. Wisner was given wide latitude and freedom to perform his job responsibilities. He was the only primary care provider in a clinic with as many as 1,000 veteran patients. Although the VA was required to devote oversight to his patient interactions, the evidence shows that it neglected to review his activities.

13. Applying the Kansas scope of employment test, the court concludes that Wisner acted within the scope of his employment, or reasonably incidental to it, when he conducted improper and unnecessary genital examinations on plaintiff. The VA may therefore be liable under the FTCA, absent some other bar to recovery.

B.    **The VA Immunity Statute Applies to Plaintiff's Claims**

14. The FTCA does not waive sovereign immunity for claims arising out of a battery.  28

U.S.C. § 2680(h) (exempting from its waiver "[a]ny claim arising out of assault, battery,

false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander,

misrepresentation, deceit, or interference with contract rights").

15. But there is also a statutory "exception to the exception" established in § 2680(h).

16. The VA Immunity Statute allows a remedy against the United States under the FTCA for

damages arising from providing medical services by health care employees of the VA

under 38 U.S.C. § 7316(a)(1), (f).  *Ingram v. Faruque*, 728 F.3d 1239, 1245–46 (10th

Cir. 2013) ("'[Section] 2680(h) does not bar application of the FTCA to [intentional] tort

claims arising out of the conduct of VA medical personnel within the scope of' 38 U.S.C.

§ 7316(f).") (citation omitted).

17. The Tenth Circuit has explained the rationale behind the VA Immunity Statute:  "In some

instances, State law characterize[d] an act of medical malpractice as an intentional tort,

leaving VA medical personnel potentially liable for an action for which the law intends

the Government to assume liability."  *Franklin v. United States*, 992 F.2d 1492, 1500

(10th Cir. 1993) (citing H.R. Rep. No. 100-191, 100th Cong., 2d Sess. 19 (1988),

*reprinted in* 1988 U.S.C.C.A.N. 432, 450).

18. The plain language of this exception-to-the-exception statute, however, does not confine

the statute's waiver to claims of medical battery:

> Although Congress was specifically concerned with medical battery, the
> remedy available under § 7316(f) is not limited to battery.  Instead, by
> rendering 28 U.S.C. § 2680(h) inapplicable, § 7316(f) allows the United
> States to be sued for "assault, battery, false imprisonment, false arrest,
> malicious prosecution, abuse of process, libel, slander, misrepresentation,
> deceit, or interference with contract rights," . . . .  Thus, in the context of

> VA health care employees providing medical care or treatment, § 7316(f)
> provides a remedy under the FTCA for claims of intentional torts, including
> false arrest and false imprisonment.

*Ingram*, 728 F.3d at 1249.

19. To apply, § 7316(f) requires only that a battery be committed by VA personnel "in
furnishing medical care or treatment."  38 U.S.C. § 7316(f).[9]  Now, in the full evidentiary
context of a trial, the court recommits to the gravamen of its earlier rulings:  the VA
Immunity Statute's plain language controls, and it does not limit immunity to claims of
medical battery.  *Doe A.L. v. United States*, No. 16-2627, 2020 WL 59861, at *4 (D. Kan.
Jan. 6, 2020); *see also Doe S.B. v. United States*, No. 16-2575, 2020 WL 59646, at *4 (D.
Kan. Jan. 6, 2020); *Doe P.M. v. United States*, No. 16-2315, 2020 WL 59645, at *4 (D.
Kan. Jan. 6. 2020); *Doe D.P. v. United States*, No. 16-2267, 2020 WL 59640, at *4 (D.
Kan. Jan. 6, 2020).

20. As noted in the Findings of Fact, Wisner's improper actions were taken while he
furnished medical care or treatment.  They occurred during medical appointments, and
while Wisner conducted medical and genital exams as part of his duties as a PA.  Some
times, justification existed for conducting genital examinations—although Wisner
conducted them improperly, without gloves.  The court once again rejects defendant's

---

[9]   The complete language of the statute requires that the negligent or wrongful act or omission be committed "in
furnishing medical care or treatment . . . while in the exercise of such person's duties in or for the
Administration."  Defendant now—for the first time—argues that the last part of subsection(f) ("while in the
exercise of such person's duties") offers another reason for rejecting plaintiff's position.  According to
defendant's newest argument, plaintiff argues that anything that happened during a medical appointment falls
under § 7316(f).  And, defendant continues, plaintiff's reading "violates the maxim that a Court must construe a
statute to give effect to all of its provisions."  (Doc. 119, at 7.)  But the court doesn't believe that plaintiff argues
any act during a medical appointment would qualify under § 7316(f).  Rather, Wisner's tortious acts fall under
the statute because they were part of more extensive medical examinations.  Further, they occurred during
Wisner's exercise of his duties for the Veterans Administration—which, in Wisner's case, include providing
medical care and treatment.  The last part of the statute does not render the "in furnishing medical care"
language useless.

position that "sexual molestation" can never qualify as "medical care or treatment." (Doc. 119, at 6, 8.)  Defendant's argument artificially compartmentalizes Wisner's behavior in a fashion that contradicts the evidence.  Its argument contradicts the actual, real world evidence showing how, when, and where Wisner committed his tortious acts. In so doing, defendant improperly simplifies the analysis and glosses over the plain language of the statute.  When Wisner touched plaintiff, he did so within the larger context of a medical appointment and an otherwise-appropriate physical examination. The court concludes that Wisner was engaged in the process of furnishing medical care when he committed his wrongful acts.

21. Defendant now cites a recent Eleventh Circuit case to support its argument, *Knezevich v. Carter*, 805 F. App'x 717 (11th Cir. 2020), decided since the court's earlier orders on this subject.  In *Knezevich*, the plaintiff brought a defamation claim against his VA doctor because, while discussing a surgical procedure with the plaintiff, the VA doctor yelled into the hallway that the plaintiff was threatening him.  A nurse already had taken plaintiff's vital signs, and the doctor had drawn the shape of an incision on the plaintiff's chest when the doctor's outburst occurred.  The Eleventh Circuit separated the "harm-causing conduct"—the doctor's hallway defamation of the plaintiff—from the rest of the medical appointment, noting that checking vital signs and drawing the incision's shape were "not what allegedly caused [the plaintiff] harm."  *Id.* at 725.

22. *Knezevich* differs from this case.  The tort alleged in *Knezevich*—defamation—had a distinct beginning and end and was easily separable from the medical care provided by the doctor.  In contrast, in this case, the edges of the boundary separating Wisner's proper medical care from his wrongful conduct are far less distinct.  At times, a full genital

examination was warranted as part of plaintiff's medical care.  It was never appropriate to conduct that exam without gloves, but performing the exam itself still had a valid basis in providing medical care.  Wisner just executed it improperly.  The lines between what was an intentional tort and what was not an intentional tort are much more muddled than in *Knezevich*.

23. For these reasons, the court concludes that the rationale of *Knezevich* does not apply to this case.  It does not justify modifying the court's earlier rulings defining the boundaries of the operative phrase—"in furnishing medical care or treatment."

24. Because Wisner's improper actions were committed "in furnishing medical care or treatment," the VA Immunity Statute applies and, on these facts, waives the sovereign immunity of the United States.

**C.      Plaintiff Has Met the Elements of His Medical Malpractice Claim**

25. Because plaintiff's medical malpractice claim has survived defendant's various challenges, the court now must evaluate whether plaintiff has carried his burden to prove the elements of his claim.  These elements are (1) a duty to meet or exceed a certain standard of care; (2) a breach of that duty; and (3) the breach proximately caused the patient's injury.  *Nold v. Binyon*, 31 P.3d 274, 285 (Kan. 2001); *Wozniak v. Lipoff*, 750 P.2d 971, 975 (Kan. 1988).[10]

26. *First:  Duty.*  Plaintiff presented evidence—by way of expert testimony—establishing the standard of care.  Gloves are always required when conducting genital or rectal examinations under the relevant standard of care.  Genital and rectal examinations were

---

[10]    The court only considers the merits of this claim with respect to the actions of Wisner himself as the tortfeasor.  While the court has considered the actions or inactions of other VA actors for purposes of its foreseeability analysis and other contextual purposes, plaintiff only preserved an actual claim for recovery based on Wisner's actions.

not required at every visit, and typically they should take 30 to 60 seconds.  Wisner, as a PA, had a duty to comply with this standard of care.

27. *Second:  Breach.*  Plaintiff presented evidence showing that Wisner breached that standard of care.  Specifically, every time Wisner conducted a genital examination without using gloves, he violated the standard of care.  He also conducted a number of genital examinations that were unnecessary.  Also, each of the genital exams lasted longer than appropriate under the standard of care.

28. *Third:  Causation of Injury.*  Plaintiff also presented evidence establishing that he suffered harm as a proximate result of Wisner's breach of the standard of care.  The court will address the extent of the harm in light of plaintiff's pre-existing conditions later in this Memorandum and Order.  But, for now, the court does find that Wisner's acts caused plaintiff harm independent of his pre-existing conditions.

29. Plaintiff also seeks to recover on an intentional infliction of emotional distress claim.  But the court already has determined that plaintiff is entitled to recover from the VA on his medical malpractice claim.  Any recovery for intentional infliction of emotional distress would duplicate plaintiff's malpractice claim, so the court need not address the claim further, other than to note this point:  To the extent that plaintiff is still trying to bring this claim against the VA for actions (or inactions) by Wisner's supervisors, he may not do so.  Plaintiff administratively exhausted claims solely for Wisner's personal conduct.  "[A]lthough a plaintiff's administrative claim need not elaborate all possible causes of action or theories of liability, it must provide notice of the facts and circumstances underlying the plaintiff's claims."  *Estate of Trentadue v. United States*, 397 F.3d 840, 853 (10th Cir. 2005) (internal quotations omitted).  Plaintiff did not mention or otherwise

reference any action or inaction by Wisner's supervisors (or the VA as an entity) in his administrative claim.  For an FTCA claim, each individual claimant must exhaust his individual claims prior to filing suit.  *Haceesa v. United States*, 309 F.3d 722, 734 (10th Cir. 2002).  The court therefore determines that plaintiff has failed to exhaust an intentional infliction of emotional distress claim based on the actions of anyone other than Wisner.  And even if the court were to consider the merits of an intentional infliction of emotional distress claim, it would limit that claim to actions by Wisner himself.

30. Because plaintiff has shown that all three elements of a medical malpractice claim are met, the court next addresses the last element—the amount of damages plaintiff sustained by Wisner's conduct.

**D.     Damages**

31. Plaintiff requests economic damages in the amount of $1,348,022—the value of recommended treatment, plus the cost of private healthcare equal to what plaintiff could receive for free from the VA.

32. Plaintiff also requests non-economic damages in the total amount of $5,392,088, broken out in this fashion:  $1,348,022 for pain; $1,348,022 for suffering; $1,348,022 for disability (PTSD); and $1,348,022 for mental anguish.

33. A plaintiff may recover for medical expenses and economic loss he is reasonably expected to suffer in the future.  Pattern Instructions Kansas 4th 171.02.  And a plaintiff may recover noneconomic loss for "pain, suffering, disabilities, disfigurement and any accompanying mental anguish."  *Id.*

34. Kansas law allows a plaintiff to recover for aggravation or activation of a preexisting condition.  Pattern Instructions Kansas 4th 171.43 ("[I]f the plaintiff had a preexisting

physical ailment, defect or disability and you find this condition was aggravated or made active causing increased suffering or disability, then the plaintiff is entitled to recover for such increased suffering and disability.").

35. Plaintiff undoubtedly suffered from PTSD and drug addiction before he ever saw Wisner. The court heard persuasive testimony that plaintiff's condition was aggravated after he learned that Wisner had manipulated him for sexual gratification.  Likewise, the court accredits plaintiff's evidence that plaintiff continues to suffer from his aggravated PTSD today.  Plaintiff deserves to recover damages in some amount.  The court thus examines, first, whether any economic damages are warranted, and, if so, how much.  The court then turns to non-economic damages.

**Economic Damages**

36. Plaintiff requests two kinds of economic damages:  value of recommended treatment for his PTSD and anticipated costs of private healthcare, assuming he never returns to the VA for care.  The court concludes that the evidence supports an award allowing plaintiff to seek treatment—outside the VA—for the PTSD, depression, anxiety, and other mental and addiction problems caused by Wisner.  In this case, the evidence further supports an award equivalent to private healthcare until age 65.

37. Allowing plaintiff to seek treatment for his PTSD and related problems, *outside* of the resources provided by the VA, is supported by the evidence about the nature of harm caused by Wisner's conduct.[11]  Requiring plaintiff to return to the VA for treatment

---

[11]   The court heard evidence—over plaintiff's repeated objections—about another option for healthcare, the VA Choice program.  Plaintiff contends that evidence of availability of benefits through the VA Choice program violates the collateral source rule.  The court allowed testimony about VA Choice, but advised the parties that it would consider whether to strike the evidence based on the collateral source rule at the time it made its Rule

necessitated by wrongdoing inflicted on him by one of the VA's providers is both unjust and illogical.  Also, here, it is likely to be futile.  The court accepts the expert testimony that plaintiff is unlikely to open up to or trust VA providers to discuss mental health issues caused by one of their former colleagues.  The fact that plaintiff barely opened up to Dr. Black after five years of treatment supports this conclusion.  The VA's current restrictions on psychotherapy appointments (plaintiff testified that he could receive just 15 minutes of treatment every 90 days) will prove unproductive for plaintiff, as will the VA's practice of rotating doctors.  The evidence unmistakably established that plaintiff needs to develop a long-term therapeutic relationship with a provider who he can trust. The court heard credible evidence that plaintiff is unlikely to form such a relationship at the VA.

38. The court further accepts that plaintiff feels betrayed by the VA and cannot forgive the VA because of Wisner's conduct.  Dr. Peterson explained that, under these circumstances, plaintiff could not establish the necessary therapeutic alliance.  Plaintiff credibly testified under oath that he will seek the treatment recommended and that he wants to improve his mental health.  The court believes that plaintiff is sincere; despite

---

52(a) decision.  The court now finds that evidence of the possibility of benefits through the VA Choice program is not barred by the collateral source rule.

This rule precludes admission of evidence of other benefits available to a plaintiff, offered to benefit a tortfeasor by reducing its liability for damages.  *Martinez v. Milburn Enters., Inc.*, 233 P.3d 205, 221 (Kan. 2010).  Here, it is not clear that the VA Choice program will always be available to plaintiff—or that it will provide benefits comparable to those provided for combat veterans at VA facilities.  The court therefore finds evidence about the program unhelpful in determining plaintiff's damages (and, in any event, inadmissible for that purpose).  But while the evidence is unhelpful, the court does find it admissible for another purpose:  plaintiff's damages model asks the court to award plaintiff money so he can secure private health insurance because he cannot return to the VA for care.  Defendant offers evidence of the VA Choice program to show that plaintiff has a viable way to continue using his VA benefits without having to return to the VA facilities where he was sexually abused.  For this purpose, the court finds evidence about the program, though admissible without offending the collateral source doctrine, unhelpful to its damage analysis.  The court's decision not to strike the evidence of the VA Choice program, in the end, does not affect the outcome of the case.

plaintiff's feelings for the VA, he has been desperate enough for help to seek treatment there. The court heard credible evidence that this treatment is valued at $429,405, and defendant adduced no contrary evidence (other than the testimony of Dr. Abrams, who believes that plaintiff's damages result from his addictions and drug abuse as opposed to plaintiff's interactions with Wisner, and that plaintiff could receive excellent treatment from the VA). The court thus awards $429,405 in economic damages.

39. Requiring the VA to pay for ongoing private healthcare is also justified by the evidence in this case. Plaintiff has adequately shown that his ability to receive necessary medical care from the VA has been compromised—and, indeed, effectively quashed. In this case, plaintiff testified credibly that he will not seek needed medical care from the VA because it is "triggering" for him to return to the place where he was molested. While Wisner was the actor, plaintiff testified that Wisner's actions have caused plaintiff to lose trust in the entire VA system. His compelling testimony, coupled with testimony from Dr. Peterson that validated plaintiff's distrust, convinces the court that Wisner's actions caused plaintiff to lose trust in the VA medical system. The evidence suggests the only time plaintiff would utilize VA services is when he faces an emergency situation and has no other choice. The court has no expectation that plaintiff would utilize the VA for necessary preventative, maintenance, and diagnostic care—potentially making his VA health benefits useless to him.

40. At first blush, this remedy seemed unusual to the court. But courts have approved similar damage awards because a prevailing plaintiff should not be forced to return time-after-time to his tortfeasor for care. *See, e.g.*, *Molzof v. United States*, 6 F.3d 461, 468 (7th Cir. 1993) ("[W]e share the reluctance of other courts addressing this issue to deny the

plaintiff the freedom to choose his medical provider and, in effect, to compel him to undergo treatment from his tortfeasor.").  The damages in those cases involved future medical expenses directly caused by the tortfeasor, which distinguishes them from this case.  But still, they provide general guidance that the court finds persuasive here: Because of Wisner's conduct, plaintiff reasonably views the VA—Wisner's former employer—as his tortfeasor.  Requiring plaintiff to accept healthcare from the VA when he cannot afford to go anywhere else would further exacerbate plaintiff's injuries.  To make plaintiff whole, he should be allowed to pursue his healthcare through providers outside the VA.  This can happen if the court awards plaintiff the value of comparable insurance to the VA benefit he earned by his combat service to the United States.

41. As noted before, the court is aware that plaintiff has returned to the VA for mental health treatment after learning of Wisner's transgressions.  But plaintiff's explanation was sincere:  He doesn't want to struggle with "this stuff" forever.  He had no other options and wanted to begin improving his mental health and fighting his addictions.  To hold that plaintiff should not have taken those admirable, small steps if he wanted to receive full economic damages is illogical.  The court declines to do so and awards plaintiff the present value of his VA health benefits through age 65, as calculated by Dr. Ward, in the total amount of $667,659.  This amount does not include Medicare costs from age 65 through plaintiff's life expectancy of 78.35 (which Dr. Ward calculated to be valued at $250,958).  The court next explains why.

42. Consistent with the court's Findings of Fact above, the court concludes that awarding plaintiff the value of VA health benefits after plaintiff becomes eligible for Medicare is not supported by the evidence.  By the age of 65, plaintiff will have had the opportunity

to make a substantial investment in his mental health—more than 25 years of private treatment, by the court's count.  And the private treatment for his mental health can continue at that point; plaintiff would only be required to go to the VA for his medical care and prescriptions.  At trial, plaintiff demonstrated a strong desire to improve his mental health and quality of life.  The evidence supports a determination that, with proper support, plaintiff can do so to a degree that continuing to fund health benefits outside the VA after age 65 is unnecessary.  The court therefore determines that plaintiff should receive the value as calculated by Dr. Ward for VA health benefits through age 65— $667,659.  An award addressing medical benefits beyond that point is too speculative to tie to plaintiff's injuries in the manner required by Kansas law.

43. Adding the lifetime PTSD life care costs to the present value of VA health benefits through age 65, the court awards plaintiff economic damages totaling $1,097,064.

### Non-Economic Damages

44. The court next turns to non-economic damages.  Plaintiff asks for compensation for four distinct injuries:  pain, suffering, disability, and mental anguish.  The court agrees that plaintiff has suffered non-economic damages.  But the court does not find that plaintiff's damages arising solely from Wisner's actions should be valued as plaintiff values them. He asks the court to award $1,348,022 for each of the four types of injury, a total of nearly $5.4 million.

45. Kan. Stat. Ann. § 60-249a requires that the trier of fact itemize the amount of non-economic damages in the categories of (1) pain and suffering, (2) disability, and (3) disfigurement, and any accompanying mental anguish.  The same statute requires the court to itemize those three categories of damages "to reflect those amounts awarded for

damages sustained to date and those awarded for damages reasonably expected to be sustained in the future."

46. Plaintiff's requested damage categories do not align precisely with the itemization required by Kansas law. Plaintiff also has not separated his request into damages to-date and future damages. But plaintiff's model provides something of a starting point and assists the court's efforts to fashion its award.

47. The court believes that plaintiff has overstepped by requesting distinct damages for (1) pain, (2) suffering, (3) disability, and (4) mental anguish. Dividing his alleged non-economic damages into these four categories provides him with a useful multiplier. But it is not grounded in Kansas law. Under the plain language and structure of § 60-249a, the court must separate non-economic damages into three categories: "(A) Pain and suffering, (B) disability, (C) disfigurement, and any accompanying mental anguish." Pain and suffering are not separated from one another. And "mental anguish" is connected by subsection with disfigurement—something plaintiff has not experienced here.[12] The court therefore finds it appropriate to limit and itemize the non-economic

---

[12] Plaintiff cites Pattern Instructions Kansas 4th 171.02 in support of his approach of itemizing damages into four categories. In fairness, the court can accept that 171.02 suggests this approach—or at least makes the appropriate approach murky. It says, "Noneconomic loss includes pain, suffering, disabilities, disfigurement and any accompanying mental anguish suffered as a result of plaintiff's injuries to date (and the noneconomic loss plaintiff is reasonably expected to suffer in the future) . . . ." The model instruction further advises, "There is no unit value and no mathematical formula the court can give you for determining items such as pain, suffering, disability, and mental anguish." The placement of punctuation in either sentence does not mirror the punctuation placement in § 60-249a. In the first sentence from 171.02, pain and suffering are separated by commas, but "any accompanying mental anguish" is not separated from disfigurement by a comma—either a conscious decision not to use an Oxford comma, or an indication that mental anguish is only considered as it accompanies disfigurement. In the second sentence from 171.02, disfigurement is not mentioned, and mental anguish is listed as a fourth item. The court will not speculate whether these slight changes from § 60-249a were intentional or unintentional. It seems the better approach to follow the language and structure of the statute, as opposed to the language of the pattern jury instruction.

damages into the two categories actually supported by the evidence:  (1) pain and suffering (to-date and future) and (2) disability (to-date and future).

48. To say the least, non-economic damages are notoriously difficult to quantify.  In Kansas, when courts instruct juries how to assess damages for pain and suffering, they typically acknowledge, "There is no unit value and no mathematical formula the court can give you for determining items such as pain, suffering, disability, and mental anguish.  You must establish an amount that will fairly and adequately compensate the plaintiff.  This amount rests within your sound discretion."  Pattern Instructions Kansas 4th 171.02.

49. The trier of fact here is the court—not a jury.  When assessing non-economic damages, the court follows the guidance of the Kansas Pattern Instruction and the counsel of the Kansas Supreme Court.  It has explained, "'Pain and suffering have no known dimensions, mathematical or financial.  There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents.  For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence.'"  *Kan. Malpractice Victims Coal. v. Bell*, 757 P.2d 251, 260 (Kan. 1988), *disapproved of on other grounds by Bair v. Peck*, 811 P.2d 1176 (Kan. 1991) (citation omitted); *Tucker v. Lower*, 434 P.2d 320, 327 (Kan. 1967) ("There is no exact yardstick by which pain and suffering can be measured and the various factors involved are not capable of proof in dollars.  For this reason the only standard for evaluation is such amount as twelve reasonable persons estimate to be fair

compensation when that amount appears to be in harmony with the evidence and arrived at without passion or prejudice."). While the standard isn't particularly satisfying, the court is mindful of two things. One, trying to define a workable measure for this category of damages is a daunting task. Two, the Kansas Supreme Court is in charge of the legal standards used by that state's laws. This court's job is to follow those state law standards when, as they do here, they control a particular aspect of a federal lawsuit.

50. The caselaw reporting and reviewing jury awards of non-economic damages reports the unprecise nature of this endeavor, even within the same jurisdiction, involving the same defendant. *Compare Howsmon v. Ricci*, 1993 WL 794315 (Cal. Super. Ct. Trial Div. 1993) (reporting $325,000 jury verdict for non-economic damages after doctor negligently performed unnecessary rectal examination at physician's office, committing a sexual battery) *with Prendergast v. Ricci*, 1994 WL 847897 (Cal. Super. Ct. Trial Div. 1994) (reporting a $100,000 "general damages" jury verdict after doctor performed rectal examinations and sexually assaulted the plaintiff during the exams); *see also Elk v. United States*, 87 Fed. Cl. 70, 97 (Fed. Cl. 2009) (awarding $250,000 for pain and suffering after Army officer sexually assaulted prospective soldier during recruitment process).

51. Using this guidance, the court finds that an appropriate award for plaintiff's pain and suffering to-date is $165,000. For future pain and suffering, the court awards $50,000. For plaintiff's disability to-date, the court awards $165,000. For future disability, the court awards $50,000. These amounts (totaling $430,000) represent the value that the court—as finder of the facts—attributes to the harm caused by Wisner's conduct exacerbating plaintiff's pre-existing conditions. The record firmly establishes that

plaintiff's conditions worsened after he learned that Wisner had manipulated and sexually molested him.

**IT IS THEREFORE ORDERED** that the court finds in favor of plaintiff and against defendant.  The court will direct the Clerk of Court to enter judgment in plaintiff's favor and against defendant United States in the amount of $1,527,064.  But before the Clerk of Court enters judgment, plaintiff must resolve his case against the other outstanding defendant, Mark Wisner.  Plaintiff is therefore ordered to show cause within 14 days of the date of this Order why his claims against defendant Wisner should not be dismissed without prejudice for failure to prosecute.  If plaintiff seeks another resolution of his claims against defendant Wisner, he must identify that outcome (and provide legal authority supporting his proposal) in his response to the show cause order.

**IT IS SO ORDERED.**

**Dated this 2nd day of November, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**